# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------x
CARLOS M. SALAS and
ADA CRISTINA SALAS,

                          Plaintiffs,

           -against-

PETER E. SALAS;
DOLPHIN ADVISORS, LLC;
DOLPHIN ASSET MANAGEMENT CORP.;
DOLPHIN DIRECT EQUITY PARTNERS, LP;
and DOLPHIN MANAGEMENT, INC.,

                          Defendants.
-----------------------------------------------------------------------x

## COMPLAINT

Plaintiffs, by their attorneys, Norris McLaughlin & Marcus, P.A., for their complaint, allege, at all times material, as follows, upon knowledge where stated or at all other times upon information and belief:

### SUMMARY OF ACTION

1.      This is an action against Peter E. Salas ("Peter") and entities under his control and domination to recover damages to, and achieve equitable relief to Plaintiffs, arising out of Defendants' breaches of fiduciary duty and other mismanagement of Dolphin Direct Equity Partners, LLP, causing Plaintiffs as limited partners to lose most of their investment owing to the manipulation and intercorporate dealings of Peter Salas, as manager and controller of the various corporate entities named herein and others.

2.      The foregoing is part of Peter's broader scheme to defraud limited partners in his

investment vehicles of the value of their investments, by falsely claiming that the value of the partnerships has been burdened by "debt", which is a sham obligation created by Peter to others of his companies, which benefits him and others but deprives certain investors of the value of their interests.

## THE PARTIES

3.      Carlos M. Salas and Ada Cristina Salas ("Plaintiffs") were and are investors in Dolphin Direct Equity Partners, LP.  They are married to one another, and residents of South Carolina.

4.      Plaintiffs are the uncle and aunt of defendant Peter E. Salas.

5.      Defendant Peter E. Salas ("Peter") is currently listed on the business records of Defendant Dolphin Asset Management Corp. as having his address in the City, County and State of New York. At the time of all events and actions relevant to this action, Peter was a resident of the City, County, and State of New York.  Upon information and belief, Peter may have recently established residence in the State of Florida.  Upon information and belief, all acts alleged to have been done by him were done in the City, County, and State of New York, or in or through the offices of the Corporate Defendants in the City, County and State of New York.  Peter is the Chief Executive Officer of Dolphin Asset Management Corp.  Peter was the President and majority or sole shareholder of Dolphin Management, Inc. and controlled it.  Peter is the President and majority or sole shareholder of Dolphin Mgmt., Inc. (and/or a successor in interest thereto), and controls it.  Peter is the Chairman, Manager and sole Director of Dolphin Advisors, LLC, serving an unlimited term of office, and controls it.

6.      Dolphin Management, Inc. is a corporation formed pursuant to the laws of the

-2-

State of Delaware with its principal place of business in the City, County and State of New York. On or about December 28, 2006, Peter caused all of the interest of Dolphin Management, Inc. to be transferred to Defendant Dolphin Mgmt. Inc., a Delaware Corporation. Dolphin Mgmt., Inc. is the successor-in-interest to Dolphin Management, Inc. Upon information and belief, all acts of Dolphin Management and Dolphin Mgmt., Inc. alleged herein were performed at or through its/their New York offices. Dolphin Management and thereafter Dolphin Mgmt. acted and acts as the managing member for Dolphin Advisors, and owns a majority interest in Dolphin Advisors. In addition, Dolphin Management, and then Dolphin Mgmt., were and are a General Partner of Dolphin Direct Equity Partners, LP. (Each of these entities are referred to interchangeably as "Dolphin Management" below.)

7.     Defendant Dolphin Advisors, LLC is a limited liability company formed pursuant to the laws of the State of New York with its principal place of business in the City, County and State of New York. Dolphin Advisors is the Managing Partner of Dolphin Direct Equity Partners. Peter is the sole Director and managing member of Dolphin Advisors.

8.     Defendant Dolphin Asset Management Corp. is a corporation formed pursuant to the laws of the State of New York with its principal place of business in the City, County, and State of New York. Peter is the sole control person of Dolphin Asset Management. Upon information and belief, all acts of Dolphin Asset Management alleged herein were performed at or through its New York offices.

9.     Defendant Dolphin Direct Equity Partners, LP is a limited partnership formed pursuant to the laws of the State of Delaware with its principal place of business in the City, County and State of New York. Peter is the sole control person of Dolphin Direct Equity Partners through his exclusive control of its Managing Partner, Dolphin Advisors. Upon

information and belief, all acts of Dolphin Direct Equity Partners alleged herein were performed at or through its New York offices. (Dolphin Direct Equity Partners is sometimes referred to below as the "fund" or the "partnership".)

10.     Collectively, Peter, Dolphin Advisors, Dolphin Asset Management, Dolphin Direct Equity Partners, and Dolphin Management are referred to herein as Defendants.

11.     The Defendants other than Peter are referred to herein collectively as the "Corporate Defendants".

12.     Dolphin Management Inc. and Dolphin Asset Management Corp. have, since their inception, served as the main operating entities through which Peter has conducted his business affairs, including the ownership and management of Dolphin Advisors and Dolphin Direct Equity Partners.

13.     Employees and agents of each of the Corporate Defendants, at the direction of Peter, performed services for and for the benefit of each of the other Corporate Defendants entirely at Peter's discretion.

14.     Upon information and belief, while Peter nominally maintained separate bank accounts for each of the Corporate Defendants, he transferred funds among those accounts and those entities solely for his own benefit, without documentation, and without regard to the actual liabilities and obligations of those entities to one another.

15.     Each of the Corporate Defendants' operations were simultaneously conducted from the same, non-segregated, office space and simultaneously utilized the same, non-segregated, clerical, administrative, accounting and executive services using common equipment (computers, office furniture, etc.) in the performance of duties for all of these companies.

16.     Peter and the Corporate Defendants also utilized additional entities not named as

parties herein, including Dolphin Offshore Partners, LP, as part of his scheme to denude investors including Plaintiffs of the value of their investments in Dolphin Direct Equity Partners.

17.     Each and all of the Corporate Defendants were operated and managed under the sole dominion and control of Peter.

## JURISDICTION AND VENUE

18.     The jurisdiction of this Court over Defendants is based upon the presence of each Defendant in the State of New York, and damages exceed any statutory jurisdictional minimum threshold.

19.     All of the acts alleged herein are alleged to have occurred within the State of New York.  All Defendants at the time of the actions alleged herein regularly did and solicited business in the State of New York.  All Defendants at the time of the actions alleged herein expected or reasonably should have expected that with business and conduct would have consequences in the State of New York and derived substantial revenue from interstate commerce.

20.     Venue is properly laid in the Supreme Court of the State of New York, County of New York, as all or most of the Defendants reside in and/or maintain their principal places of business in the State, County, and City of New York.

## FACTS

21.     In the spring of 2004, Peter solicited Plaintiffs both orally and in writing to invest as limited partners in Dolphin Direct and provided them with offering documents describing the terms of investment and the strategies and governance of Dolphin Direct.

22.     On or about May 13, 2004, Plaintiffs invested $50,000 as limited partners, and executed all appropriate documentation to effectuate such investment, including entering into the limited partnership agreement for Dolphin Direct (the "Partnership Agreement") as limited partners with Dolphin Advisors and Dolphin Management as general partners and a number of other limited partners with rights parallel to Plaintiffs'.

23.     Among the rights conferred by the Partnership Agreement on Plaintiffs were the rights to receive regular accountings of Dolphin Direct's activities, the option to invest in future offerings of partnership interests every six months when Dolphin Direct solicited contributions to fund investments, the right to receive audited financial statements at a minimum every two years, and the right for their investments to be treated with the care and loyalty that are the duties of the partnership's fiduciaries: Peter, Dolphin Management and Dolphin Advisors.

24.     Regular and accurate disclosures of the activities and performance of the partnership were a particularly important right of Plaintiffs' because the partnership would continue to be offered significant investments by the general partners that Plaintiffs would need to either fund through requested capital contributions, decline to fund with the result of suffering dilution to their investment in favor of other partners who did fund any requested contribution or, if Plaintiffs and sufficient other partners all declined to fund a contribution, effectively veto any new proposed investment by the partnership.

25.     On or about June 8, 2004, Peter confirmed Plaintiffs' initial capital contribution in the amount of $50,000 and caused them to be issued a receipt therefor.

26.     In or about October 2004, Peter advised Plaintiffs in writing, through Dolphin Asset Management Corp., that "the value of [their] investment in Dolphin Direct Equity Partners, L.P. increased by 13.0% between April 15 and September 30 to $56,502." Peter transmitted to

Plaintiffs a check in the amount of $4,628.54, representing their interest in a distribution of $1,500,000 being made to limited partners as a whole.   In the same communication, Peter requested that:

> Looking forward, we ask you to consider an amendment to the limited partnership agreement that during the investment period would allow the fund to retain and reinvest cash receipts from dividends, interest and bond and note redemptions at the discretion of the managing partner. Given the initial make-up of the fund's portfolio, we expect to receive cash from dividends and interest on a regular basis; further, using short-term debt instruments will likely be a strategy that we employ in constructing long-term investments going forward.
>
>             * * *
>
> Please fill out the attached Consent to Amendment, indicating your preference, and promptly return it to our attention ...

27.     After October 2004, Defendants made no further distributions to Plaintiffs for almost 8 years.

28.     Also after October 2004, Peter sent to Plaintiffs and other limited partners from time to time letters disclosing the performance of their investments in Dolphin Direct and solicitations to invest additional amounts in Dolphin Direct.  Each of these letters was materially and intentionally misleading by, at a minimum, inflating the cumulative returns on investment calculated by Peter.   In addition, they selectively disclosed data that made it difficult or impossible for investors to discern the activities or performance of the partnership.

29.     In or about April 2005, Peter advised Plaintiffs in writing, through Dolphin Asset Management Corp., that "the value of [their] investment in Dolphin Direct Equity Partners, L.P. increased by 21.4% between October 1, 2004 and March 31, 2005 to $62,956, a return of 37.1% since inception on April 15, 2004."  The return on investment from inception was in fact much lower than 37.1%.

30.     In addition, Peter advised of Dolphin Direct's "commit[ment] to invest an

additional $10,400,000" and further advised that "your pro rata share of the requested capital contribution is $31,035, which as you know is not mandatory."

31.     In reliance on Peter's representations, Plaintiffs elected to contribute an additional $40,000.00 by two checks dated April 27, 2005. The tendered amount was larger than the requested amount of the contribution because the Partnership Agreement allowed for investors to assume unsubscribed portions of any offering by paying in a larger amount.

32.     In or about September 2005, Peter advised Plaintiffs in writing, through Dolphin Asset Management Corp., that "[w]e estimate that the value of [their] investment in Dolphin Direct Equity Partners, L.P. will have increased by approximately 14% between April 1, 2005 and September 30, 2005 to approximately $108,625, representing a return since inception on April 15, 2004 of approximately 57%." The return on investment from inception was in fact much lower than 57%.

33.     Peter further advised Plaintiffs:

> During this most recent period, the fund's general partner has invested a net additional $24.0 million on behalf of the fund. We therefore seek additional capital contributions, which contributions will be made effective as of October 1. Your pro rata share of the requested capital contribution is $71,673, but you may of course contribute less than this amount or request to contribute more than this amount.

34.     In reliance on Peter's representations, Plaintiffs elected to, and did, contribute an additional $85,000.00 by wire transfer to an account as directed by Peter.

35.     In or about May 2006, Peter advised Plaintiffs in writing, through Dolphin Asset Management Corp., that "the value of [their] investment in Dolphin Direct Equity Partners, L.P. increased by 20.4% for the six-month period ended March 31; the cumulative return since April 15, 2004 is 89.3%," and that the "valuation of [their] interests at March 31, 2006 [was]

$221,592". The return on investment from inception was in fact much lower than 89.3%. Moreover, Peter did not offer Plaintiff's the opportunity to invest in the partnership at this time despite an obligation to do so each six months that the partnership has had investment activities.

36.     From September 2005 until September 2007, Peter failed to communicate any opportunity to invest or decline to invest in the partnership to Plaintiffs despite the fact that Peter was directing the partnership to make very large investments during this period and the partnership had an obligation to offer to its limited partners, including Plaintiffs, the opportunity to invest or decline to invest equivalent amounts each six months.

37.     Each of these letters was intentionally and materially misleading in describing the performance of the Plaintiffs' investments in Dolphin Direct.  The performance of the Plaintiffs' total investment at all times was far lower than the growth rate cited in the letter because Peter deceptively described the performance of only a portion of the investment, which portion had no greater bearing on total performance, and was no easier to establish, than any other investment made by the Plaintiffs.  Moreover, Peter did not disclose that he was selectively reporting performance data, instead representing returns as comprehensive.  The sole purpose of Peter hand-picking which performance data to reveal appeared to be to induce additional investment by selectively disclosing positive performance data.

38.     In or about September 2007, Peter advised Plaintiffs in writing, through Dolphin Asset Management Corp., that Dolphin Direct Equity Partners, L.P. was "seeking additional capital contributions of $22 million to fund the investments made over the two years since the last capital contribution.... [and that their] pro rata share of the requested capital contribution is $59,879, but you may of course contribute less than this amount or request to contribute more than this amount."  Notably, in this letter Peter for the first time omitted any representations

regarding Plaintiffs returns on investment or capital account.

39.     In reliance on Peter's representations, Plaintiffs elected to and did contribute an additional $70,000.00 by check dated on or about October 11, 2007.

40.     After the September 2007 letter, Peter failed to communicate any information regarding the activities or performance of the fund or to offer limited partners the opportunity to invest or decline to invest in the partnership for approximately 17 months, despite an obligation to do so each six months.

41.     In or about February 2009, Peter advised Plaintiffs in writing, through Dolphin Asset Management Corp., that "the cumulative return from April 15, 2004 to September 30, 2008 is 87.1%"

42.     Plaintiffs were provided with an audit report for Dolphin Direct for the year ending December 31, 2007, and dated October 2, 2008, which purports to show, based upon information provided by and solely in the control of Peter, that Dolphin Direct had realized and unrealized gains over the period from December 16, 2003 to December 31, 2007 of $32,789,773, and net investment income of $33,831,893. After deduction of Management Fees (paid to Dolphin Advisors, which Peter controlled and in which he owned a majority economic interest) of $1,357,652, other expenses, and interest expense, the change in net assets was purported to be $26,861,033, with approximately half of that change purportedly inuring to the benefit of limited partners (the other half benefiting general partners owned and controlled by Peter).

43.     Plaintiffs received no further audit reports for Dolphin Direct, despite request therefor and despite the obligation of the Defendants to provide these at least bi-annually under the terms of the Partnership Agreement controlling Dolphin Direct Equity Partners.

44.     In following years, received no further letters or other correspondence, as before,

-10-

describing the performance of the fund, apart from Forms K-1 from Peter in the name of Dolphin Direct which bore little apparent resemblance to actual results of the investments or the fund.

45.     In or about November 2013, Peter advised Plaintiffs in writing, through Dolphin Asset Management Corp., that "the value of [their] investment in Dolphin Direct Equity Partners, L.P. as of September 30, 2013 was $87,772, representing an increase of 20.1% in the 12 month period since the end of September 2012." However, even accepting the $87,772 figure as accurate, this represented a loss of at least 64% of Plaintiffs' investments in Dolphin Direct, and the actual amount of the loss is believed to be significantly higher.

46.     In all, Plaintiffs invested $245,000 in Dolphin Direct based upon their relationship of trust and confidence in Peter and the representations of Dolphin Direct and Peter to them.

47.     Plaintiffs placed special trust and confidence in Peter, and decided to make their initial and subsequent investments in Dolphin Direct, in light of:

        (a)     his representation of his forthright dealings and business acumen;

        (b)     his representations as to the valuations of and prospects for Dolphin Direct;

        (c)     their close familial relationship.

48.     Plaintiffs regularly requested of Peter that Peter disclose to them an accounting of the valuation of Dolphin Direct Equity Partners, L.P. beyond the summary letters received from time to time.

49.     Peter failed to respond to these written requests, sometimes for months. When he did finally respond, he claimed to have ignored these demands for accounting because they came from Cristina Salas and that he doesn't respond to women because they are hysterical and irrational. He further claimed that no such accounting had been performed and that an

accounting would be provided at some point in the future, but that he was too busy to complete the request at the time, exploiting Plaintiffs' familial trust in him to forestall their demands for transparency.

50.     The information which Plaintiffs did receive from Peter was incomplete and (now apparently) inaccurate, though at the time Plaintiffs reasonably believed such information to be true and accurate, based upon their communications with Peter.

51.  The Partnership Agreement gave Plaintiffs the right to withdraw all of their capital from Dolphin Direct at any time at a 15% discount to a valuation made by the managing general partner.  Failing to provide the Plaintiffs with either valuation information or an accurate portrayal of the fund's performance denied Plaintiffs this important protection.

52.     On or about December 17, 2013, Peter caused Dolphin Direct to transmit to Plaintiffs a check in the amount of $73,103.00, which Plaintiffs accepted as a partial distribution of monies owed to them in relation to their investment in Dolphin Direct.

53.     At the same time, Peter wrote to Plaintiffs to recommend that they cash out their remaining interests at a valuation of his own invention.  Plaintiff's declined to do so and instead renewed their demands for an accounting and information about the activities of the partnership.

54.     Peter failed to do so and instead provided them piecemeal and incomplete information.

55.     Also now for the first time Peter revealed that he had caused the partnership to pay to another entity wholly owned and controlled by him amounts in excess of $64 million in preference to the Plaintiffs and other limited partners.

56.     On or about December 23, 2013, Peter caused Dolphin Direct to transmit to Plaintiffs an additional check in the amount of $13,946.14, purportedly "cashing out" their

-12-

interest in Dolphin Direct, though they had not requested such, with such amount purportedly representing the actual remaining value of their limited partnership interest at that point in time.

57.     Plaintiffs have refused this latter tender and have not cashed the check presented.

58.     And in addition to denuding the partnership of all cash, on information and belief, Peter has retained economic interests in multiple partnership properties directly or through affiliates and has excluded the true owners, the limited partners, from any economic or other participation in these.


### PETER'S MANIPULATION OF DOLPHIN DIRECT EQUITY PARTNERS

59.     In addition to the foregoing, Peter utilized his domination and control of the Corporate Defendants to improperly manipulate the value of investors' interests in Dolphin Direct Equity Partners and Dolphin Advisors.  After inducing the limited partners, including Plaintiffs, to make tens of millions of dollars of equity investments in Dolphin Direct, Peter caused Defendant Dolphin Management, a General Partner of Dolphin and an entity controlled and owned exclusively by him, to contribute approximately $40 million into Dolphin Direct, but improperly designated such contribution as "debt" and therefore superior in right of repayment than the limited partners' investments.  Peter then caused Dolphin Direct to repay his company Dolphin Management from the proceeds and profits an amount exceeding its investment in Dolphin Direct by at least $16 million even while the limited partners were allocated "losses".

60.     This manipulation benefitted his own wholly owned entity's investment with a high "interest rate" and a cushion against losses comprising all of the limited partners' prior investments, and had the direct effect of siphoning the value of Dolphin Direct over to Dolphin Management and upstream therefrom to Dolphin Offshore and Peter.  The effect of this was

expressly antithetical to the fiduciary duties of Peter, Dolphin Direct and Dolphin Management to the limited partners and also to the terms of the Partnership Agreement, which placed investments by general partners on an equal, and not higher, footing than limited partners' interests.

61.     At the same time, Peter failed to give investors in Dolphin Direct the opportunity they were secured by the partnership agreement to be made aware of the fund's investment activities each six months and to invest in new opportunities presented to Dolphin Direct, or alternatively to effectively "veto" Dolphin Direct's further investment activity by declining to make capital contributions or to withdraw their capital as provided by the Partnership Agreement.  Instead Peter hid from them massive dilutive investments being made by Peter, unbeknownst to the other investors.

62.     All funds contributed to Dolphin Direct Equity Partners by partners were required and contemplated to be in the nature of equity contributions, and distributions of proceeds of the various sales of the partnership's assets were required to be made to limited partners on a pro rata basis.

63.     Section 3 of the Limited Partnership Agreement of Dolphin Direct Equity Partners explicitly provided that financial participation of Peter in the Limited Partnership would be by way of equity, and not by "loaning", or arranging for a company that he controlled to "loan" funds to the partnership.  This is confirmed in the Offering Memorandum for Dolphin Direct Equity Partners.

64.     Section 3 of the Limited Partnership Agreement of Dolphin Direct Equity Partners explicitly required the Partnership to seek capital contributions from its partners each six months to fund acquisitions and expenditures made by the Managing General Partner on

behalf of the partnership in the preceding period, that each partner would be offered the opportunity to make incremental capital contributions pro rata to his existing interests, and that any unsubscribed portion of the capital offering would then be offered to partners who had subscribed for their initial allocation in that offering.   This is confirmed in the Offering Memorandum for Dolphin Direct Equity Partners.   Nowhere in the Limited Partnership Agreement or the Offering Memorandum does it disclose or contemplate that a general partner may fund investments in Dolphin Direct Equity Partners in the form of debt.  Peter, through the Corporate Defendants Dolphin Management and Dolphin Advisors, is and was a general partner of Dolphin Direct Equity Partners, its sole control person and in fact by far its largest owner.

65.     Under the terms of the partnership agreement, any acquisitions or expenditures made by the Managing Partner on behalf of the partnership during the time between its semi-annual requests for capital contributions were to be offered to the partnership at the purchase price paid, plus financing costs and expenses. The partnership was not required to purchase and fund the Managing Partner's offered investment, which unaccepted offering would then remain the Managing Partner's risk.  And indeed, an important check on the activities of the Managing Partner was the ability of the other partners to decline to make capital contributions to fund such investments by the partnership.

66.     For a period of years, Peter utterly ignored the partnership's and the partners' rights to be made aware of, acquire and fund, at their discretion, investments made by the Managing Partner through their own capital contributions. Peter caused the partnership to fail to seek capital from the partners semi-annually and to fail to inform the partners of the activities of the partnership and the Managing Partner. Instead Peter deemed the partnership to have acquired and funded all investments and expenditures made by the Managing Partner, taking the risk of

loss away from the Managing Partner and placing it with the partnership, even though the partnership was not provided by its partners with the equity capital to make these investments, funding these instead with "debt" secretly provided by Peter.

67.     Through this mechanism, Peter caused the partnership to pay to the Managing Partner (which he exclusively owns and controls) tens of millions of dollars to purchase investments that the limited partners, including Plaintiffs, declined to fund, and concurrently deemed the partnership to have borrowed from his wholly owned affiliate Dolphin Management the funds to pay the Managing Partner.  As a result Peter caused the partnership to assume a "debt" obligation to one of his wholly owned affiliates in order to fund payments to another of his wholly owned affiliates.

68.     Owing to Peter's improper manipulations, he and Dolphin Management have netted a positive return on their capital while investors including Plaintiffs, to whom they owed fiduciary duties, have been told that they have "losses".  On information and belief, save for the self-dealing repayment to Dolphin Management of "debt" and "interest" in an amount estimated to exceed $56 million, all other investors would have avoided these losses.

69.     Peter failed to provide, despite a clear obligation under the Dolphin Direct partnership agreement to do so and demand therefor, the required financial information to partners in the form of audited financial statements and accurate valuations of their investments. The partnership agreement required the provision of audited financial statements at least every two years. In fact, only two audit reports were delivered to the partners in ten years: one prepared in October 2008 (almost five years after inception of the fund) and the second in September 2012 (almost four years after the prior report).

70.     Neither the audited financial statements described above nor any financial report

provided to Plaintiffs or, to Plaintiffs' knowledge, to any limited partners before 2014 disclosed the over $40 million in "debt" and $16 million of "interest" that Peter alleged was owed by Dolphin Direct Equity Partners to his alter ego, Dolphin Management.

71.     Upon information and belief, certain limited partners of Dolphin Direct Equity Partners were not injured by Peter's scheme, or in the same manner or extent as Plaintiffs because, inter alia, they were also partners of Dolphin Offshore Partners, LP.   These certain limited partners thereby benefitted from the scheme through preferential repayment of "loans" and "interest" from Dolphin Direct Equity Partners to Dolphin Management because, on information and belief, Dolphin Management then paid at least a portion of these amounts to Dolphin Offshore Partners, LP.   Moreover, Peter owned majority, substantial and/or controlling interests in Dolphin Management and Dolphin Offshore Partners, LP and benefitted from, and was not injured by, the scheme alleged herein.

72.     Plaintiffs, however, were not among these limited partners, and so were uniquely and specially damaged in a manner and amount different from other limited partners and the partnership as a whole.

## COUNT I

### BREACH OF FIDUCIARY DUTY (against Peter and Dolphin Advisers)

Plaintiffs repeat and reallege the foregoing allegations as if fully set forth, and further alleges:

73.     Plaintiffs were and are limited partners in Dolphin Direct.

74.     Dolphin Advisers was and is the General Partner of Dolphin Direct, and as such owed and owes fiduciary duties of candor, loyalty, good faith and fair dealing to Plaintiffs.

75.     Peter is the sole control person and majority stakeholder of Dolphin Advisors, and thereby owed and owes those same fiduciary duties to Plaintiffs.

76.     As managing member of Dolphin Direct and as its controlling person respectively, Dolphin Advisers and Peter had and have complete possession, custody and control of all of the books and records of Dolphin Direct.

77.     Plaintiffs reposed special trust and confidence in Peter, and Peter accepted such trust and confidence.

78.     Despite demand therefor, Peter has failed to provide complete and accurate accountings to Plaintiffs with respect to Plaintiffs' investment and with respect to the financial condition of Dolphin Direct.

79.     Without authorization, Peter converted Plaintiffs' cash investment, as well as any distributions and additional earned capital and fee interests of Plaintiffs, to either his own account or the accounts of the Corporate Defendants, in whom Peter has exclusive or significant interests, denying Plaintiffs the return of their original cash investment and the benefit of any gains thereon.

80.     Peter has breached his fiduciary duties to Plaintiffs.

81.     Plaintiffs have sustained substantial damages as a result of the breach of such fiduciary duties in an amount unknown and within the exclusive knowledge of Defendants but estimated to be in excess of the jurisdictional limits of all courts of the State of New York of limited jurisdiction and in an amount to be proven at trial.

82.     Plaintiffs also seeks the imposition of a constructive trust on all the profits generated by and in the Corporate Defendants attributable to the breaches of fiduciary duty.

## COUNT II

### CONVERSION (against all Defendants)

Plaintiffs repeat and reallege the foregoing allegations as if fully set forth, and further allege:

83.     Peter is the sole control person and majority stakeholder of Dolphin Advisors, it and Peter thereby owed and owe fiduciary duties to Plaintiffs in connection with Plaintiffs' investment.

84.     Plaintiffs reposed trust and confidence in Peter, and Peter accepted such trust and confidence.

85.     Despite demand therefor, Peter has failed to provide complete and accurate accountings to Plaintiffs with respect to Plaintiffs' investment and with respect to the financial condition of Dolphin Direct.

86.     Without authorization, Peter converted Plaintiffs' cash investment, as well as any distributions and additional earned capital and fee interests of Plaintiffs, to either his own account or the accounts of the Corporate Defendants, in whom Peter has exclusive or significant interests, denying Plaintiffs the return of his original cash investment and the benefit of any gains

thereon.

## COUNT III

### PIERCING THE CORPORATE VEIL (against all Defendants)

Plaintiffs repeat and reallege the foregoing allegations as if fully set forth, and further allege:

87.    Peter and each of the Corporate Defendants are responsible and liable for the debts of each other to Plaintiffs, on the following basis:

        (a)    to the extent that any of the Defendants are without assets sufficient to satisfy a judgment against them by Plaintiffs, it is because Peter has stripped such Defendant of its assets through his domination and control of said entity and disregard of the corporate form of such entity;

        (b)    imposing responsibility on Peter and each of the Corporate Defendants is necessary to achieve equity, even in the absence of fraud, where Peter exercised control over the daily operations of the Corporate Defendants, and acted as the true prime mover behind said entities' actions; and

        (c)    Peter, through his domination and control of the Corporate Defendants, has conducted his own business through said entities, which exist solely to serve his personal interests.

88.    "Piercing the corporate veil" is appropriate given the presence of the following factors:

        (a)    inter-company transfers between and among Peter and the Corporate Defendants based on a less than objective basis;

     (b)    the existence of overlapping officers, directors and personnel, primarily

          Peter;

     (c)    common office space and shared facilities;

     (d)    the lack of independent business discretion displayed by the Corporate

          Defendants; and

     (e)    the intertwined use of the Corporate Defendants as mere instrumentalities

          of Peter.

89.    By reason of the foregoing, the Court in equity should pierce the corporate veil and award Judgment in favor of Plaintiffs and against each Defendant in the sum of the compensatory damages awarded upon any Count in this complaint.

## COUNT IV

### ACCOUNTING (against all Defendants)

Plaintiffs repeat and reallege the foregoing allegations as if fully set forth, and further allege:

90.    Peter and Dolphin Advisors were fiduciaries to Plaintiffs and Plaintiffs reposed trust and confidence in both.

91.    Plaintiffs entrusted money to Peter and Dolphin Advisors in the expectation, based on the specific representations of Peter on his own behalf and that of Dolphin Advisors as its sole control person, that they would receive complete and accurate information as to the status of their investment.

92.    Plaintiffs requested accountings from the Defendants of the money and property entrusted to the Defendants. Defendants had the burden of accounting to Plaintiffs for the use of

their funds and the financial condition of Dolphin Advisors.

93.     Defendants have failed to provide a complete and accurate accounting, despite repeated demand therefor.

94.     Plaintiffs have no adequate legal remedy in the absence of an accounting to be ordered by this Court, as all records are in the sole custody and control of the Defendants.

95.     Defendants should be required to furnish Plaintiffs with an accounting.

## COUNT V

### EQUITABLE SUBORDINATION (against all Defendants)

Plaintiffs repeat and reallege the foregoing allegations as if fully set forth, and further allege:

96.     Under the doctrine of equitable subordination, courts will subordinate a creditor's claims to other claims if it finds that the creditor's conduct was fraudulent, illegal or constituted a breach of fiduciary duties and was detrimental or harmful to the debtor.

97.     Through Peter's control over the Corporate Defendants, he, Dolphin Management, Dolphin Advisors and Dolphin Direct Equity Partners have engaged in inequitable conduct and have

breached their fiduciary duties by using illusory "loans" to create an interest in Dolphin Direct Equity Partners purportedly ostensibly superior to the equity interests of its partners.

98.     Peter has placed his own interests and those of companies in which he holds controlling interests superior to those of the partners of Dolphin Direct Equity Partners.

99.     Peter has abused his position as the sole control person of Dolphin Direct Equity Partners through his exclusive control of its Managing Partner.

100.    Equitable subordination is not otherwise inconsistent with the provisions of applicable state law and may be the only means of providing a remedy to Plaintiffs for Defendants' inequitable conduct.

101.    The "loans" of Dolphin Direct Equity Partners should be equitably subordinated to the interests of the limited partners thereof.

102.    Alternatively, the loans should be recharacterized as equity pursuant to the terms of the partnership agreement and associated documents.

103.    Plaintiffs have no adequate remedy at law.

## COUNT VI

### FRAUD (against all Defendants)

Plaintiffs repeat and reallege the foregoing allegations as if fully set forth, and further allege:

104.    The foregoing representations made by Peter to Plaintiffs, and by Peter on behalf of the Corporate Defendants to Plaintiffs, were material to Plaintiffs' investment decisions, and were known by Peter and the Corporate Defendants to be false and misleading when made. Peter and Defendants also omitted to disclose the true circumstances of Plaintiff's investments and of Defendants' business transactions under circumstances where the omissions were material and misleading.

105.    Peter and the Corporate Defendants intended Plaintiffs to rely upon the misrepresentations and upon misunderstanding of the true facts created by the omissions.

106.    Plaintiffs did in fact rely upon the misrepresentations and omissions by Defendants, and acted reasonably under the circumstances in doing so.

107.   Plaintiffs were damaged by Defendants' misrepresentations in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

a) On COUNT I, compensatory damages in an amount to be determined at trial, together with disgorgement of all profits made and retained by Defendants at the expense of Plaintiffs, and punitive damages in an amount treble such damages and disgorgement;

b) On COUNT II, compensatory damages in an amount to be determined at trial;

c) On COUNT III, compensatory damages in an amount to be determined at trial;

d) On COUNT IV, a declaration that Plaintiffs are entitled to an accounting of the books, accounts, profits and losses of each of the Corporate Defendants, and an order directing Defendants to turn over such books, accounts and records as will permit the conduct of such accounting;

e) On COUNT V, an order declaring that any and all "loans" of funds by any entity owned or controlled or managed by Peter Salas to Dolphin Direct Equity Partners be deemed subordinate in interest, value, amount and priority to the interests of limited partners in Dolphin Direct Equity Partners, or alternatively, as appropriate, be characterized as equity;

f) On COUNT VI, compensatory damages in an amount to be determined at trial, as well as punitive damages in an amount to be determined;

g) pre-judgment and post-judgment interest on the amounts awarded, together

-24-

with the costs and disbursements of this action, including attorneys' fees and expenses; and

h) such other and further relief as the court may find appropriate.

Dated: New York, NY
February 26, 2016

NORRIS, McLAUGHLIN & MARCUS, P.A.

By: ALFRED N. METZ
Attorneys for Plaintiffs
875 Third Avenue, 8th Floor
New York, New York 10022
(212) 808-0700

-25-