UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CARLOS M. SALAS and ADA CRISTINA
SALAS,

                    Plaintiff,

        -against-

DOLPHIN ADVISORS, LLC, DOLPHIN ASSET
MANAGEMENT CORP., DOLPHIN DIRECT
EQUITY PARTNERS, LP, DOLPHIN
MANAGEMENT, INC., and PETER E. SALAS,

                    Defendants.

16cv02248 (DF)

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

**DEBRA FREEMAN, United States Magistrate Judge:**

        In this action, which is before this Court on consent pursuant to 28 U.S.C. § 656(c),

plaintiffs Carlos Salas ("Carlos") and Ada Christina Salas ("Ada") (collectively, "Plaintiffs")

have asserted various claims against defendants Dolphin Advisors, LLC ("Dolphin Advisors"),

Dolphin Asset Management Corp. ("Dolphin Asset"), Dolphin Direct Equity Partners, LP

("Dolphin Direct"), Dolphin Management, Inc. ("DMI"), and Peter Salas ("Peter") (collectively,

"Defendants") arising out of the alleged loss of value of investments Plaintiffs' made in Dolphin

Direct.  After conducting a bench trial in this action, this Court made certain preliminary findings

of liability from the bench.  After having reviewed and considered the parties' extensive post-

trial submissions, however, together with the applicable law that governs Plaintiffs' claims, the

Court now revises those findings, and concludes that Plaintiffs have only successfully

established at trial that Dolphin Direct is liable to Plaintiffs for the tort of conversion for having

charged Plaintiffs an unauthorized penalty upon the involuntary liquidation of their capital

account; that Dolphin Advisors is liable for breaching its fiduciary duty to Plaintiffs by having

allowed the conversion to be effected; and that Peter is liable for having aided and abetted

Dolphin Advisors' breach in that regard.  As to these claims, Plaintiffs are entitled to judgment from these three defendants, jointly and severally, in the amount of $642.86.  Plaintiffs are also entitled to prejudgment interest on that amount, running from the date of the conversion, although the rates of prejudgment interest that will be awarded will differ, depending on the state law that applies to the particular defendants (8.75% per annum under Delaware law on the judgment against Dolphin Direct, and 9% per annum under New York law on the judgment against Dolphin Advisors and Peter).

As to the remainder of Plaintiffs' claims, the Court concludes that Defendants are entitled to judgment in their favor on the ground that those remaining claims are either time-barred, have not been proven at trial, are not cognizable, or are deemed abandoned.[1]  Plaintiffs' request for the Court to deem their Complaint amended to conform to the proof adduced at trial, so as to add unpleaded claims and to join DMI's successor in interest, Dolphin Mgmt. Services, Inc. ("DMSI") as an additional defendant, is denied for the reasons discussed below, as is Plaintiffs' request for attorneys' fees.

---

[1] Plaintiffs initially pleaded claims against Dolphin Asset, in their Complaint, for conversion, piercing the corporate veil, an accounting, equitable subordination, and fraud.  (*See* Complaint, dated February 26, 2016 (Dkt. 1-1) ("Compl.").)  In their post-trial submissions, however, Plaintiffs do not assert any claims against Dolphin Asset (*see generally* Pl. Proposed Conclusions), and therefore those claims are deemed to be abandoned, *Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) ("Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended.").

**TABLE OF CONTENTS**

BACKGROUND ...................................................................................................................6

I.      FINDINGS OF FACT.................................................................................................7

      A.      Peter Salas and the Dolphin Entities ...............................................7

      B.      Dolphin Direct's Investment Structure .................................................10

            1.      The Offering Documents ..........................................................10

            2.      Dolphin Direct's Use of Debt to Fund its Investments.............................13

                     a.      Dolphin Direct's Audits and Financial Statements.......................13

                     b.      Dolphin Direct's Debt Agreements .............................14

                     c.      Short- or Long-Term Character of the Debt ...............................16

                     d.      Dolphin Direct's Payment of Interest on Its Loans, and the Allocation of a Portion of that Interest to Plaintiffs.....................18

            3.      The Incomplete Disclosure of Dolphin Direct's Debt Arrangements in the Offering Memorandum and Partnership Agreement .....................19

      C.      Plaintiffs' Investments in Dolphin Direct ...............................................20

             1.      Plaintiffs' Relationship With Peter Salas...................................20

             2.      Plaintiffs' Decision To Invest in Dolphin Direct......................21

             3.      Plaintiffs' Receipt of the Offering Documents .........................22

             4.      Plaintiffs' Period Receipt of Update Letters .............................26

             5.      Plaintiffs' Capital Contributions to Dolphin Direct.................26

             6.      Involuntary Liquidation of Plaintiffs' Dolphin Direct Capital Account ........................................................................28

             7.      Plaintiffs' Receipt of the 2007 Financial Statements................................31

II.     CONCLUSIONS OF LAW .......................................................................................34

      A.      Plaintiffs' Fraud Claims ........................................................................34

             1.      Claims That Plaintiffs Were Fraudulently Induced To Invest in Dolphin Direct ...........................................................................36

a.  The Claims Are Time-Barred ......................................................36

b.  In Any Event, Plaintiffs Did Not Prove Their Induced-Investment Fraud Claims at Trial ...................................40

2.  Holder Claims .......................................................................................44

a.  The Law is Unsettled as to Whether Holder Claims Are Cognizable ............................................................................44

b.  Even If the Law Permits Some Holder Claims, Plaintiffs' Claims Fail ...............................................................................49

B.  Plaintiffs' Breach-of-Fiduciary-Duty Claims .......................................................52

1.  Claimed Violations of the Fiduciary Duty of Disclosure ........................55

a.  The Non-Disclosure Claims Should Be Considered Timely, But Only in Part, With Respect to Certain of the Claims Against Dolphin Advisors and Peter...............................................55

b.  Regardless of Whether Any Portion of Plaintiffs' Breach-of-the-Duty-of-Disclosure Claims May Be Considered Timely, the Claims Fail on the Merits ...............................................62

i.   Peter Did Not Owe Fiduciary Duties to Plaintiffs, Although DMI, DMSI, and Dolphin Advisors Did ...........64

ii.  DMI, DMSI, and Dolphin Advisors Breached Their Fiduciary Duties Through the Non-Disclosure of Material Facts...............................................67

iii. Plaintiffs Failed To Demonstrate Damages Resulting From the Breach...............................................70

2.  Claimed Violations of the Fiduciary Duty of Loyalty (by Self-Dealing) ...............................................71

a.  Plaintiffs Lack Standing To Assert a Claim Against DMI or DMSI for Having Stood in the Position of a Lender to Dolphin Direct ...............................................72

b.  Deeming the Complaint Amended To Add Plaintiffs' Newly Articulated Dilution Claim Would Be Futile and/or Unduly Prejudicial ...............................................74

i.     The Claim Against DMI, as Well as Any Claim Against Peter for Aiding and Abetting DMI's Breach, Would Be Time-Barred ...................77

ii.    DMSI Did Not Consent to the Resolution of This Claim Against It at This Trial, and Did Not Have the Opportunity To Defend Against the Claim .................78

iii.   The Court Declines To Deem the Complaint Amended To Add a Claim That Peter Aided and Abetted DMSI's Alleged Self-Dealing ............................82

C.     Plaintiffs' Claims for Conversion, and Related Claims for Breach of Fiduciary Duty ......................................................................................84

1.    The Conversion Claim and Any Related Breach-of-Fiduciary-Duty Claims Are Timely ................................................................................85

2.    Plaintiffs Proved These Claims at Trial ..................................................86

a.    Dolphin Direct Is Liable for Conversion ......................................86

b.    Dolphin Advisors Breached Its Fiduciary Duty by Effecting the Conversion .................................................................................89

c.    Peter Aided and Abetted Dolphin Advisors' Breach ....................90

D.    Plaintiffs' Promoter Liability Claim ...................................................91

E.    Plaintiffs' Claims for Equitable Relief .................................................93

III.   AMOUNTS TO BE AWARDED TO PLAINTIFFS ...........................................96

A.    Damages......................................................................................96

B.    Prejudgment Interest .................................................................97

C.    Plaintiffs Are Not Entitled to an Award of Attorneys' Fees.................98

CONCLUSION.................................................................................98

## BACKGROUND

In this family dispute, Plaintiffs allege that they were fraudulently induced by their once-trusted nephew, Peter, to invest in an investment fund that he controlled, and that they were then misled for years as to material aspects of the fund's operations.  In particular, at the core of Plaintiffs' claims are allegations that Plaintiffs were not informed that Dolphin Direct, the partnership that operated the fund in which they invested, had incurred substantial debt that presented serious risk to the financial health of the partnership, and, further, that they were not informed that the loans in question had been extended to Dolphin Direct by another "Dolphin" entity owned by Peter.  Plaintiffs' investment account at Dolphin Direct was eventually involuntarily cashed out at a significant loss to Plaintiffs.  Plaintiffs have sued Peter and a number of interrelated Dolphin entities to recover their investment losses, which they contend were incurred as a result of Defendants' various acts of fraud, as well as though breaches of fiduciary duty and conversion of funds.

The Court held a three-day bench trial on Plaintiffs' claims from November 27 to November 29, 2018.  Prior to trial, the parties stipulated to certain facts regarding the corporate structure of the Dolphin entities and the investments that Plaintiffs had made in Dolphin Direct. (*See* Joint Pretrial Order, dated Nov. 21, 2018 (Dkt. 43) ("JPO").)  At trial, the Court heard testimony from Carlos, Peter, and Plaintiffs' expert witness, Jason Scharfman ("Scharfman") (*see* Transcript of trial, conducted Nov. 27-29, 2018 (Dkts. 52, 54, 56) ("Tr.")), and also received in evidence certain exhibits.[2]

---

[2] Trial exhibits offered by Plaintiffs will be cited to as "Pl. Ex. __," and trial exhibits offered by Defendants will be cited to as "Def. Ex. __."

Following the trial, Plaintiffs and Defendants each made lengthy submissions, setting out proposed findings of facts and conclusions of law (*see* Defendants' Proposed Findings of Fact and Conclusions of Law, dated Jan. 25, 2019 (Dkt. 50) ("Def. Proposed Findings"); Plaintiffs' Proposed Findings of Fact and Conclusions of Law, dated Jan. 25, 2019 (Dkt. 51) ("Pl. Proposed Findings" or "Pl. Proposed Conclusions")[3]), and then responding to each other's submissions (*see* Plaintiffs' Response to Defendants' Proposed Findings of Fact and Conclusions of Law, dated Feb. 15, 2019 (Dkt. 61) ("Pl. Resp."); Defendants' Response to Plaintiffs' Proposed Findings of Fact, dated Feb. 15, 2019 (Dkt. 62) ("Def. Resp.")).

Upon due consideration of all of the testimonial and documentary evidence presented at trial, including both direct and circumstantial evidence, and the post-trial submissions of the parties, the Court makes the following findings of material fact and conclusions of law:

# I.   <u>FINDINGS OF FACT</u>

## A.   <u>Peter Salas and the Dolphin Entities</u>

In 1988, Peter incorporated DMI under the laws of the state of New York,[4] to serve, according to Peter, "as an investment manager for a new partnership which was to invest in

---

[3] Given that Plaintiffs Proposed Findings of Fact and Conclusions of Law is segmented into two sections – Proposed Findings of Fact, and Proposed Conclusions of Law – having a separate paragraph numbering system, the Court will cite to each section separately herein, as named above.

[4] Although the parties stipulated in the Joint Pretrial Order that DMI was "formed pursuant to the laws of the state of Delaware" (JPO ¶ 7(vi)), they later stipulated to the accuracy of the information contained in Plaintiffs' Exhibit 3 (Tr., at 492:18-21), which reflects that DMI was a New York corporation, formed in 1988 (*see* Pl. Ex. 3).  Further, the Offering Memorandum also states that DMI was a New York corporation, and public records further confirm this fact, *see Business Entity Database*, NYS DEPARTMENT OF STATE, DIVISION OF CORPORATIONS, https://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENTITY_SEARCH_ENTRY (last visited Aug. 27, 2019) ("NYS Business Entity Database").

microcap equities."[5]  (Tr., at 390:24-391:9.)  The parties stipulated that Peter "was the President and majority shareholder" of DMI (JPO ¶ 7(iii)), although they also stipulated into evidence an organizational chart showing Peter to have "[o]wn[ed] 100%" of that entity (Pl. Ex. 3; *see also* Tr., at 286:12-14 (Peter testifying that he was "effectively" DMI's sole owner)).  In 1989, Peter formed Dolphin Offshore, LP ("Dolphin Offshore") as a vehicle to invest in microcap stocks (Tr., at 391:8-18 (Peter)), with DMI serving as its managing general partner (*id.*, at 392:1-3 (Peter)).[6]  That same year, Lehman Brothers ("Lehman") began to serve as the prime broker for Dolphin Offshore.  (*Id.*, at 392:12-20 (Peter).)

In December 2003, Peter formed a new investment fund, Dolphin Direct, as a limited partnership pursuant to the laws of the state of Delaware.  (JPO ¶ 7(xiii); *see* Tr., at 397:5-9, 398:2-14 (Peter).)[7]  Peter testified that he formed Dolphin Direct after having closed Dolphin Offshore to new investments several years prior (Tr., at 397:10-18), and that he intended Dolphin Direct to undertake a variety of investments, including in, *inter alia*, private companies, small public companies, non-publicly quoted securities, and leveraged buyouts (*id.*, at 400:7-12).

---

[5] Microcap stock refers to equity in companies having market capitalizations of less than $250 or $300 million.  *Microcap Stock*, U.S. SECURITIES AND EXCHANGE COMMISSION, https://www.investor.gov/additional-resources/general-resources/glossary/microcap-stock (last visited Aug. 27, 2019).

[6] In 1989, Peter also formed a second partnership, Dolphin Partners, LP, which was consolidated into Dolphin Offshore in the early 1990s.  (*Id.*, at 391:8-11 (Peter), 393:13-20 (Peter).)

[7] The Court notes that an organizational chart stipulated by the parties to be accurate indicates that Dolphin Direct was incorporated in 2004 (*see* Pl. Ex. 3), but Peter testified to his belief that "the actual formation was in December of 2003" (Tr., at 397:5-9), and public records, of which the Court may take judicial notice, *see Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166-67 (S.D.N.Y. 2015), reflect the date of incorporation as December 17, 2003, *see* Entity Search, DELAWARE DEPARTMENT OF STATE, DIVISION OF CORPORATIONS, https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx (last visited Aug. 27, 2019).

DMI, a New York corporation founded in 1988, became a general partner in Dolphin

Direct (JPO ¶¶ 7(vi, viii); Pl. Ex. 3; Pl. Ex. 4, Tab A, at 1), although, at some point in December

2006 (*see* Pl. Ex. 3), DMI transferred its interests in Dolphin Direct to DMSI, a Delaware

corporation (*see* JPO ¶ 7(vii) (stipulating that DMSI "is the successor-in-interest" to DMI); *see*

*also id.* ¶ 7(ix) (stipulating that DMSI "became a general partner of [Dolphin Direct]")).[8]

Dolphin Direct's managing partner was Dolphin Advisors, a New York limited liability company

that was roughly 75% owned by DMI.  (JPO ¶¶ 7(x, xiv); Pl. Ex. 3; Pl. Ex. 4, Tab A, at 1; Tr., at

331:6-22 (Peter)).  In addition to owning a majority stake in Dolphin Advisors through DMI and

then through DMSI, Peter was also Dolphin Advisors' managing member, Chairman, and sole

Director.  (JPO ¶ 7(v).)  Further, it is undisputed that another Dolphin entity, Dolphin Asset,

which was incorporated pursuant to the laws of the State of New York and was solely controlled

by Peter (JPO ¶ 7(xii)), provided administrative services for, and, until at least 2007, shared

office space with, both Dolphin Advisors and Dolphin Offshore (Tr., at 286:23-287:20, 447:21-

448:11 (Peter)).

At trial, Plaintiffs offered, as a demonstrative exhibit, a chart reflecting the control

structure of the various Dolphin entities, with the exception of Dolphin Asset.  (Pl. Ex. 28.)  That

chart is recreated below for ease of reference as to the interactions among the different Dolphin

entities implicated in this action.  The Court understands that the information contained on the

chart with respect to DMI applies equally to its successor, DMSI.

---

[8] Although, at trial and in their post-trial submissions, Plaintiffs have routinely referred to
DMI and DMSI collectively as "Dolphin Management," this Court will refrain from doing so, as
DMI is a party to this action, while DMSI is not, and as these two entities were apparently
involved in the underlying events at different points in time.



### B.   **Dolphin Direct's Investment Structure**

#### 1.   **The Offering Documents**

Dolphin Direct operated pursuant to a Confidential Offering Memorandum, dated March

2004 (the "Offering Memorandum"), and Limited Partnership Agreement, dated April 15, 2004

(the "Partnership Agreement").   (*See* Pl. Ex. 4, Tabs A & B; *see* Tr., at 432:20-22 (Peter).)[9]   The

Offering Memorandum stated that Dolphin Direct was seeking initial capital contributions, for

---

[9] The Court notes that Peter testified that the Offering Memorandum and Partnership Agreement were prepared by Dolphin Direct's outside counsel and Carlos P. Salas ("Carlos P."), who was Dolphin Direct's in-house counsel (*see* Tr., at 432:23-433:2 (Peter)), and is also Plaintiffs' son (*see id*., at 483:1-2 (Peter)).

subscriptions for limited partnership interests in the fund, that the capital contributions would initially fund investments in 15 identified portfolio companies, but that Dolphin Direct would also pursue other types of investments. (Pl. Ex. 4, Tab B, at 1-6.) Both the Offering Memorandum and the Partnership Agreement also provided that additional contributions would be sought from investors through "capital calls" that would be made on March 31 and September 30 of each year ("Offering Dates"), so as to fund investments that Dolphin Direct had previously made, or that it intended to make in the near future. (*Id.*, Tab A, at 6-7, § 3.1(c); Tab B, at 12-13.) Although the limited partners in Dolphin Direct would be under no obligation to make additional capital contributions upon each Offering Date (*id.*, Tab A, at 6-8, § 3; Tab B, at 9, 11-12; *see* Tr., at 365:3-14 (Peter)), both documents further provided that, in the event Dolphin Direct did not make new investments on or shortly after an Offering Date, DMI would initially "acquire Portfolio Investments directly, and contemporaneously therewith, enter into a purchase and sale agreement with [Dolphin Direct] providing for the sale of the Portfolio Investments to [Dolphin Direct] on or immediately after the next Offering date" (Pl. Ex. 4, Tab A, at 7-8, § 3.1(i); Tab B, at 13).

In addition, with respect to the authority over investment decisions, both the Offering Memorandum and Partnership Agreement set out that Dolphin Advisors, as managing partner, would have "exclusive control" over Dolphin Direct's operations, including the use of its cash. (*Id.*, Tab A, at 2, § 2.1(a), 8, § 3.1(j); Tab B, at 8, 13.) Thus, in effect, under Dolphin Direct's organizational documents, a limited partner would not be entitled to reject an investment proposed by Peter. (*See* Tr., at 365:3-11 (Peter).) Further, the Partnership Agreement provided that, in the event a limited partner were to request the withdrawal of its capital account, Dolphin Direct would be required to purchase that partner's interest in the fund at a price of only 85% of

the asset value of that partner's capital account (*i.e.*, effecting a 15% withdrawal penalty). (Pl. Ex. 4, Tab A, at 10, § 3.3(a).)

The Offering Memorandum and the Partnership Agreement also contained several other common provisions relevant to the issues in this case. Both documents provided that Dolphin Direct would bear certain expenses related to its operations, including "costs of capital." (*Id.*, Tab A, at 11, § 3.6(c); Tab B, at 19-20.) Further, both documents provided that Dolphin Direct would provide its partners, "as promptly as practicable after the close of each fiscal year," with audited financial statements reflecting the results of the fund's operations for that year. (*Id.*, Tab A, at 11-12, § 3.7; *see* Tab B, at 22; *see also* Tr., at 49:3-9 (Scharfman).) The Offering Memorandum specifically provided that Dolphin Direct "ha[d] retained KPMG as an independent auditor of its financial statements." (Pl. Ex. 4, Tab B, at 22.) Finally, both the Offering Memorandum and the Partnership Agreement contained conflict-of-interest disclaimers, which together provided that certain partners might have business interests that would conflict with the fund's; that Dolphin Advisors "and its affiliates" might engage in transactions with Dolphin Direct; and that Peter and Dolphin Advisors might devote substantial time to other business interests, including the management of Dolphin Offshore. (*Id.*, Tab A, at 4, § 2.6; Tab B, at 25.)

Finally, in addition to the Offering Memorandum and the Partnership Agreement, Dolphin Direct solicited investments through subscription documents (the "Subscription Documents," and together with the Offering Memorandum and the Partnership Agreement, the "Offering Documents"), which set out the rights and obligations of an investor in purchasing a limited partnership interest in Dolphin Direct. (*Id.*, Tab C.) In relevant part, the Subscription Documents specifically required an individual investor to certify, as a condition to purchasing a

12

limited partnership interest, that he or she satisfied the financial requirements of an "accredited investor," which could be met by either:  (1) having an individual net worth or joint net worth with his or her spouse in excess of $1,000,000, or (2) having an individual income of more than $200,000 in each of the past two years or joint income with his or her spouse of more than $300,000 in each of those years.  (*Id.*, Tab C, at 16.)[10]

### 2.     Dolphin Direct's Use of Debt to Fund Its Investments

#### a.     Dolphin Direct's Audits and Financial Statements

Despite the representations in the Offering Memorandum and Partnership Agreement, Dolphin Direct did not undertake audits of the fund, or provide its partners with audited financial statements, on an annual basis.  (*See* Pl. Ex. 14; Tr., at 50:1-51:2 (Scharfman).)   Further, despite the statement in the Offering Memorandum that KPMG would serve as Dolphin Direct's auditor, KPMG did not perform any audits of the fund.  (*See* Pl. Ex. 14; Tr., at 50:24-51:2 (Scharfman).) Instead, the fund was audited only three times, and each of those audits was performed by another accounting firm, Baker Tilly (BVI) Limited ("Baker Tilly").  In the first audit, conducted in 2008, Baker Tilly audited Dolphin Direct's financial statements covering the period from December 2003 through 2007 (the "2007 Financial Statements").  (*See* Pl. Ex. 14, Tab A.)  In the second, conducted in 2012, Baker Tilly audited the fund's financial statements covering the period from January 2008 through 2011 (the "2011 Financial Statements").  (*See* Pl. Ex. 14, Tab B.)  Finally, in the third, conducted in 2014, Baker Tilly audited the fund's financial statements covering the period from January 2012 through 2013.  (*See* Pl. Ex. 14, Tab C.)

---

[10] The Offering Memorandum also provides that "only accredited investors . . . will be accepted as limited partners" of Dolphin Direct.  (*Id.*, Tab B, at 3.)

### b.      **Dolphin Direct's Debt Agreements**

Peter explained at trial, and this Court finds, that Dolphin Direct regularly incurred debt in order to acquire investment assets before having raised sufficient capital, through capital calls, to do so.  (Tr., at 355:25-357:8 (Peter).)  In particular, Dolphin Direct incurred debt through a "waterfall" loan arrangement consisting of lines of credit that were extended through different Dolphin entities.  The waterfall began with Lehman, which provided margin loans to Dolphin Offshore, which then loaned funds to DMI (and potentially later to DMI's successor, DMSI), which in turn loaned funds to Dolphin Direct.  (*See id*., at 34:6-18 (Scharfman), 300:6-302:18 (Peter).)  Dolphin Direct would use the proceeds of capital calls to repay DMI, and then DMSI, for the loans extended to it.  (*Id*., at 355:3-6 (Peter).)  The Court also finds that, although these lines of credit were extended as early as 2003, the actual documents memorializing the loans – *i.e.*, the promissory notes between Dolphin Offshore and DMI, and between DMI and Dolphin Direct (*see* Pl. Ex. 11, Tabs A & B) – were not created until 2009 to 2010.  As Peter conceded at trial, he created and signed the promissory notes in 2009 or 2010, but then backdated them to dates in 2003.  (Tr., at 308:9-310:3; *see* Pl. Ex. 11, Tabs A & B.)  In effect, Peter created the loan documents to involve DMI as a party to the transaction, despite that entity's having already been succeeded by DMSI several years earlier.  (*See* Pl. Ex. 3.)

The Court also finds that Dolphin Direct entered into an agreement with DMI in 2009 to 2010 to guarantee the latter's loans to Dolphin Offshore (the "Guarantee").  (Tr., at 112:19-24 (Scharfman), 306:11-13, 314:24-315:2 (Peter); Pl. Ex. 11, Tab C.)  Similar to the promissory notes documenting the intra-Dolphin lines of credit, Peter admitted at trial that he created and signed a document memorializing the Guarantee in 2009 or 2010, but backdated the document to appear as if it had been signed and dated on December 18, 2003, by DMI.  (Tr., at 311:4-10

14

(Peter); Pl. Ex. 11, Tab C.)  Further, as for the promissory notes, Peter created the Guarantee to involve DMI as a party to the transaction, despite that entity's having already been succeeded, at that point, by DMSI.  (*See* Pl. Ex. 3.)  Unlike the promissory notes, however, the Guarantee reflected an entirely new agreement that arose at the point when the document was created, and did not reflect an arrangement put into place in 2003.  (Tr., at 314:24-315:2 (Peter).)

Plaintiffs' expert, Scharfman, opined at trial that the waterfall loan arrangement posed significant risk to Dolphin Direct investors, given that each of the constituent lines of credit was structured as a demand loan; thus, a decision by Lehman to call its loan to Dolphin Offshore could, in effect, cause all of the outstanding loans to be called for repayment.  (Tr., at 38:19-24 (Scharfman); *see also id.*, at 301:18-302:9 (Peter).)  In other words, in the event Lehman (or its liquidator) were to call its loan to Dolphin Offshore, Dolphin Offshore, in turn, could call its loan to DMI (or DMSI), and this, in turn, could lead to DMI's (or DMSI's) acceleration of its loan to Dolphin Direct – ultimately putting Dolphin Direct "on the hook for loans that were taken out by other Dolphin entities."  (*Id.*, at 42:25-43:21 (Scharfman).)  In such an event, Dolphin Direct would face liquidation or a severe reduction of capital in order to repay the loans, which would in turn hurt its investors.  (*Id.*)  Nevertheless, as confirmed by Scharfman, the Court finds that this hypothetical event never occurred, as the funds borrowed in the first instance by Dolphin Offshore were repaid without the loan being called by Lehman.  (*Id.*, at 44:1-12.)[11]

---

[11] In their post-trial submissions, Plaintiffs reference an opinion offered by Scharfman in his expert report, in relation to the risk posed by the inter-Dolphin-entity loan arrangement, that "Peter borrowed money from Dolphin Offshore in excess of Dolphin Management's contractual rights, and therefore, Dolphin Management was . . . in default in its loan abilities in Dolphin Offshore."  (*See* Pl. Proposed Findings ¶ 93 (quoting Def. Ex. A, at 10-11).)  Given that the parties did not solicit any testimony at trial relating specifically to this opinion, and that the Court has little understanding of its meaning or potential importance, the Court will not consider it here.

c.       **Short- or Long-Term Character of the Debt**

Contrary to Plaintiffs' assertion that Dolphin Direct had incurred "long-term debt" from the inception of the fund (*see, e.g.*, Pl. Proposed Findings ¶¶ 41-48), the evidence adduced at trial does not demonstrate that Dolphin Direct was incurring long-term debt until at least 2009 or 2010.  In describing the difference between short-term and long-term debt, Scharfman defined "short-term" debt, or interim financing, as generally constituting a loan intended as a line of financing for "point to point" funding purposes, such as for financing investments while a capital call from investors is pending.  (Tr., at 31:7-8, 32:20-33:2, 80:24-81:9.)  Scharfman further opined that, while there is no bright-line rule as to when the length of a loan's maturity period makes it appropriate to characterize it as "long-term" debt, a loan having a maturity period of less than one year would generally be considered short-term debt, and a loan having a maturity period of greater than three years would generally be considered long-term debt.  (*Id*., at 82:17-83:11.)  Peter, although not qualified by the Court to testify as an expert in this case, similarly testified to his belief that long-term debt generally had a maturity period of greater than one year.  (*Id*., at 422:2-4.)

Whereas Peter testified that Dolphin Direct was only incurring short-term debt prior to 2009 or 2010, Scharfman opined to the contrary, testifying that the debt incurred by Dolphin Direct had *always* consisted of long-term debt.  (*Id*., at 83:21-84:1 (Scharfman).)  In this regard, Scharfman testified to his view that the loans received from DMI (or DMSI) were not intended to be used for limited financing purposes, but instead were "contemplated to be used for a long period of time," and had terms of "several years."  (*Id.*, at 83:12-20.)  There does not appear to be any basis, however, for Scharfman's assessment that Peter had intended for individual loans from DMI or DMSI to be "used for a long period of time," nor do any of the loan documents

submitted by the parties evidence that such loans had terms of "several years."  Indeed, the promissory note issued to DMI, although backdated, provides a maximum maturity period of roughly one year (Pl. Ex. 11, Tab A, at 1), and the audited financial statements reflect only that "[Dolphin Direct] borrow[ed] from [DMI]," without identifying whether such borrowing involved short-term or long-term debt (*e.g.*, Pl. Ex. 14, Tab A, at 16).

Although Peter's testimony indeed reflects that he had always contemplated that debt would be used by Dolphin Direct to finance its investments (Tr., at 333:23-334:23), he also testified that the loans Dolphin Direct received from DMI or DMSI constituted short-term debt until that debt, as a result of the financial crisis,[12] became "stale" (Tr., at 422:16-423:13).  In particular, Peter explained that, in the aftermath of the financial crisis, Dolphin Direct became unable to make scheduled capital calls from investors in March 2008 and September 2008 (*id.*, at 423:14-17, 426:3-10), which, at that time, hampered Dolphin Direct's ability to raise sufficient capital to repay its loans, as intended (*id.*, at 423:15-17, 426:3-22).  The Court finds Peter's trial testimony on this point to have been credible, and thus finds that, while Dolphin Direct had incurred debt from DMI even before Dolphin Direct had raised capital from investors (*id*, at 428:20-25), the debt it incurred through at least 2008 is appropriately characterized as "short-term" debt (*see id.*, at 429:1-430:25), and only in 2009 or 2010 did the character of the debt change, rendering it "long-term" debt (*see id*., at 428:4-12, 431:1-2).[13]

_____

[12] Peter's reference to the financial crisis pertains to the global financial crisis that began in 2008, following a burst in the U.S. housing bubble in 2007, that led to an international banking crisis and general economic downturn.  *The Financial Crisis Five Years Later: Response, Reform, and Progress In Charts*, U.S. Department of the Treasury, https://www.treasury.gov/connect/blog/Pages/The-Financial-Crisis-Five-Years-Later.aspx (lsat visited Aug. 27, 2019).  During that period, capital markets began to freeze, and many of the nation's financial institutions failed or were forced to merge to avoid insolvency.  *Id.*

[13] Peter stated that the Guarantee evidences that Dolphin Direct first had what could be characterized as long-term debt in 2009 or 2010, in light of the Guarantee's supposed reference

**d.      Dolphin Direct's Payment of Interest**
**on Its Loans, and the Allocation of**
**a Portion of that Interest to Plaintiffs**

The Court finds that, during all relevant times, DMI charged Dolphin Direct interest on

the loans that DMI extended, and that DMSI then did the same.  Peter testified that, although

there was no documentation memorializing the loans until years after they were first issued, the

loans were understood to contain a term requiring that interest be charged by DMI, and then by

DMSI, as calculated through a set formula.  (*Id*., at 308:19-309:1.)  The financial statements

audited by Baker Tilly show that Dolphin Direct made interest payments of $5,489,651 during

the 2003-through-2007 audit period, $12,683,186 during the 2008-through-2011 audit period,

and $652,961 during the 2012-though-2013 audit period, on loans made by DMI or DMSI to

Dolphin Direct.  (Pl. Ex. 14, Tab A, at 5, 16; Tab B, at 5, 19; Tab C, at 5, 17; *see* Tr., at 437:24-

438:15 (Peter).)  Further, the financial statements audited by Baker Tilly reflect that Dolphin

Direct owed DMSI $18,662,864 as of December 31, 2007, $9,610,105 as of December 31, 2011,

and $22,165,727 as of December 31, 2013.  (Pl. Ex. 14, Tab A, at 4; Tab B, at 4; Tab C, at 17;

*see also* Tr., at 439:14-22 (Peter).)  The Court accepts Peter's testimony at trial that Dolphin

Direct's interest payments on this debt were considered expenses of the partnership (*see* Tr., at

328:9-15), and, as such, they were allocated to the limited partners on a *pro rata* basis, as

reflected in Form K-1 tax forms that were provided to the limited partners each year (*see, e.g.*,

Pl. Ex. 18; *see also* Tr., at 328:16-23).

The Court also finds that all of the interest payments made by Dolphin Direct to DMI

(and then to DMSI) were applied to increase DMI's (and then DMSI's) own equity stake in the

---

to loans having a maturity date of September 2014 (*id*., at 428:4-12), but the Court, upon its
review of the Guarantee, does not discern any such reference.

fund.  In fact, Peter testified that Dolphin Direct never made any interest payments to DMI or

DMSI in cash (*id.*, at 319:19-24); instead, Dolphin Direct apparently recognized those payments

on its books as capital contributions made by DMI or DMSI to the fund, thereby increasing the

value of DMI's or DMSI's own capital account (*id.*).  This redirection of the interest payments

(which Plaintiffs describe as "converting" the payments into equity (*see, e.g.*, Proposed Findings

¶ 104)) had the effect, as confirmed by Peter, of diluting other partners' shares of the fund and

correspondingly increasing DMI's or DMSI's share, which, in turn, had the effect of increasing

the amount of any potential distributions that DMI or DMSI might receive from the fund, relative

to the other partners (*id.*, at 319:25-320:19; *see also id.*, at 329:14-24).

**3.    The Incomplete Disclosure of Dolphin
Direct's Debt Arrangements in the Offering
Memorandum and Partnership Agreement**

The Court finds that the Offering Memorandum and Partnership Agreement disclosed

that Dolphin Direct would incur debt as part of its investment strategy.  In particular, as noted

above, both documents provided that Dolphin Direct would bear the "costs of capital" arising

from the fund's operations.  (Pl. Ex. 4, Tab A, at 11, § 3.6(c); Tab B, at 20.)  Nevertheless, the

Court finds that none of the Offering Documents disclosed that Dolphin Direct would be

incurring debt from *DMI* to finance its investments, or that the limited partners' shares in the

fund would routinely be diluted by the application of the fund's interest payments to DMI's

capital account.

It is true that the Partnership Agreement and the Offering Memorandum contained

conflicts-of-interest disclaimers, and the Partnership Agreement specifically disclosed the

possibility that DMI might "engage in transactions with [Dolphin Direct]."  (*See id.*, Tab A, at 4,

§ 2.6; Tab B, at 25.)  While that disclaimer disclosed the possibility, elsewhere provided for in

the organizational documents, that Dolphin Direct would enter into transactions with DMI for the

19

sale of portfolio investments (*see id.*, Tab A, at 7-8 § 3.1(i); Tab B, at 13), it did not disclose the possibility, as Scharfman opined at trial (*see* Tr., at 43:22-43:25), that Dolphin Direct would receive loans from, and pay interest to, DMI, on the last of a series of downward-flowing, inter-Dolphin-entity demand loans.  Furthermore, the disclaimer did not disclose that the limited partners' ownership share of Dolphin Direct would be diluted by the routine application of Dolphin Direct's interest payments to increase DMI's own stake in the fund.

        **C.**      **Plaintiffs' Investments in Dolphin Direct**

            **1.**      **Plaintiffs' Relationship With Peter Salas**

Plaintiffs Carlos and Ada are residents of South Carolina and are married to each other. (JPO ¶ 7(i).)  Carlos is Peter's uncle (Tr., at 482:24-25 (Peter)), and, as noted above, is also the father of Carlos P. (*id.*, at 483:1-2 (Peter)), whom Peter hired at some point to work for Dolphin Asset and Dolphin Direct as an in-house attorney (*id.*, at 433:1-2 (Peter), 483:21-484:4 (Peter)).

Carlos testified that he and Ada had a "close" and "warm" relationship with Peter going back several decades prior to the events at issue.  (*Id.*, at 117:12-14, 119:8-12.)  Carlos recalled that he first met Peter in 1960, when Peter was a child, but they established a close relationship in 1973, while Carlos was living in Argentina, and Peter subsequently convinced Carlos to move to the United States in 1974, following the death of Carlos's father.  (*Id.*, at 117:1-20.)  Carlos testified that he and Peter spent "quite a bit of time" together over the years (*id.*, at 118:1-3), during which, in addition to participating together in social outings and familial gatherings (*id.*, at 119:8-12), they discussed Carlos's business ventures (*id.*, at 118:1-119:7).  In particular, Peter provided Carlos with business and financial advice when Carlos set up a business in 2001, and also discussed with him Carlos's business dealings with a certain Italian company.  (*Id.*, at 118:7-11, 119:22-120:1.)  With respect to the company Carlos set up in 2001, Carlos testified that Peter

had initially intended to invest in that company and had helped to structure that intended

investment, but, eventually, the investment did not take place.  (*Id*., at 118:12-19, 119:3-7.)

Carlos testified that, prior to his investment in Dolphin Direct, he had trust and confidence in

Peter, and generally followed Peter's advice.  (*Id*., at 119:13-24.)

### 2.  **Plaintiffs' Decision To Invest in Dolphin Direct**

Carlos testified that Peter first discussed with him the opportunity to invest in Dolphin

Direct during a golf outing in October or November 2003.  (*Id*., at 121:25-122:11; 178:17-

179:17.)  Carlos recalled, in particular, that Peter initiated the conversation by recommending

that Carlos's brother (who then lived in Venezuela) invest in Peter's fund because Peter "could

easily offer better returns than what [Carlos's] brother was getting."  (*Id*., at 121:25-122:11; *see*

*also id.*, at 178:17-179:17.)  Carlos further testified that, even though he had no prior private

investment experience, he considered investing in Dolphin Direct because he trusted Peter, such

that he and Ada believed that Dolphin Direct "sound[ed] like a good idea to make some money."

(*Id*., at 124:19-24, 125:10-13.)  Carlos also noted, with respect to his decision to invest in

Dolphin Direct, that he believed Peter "had a certain background that you could trust," including

a Harvard education and prior employment with J.P. Morgan.  (*Id*., at 125:7-9.)  Although Peter

did not directly contradict Carlos's account of the circumstances in which Carlos learned of the

opportunity to invest in Dolphin Direct and as to why he decided to do so, Peter testified that he

did not ask either Carlos or Ada to become limited partners in the fund.  (*Id*., at 487:15-18.)

As noted above, in accordance with the Offering Documents, in order for an individual to

become a limited partner in Dolphin Direct, that person would be required to meet certain

financial requirements of an "accredited investor."  (Pl. Ex. 4, Tab B, at 3; Tab C, at 16; *see also*

Tr., at 189:13-190:3 (Carlos).)  Further, as Peter testified, to invest in Dolphin Direct, an

individual would be required, simultaneously, to be a partner in Dolphin Offshore.  (Tr., at

431:25-432:3.)  The Court finds that, notwithstanding the fact that Carlos and Ada did not meet

the criteria to be accredited investors (*see id*., at 122:9-21 (Carlos)), and were not partners of

Dolphin Offshore (*id*., at 432:4-6 (Peter)), Peter waived both requirements in order to permit

them to invest in Dolphin Direct as limited partners (*id*., at 122:9-123:1 (Carlos), 432:7-12

(Peter))).  Peter explained that he waived the requirements at the request of Carlos P., Plaintiffs'

son, who, at that point, owned 25% of Dolphin Advisors.  (*Id*., at 432:13-15.)

### 3.     Plaintiffs' Receipt of the Offering Documents

Although the Court only heard testimony from Carlos, and not Ada, at trial, Carlos's

testimony makes sufficiently clear, and the Court therefore finds, that neither he nor Ada relied

on the contents of the Offering Documents before deciding to invest in Dolphin Direct.  Carlos

recalled receiving copies of those materials, which he testified to having completed and signed

prior to investing in the fund.  (*Id*., at 126:23-127:12; *see* Pl. Ex. 4.)  Nevertheless, Carlos's

testimony reflects that he did not read the Offering Memorandum; rather, at most, prior to

signing the Partnership Agreement and Subscription Documents, he may have lightly skimmed

the documents without serious regard to their contents, and no evidence presented at trial

suggests that Ada gave them any greater attention.

With respect to the Partnership Agreement, Carlos specifically testified as follows:

> Q:     Prior to investing in Dolphin Direct, did you read the
> [Partnership Agreement]?
>
> A:     Not really.  We invested and these were supposed to be
> pro forma type documents.  Just the normal thing, just look
> at them and put them in your file, that sort of thing.  We
> never paid much attention to it.
>
> Q:     You said not really in response to my question.  Is the
> answer, no, you didn't?

A:      I didn't read them thoroughly.  I read them, yes.  I'm sure I
        perused[14] them and looked at them, yes.

Q:      You just said not really and now you are telling me you
        perused them?

A:      Right.  I didn't read them completely.  I read parts of it, I'm
        sure.

Q:      What parts did you read?

A:      I do not recall.

(Tr., at 183:5-20.)  The Court finds that Carlos's credibility on the question of whether he read

the Partnership Agreement at all was undermined by his prior deposition testimony, as brought

out on his cross-examination at trial:

Q:      Mr. Salas, could you please look at . . . Line 7 on page 29:

                'MR. OSBORN:      Prior to investing in Dolphin
                                  Direct, did you[] review the
                                  partnership agreement?

                'MR. SALAS:       No.'

        Did I read that correctly?

A:      Yes.

Q:      In your deposition you testified that you didn't read the
        partnership agreement and here you've kind of waffled.
        Can you tell me whether you read the partnership
        agreement or didn't read the partnership agreement prior to
        you and your wife investing in Dolphin Direct?

A:      I don't believe I did, not at least completely, or as thorough
        as I should, obviously.  I think part of this is a
        misunderstanding in what I signed or what kind of papers.

---

[14] From context, the Court does not understand Carlos to have used the word "peruse" to
mean that he read the contents of the Partnership Agreement fully and carefully, but rather to
mean that he only scanned the document in a cursory fashion.

> I didn't know exactly what the partnership agreement was or the subscription document was.
>
> Q:   At your deposition I put the document in front of you, didn't I?  I identified it as the partnership agreement Tab A. So I showed you the partnership agreement specifically.
>
> A:   That's correct. . . .

(*Id.*, at 186:21-187:17.)

Similarly, Carlos initially testified at trial that he read the Offering Memorandum prior to investing in Dolphin Direct, but, after being confronted with his prior deposition testimony, he eventually conceded that he had not done so:

> Q:   Prior to investing in Dolphin Direct, did you read the . . . [Offering Memorandum]?
>
> A:   I'm sure I looked at it also, yes.  Because we received it, I believe, two or three sets of documents.  One of them we had to fill.  Another we had to just put our initials in.
>
> Q:   Do you know what a confidential offering memorandum is?
>
> A:   No.
>
> Q:   And at your deposition on page 29 I asked you:  Prior to investing in Dolphin Direct, did you review the offering memorandum?  On the next line, line 6, you say no.  Did I read that correctly?
>
> . . .
>
> A:   I said no.
>
> Q:   Is that the same testimony you would offer today?
>
> A:   Basically I have, since then, become more familiar with it. So somehow the dates may get crossed. I remember thinking what you were talking.  And if you continue, you will see that I mentioned filling out one of them because that's what you were referring to, a document that I had put my name, my address, etc., and ask some questions.  That one, yes, of course, I did see it because I filled it.

> Q:    As you sit here today, is it your testimony that prior to
>       investing in Dolphin Direct, you did not read the
>       confidential offering memorandum?
>
> A:    You are probably right there.

(*Id.*, at 187:19-189:1.)

With respect to the Subscription Documents, Carlos testified he recalled looking at them at some point, and noticed that they required the signatory to confirm that he or she satisfied the financial requirements of an "accredited investor." (*Id.*, at 189:2-12.) Nonetheless, Carlos conceded that he "didn't know exactly what the . . . subscription document was" (*id.*, at 187:3-12), and, when prompted about his having signed the documents, he stated that he, in fact, did not actually "remember signing this form" (*id.*, at 192:24-193:4).

Furthermore, Carlos's testimony, fairly read, reflects that he had made his decision to invest in Dolphin Direct even before he received the Offering Documents from Peter. Carlos testified that he had agreed to invest in Dolphin during his golf outing with Peter in October or November 2003, without seeing the Offering Documents. (*Id.*, at 125:14-25.) Carlos explained that he had agreed to invest in Dolphin Direct, without seeing such documents, because he "never thought it was that important, and the documents were described to me." (*Id.*, at 126:1-4.) Carlos further explained his belief at the time that the documents were "forms that were almost irrelevant, but it had to be done just to document things." (*Id.*, at 126:5-7.)

In light of Carlos's trial testimony, which reflects that he, at best, cursorily read the Offering Documents, and likely did not read the Offering Memorandum and Partnership Agreement at all, the Court finds that Plaintiffs did not rely upon any of the Offering Documents in making their decision to invest in Dolphin Direct.

### 4.     Plaintiffs' Periodic Receipt of Update Letters

Plaintiffs periodically received update letters (each, an "Update Letter") from Peter between October 2004 and December 2013.[15]  The Update Letters, which were printed on Dolphin Asset letterhead[16] and signed by Peter, generally disclosed the amount and changes in Plaintiffs' capital account, provided updates as to Dolphin Direct's investment activities, and, on certain occasions, sought additional capital contributions (*i.e.*, as a capital call).  (*See generally* Pl. Ex. 1; *see also* Tr., at 145:13-18 (Carlos).)  Carlos testified that he most likely received all of the Update Letters by e-mail.  (Tr., at 145:23-25, 217:13-218:3.)  Further, Carlos testified credibly, and the Court finds, that he read the Update Letters when he received them.  (*Id.*, at 195:4-5.)

### 5.     Plaintiffs' Capital Contributions to Dolphin Direct

The Court finds that, as described in further detail below, Plaintiffs made four separate capital contributions to Dolphin Direct, totaling $236,035, between May 2004 and October 2007.

First, Plaintiffs' initial investment in Dolphin Direct, made in May 2004, amounted to $50,000.  (JPO ¶ 7(xvii); Tr., at 127:13-18 (Carlos).)

Second, in April 2005, Plaintiffs received an Update Letter requesting an additional capital contribution of $31,035 (Pl. Ex. 1, Tab B; *see* Tr., at 145:19-146:17 (Carlos)); in response

---

[15] Plaintiffs received 13 Update Letters in total – in October 2004, April 2005, September 2005, May 2006, August 2007, September 2007, February 2009, September 2009, October 27, 2011, February 2013, November 2013, and December 2013.  (*See generally* Pl. Ex. 1.)  The Court notes that the only copy of the October 2004 Update Letter that is contained in the trial record appears to be in draft form.  (*See* Pl. Ex. 1, Tab A.)

[16] As noted above, Dolphin Asset provided administrative services for Dolphin Advisors (*see* Tr., at 286:23-287:20 (Peter), 447:21-448:11 (Peter)), and thus presumably prepared the Update Letters at the direction of Dolphin Advisors as part of that role.

to and in reliance on that Update Letter, Plaintiffs made a contribution of the requested amount, by sending Dolphin Direct a check shortly thereafter.[17]

Third, in September 2005, Plaintiffs received an Update Letter requesting an additional capital contribution of $71,673. (Pl. Ex. 1, Tab C.) Contrary to Defendants' assertion that Plaintiffs made a capital contribution of $75,494 in response to this Update Letter (*see* Def. Proposed Findings ¶ 65), the Court finds that Plaintiffs' contribution at that time, made in response to and in reliance on the Update Letter, was $85,000. Although Plaintiffs' expert, Scharfman, opined in his expert report that Plaintiffs' September 2005 contribution was only $75,494 (*see* Def. Ex. A, at 3), there is no documentation in the record supporting this figure. Rather, the only documentation evidencing Plaintiffs' actual contribution made is a completed Contribution Instruction form, dated September 28, 2005 and attached to the September 2005 Update Letter, stating that Plaintiffs "elect[ed] to contribute up to $85,000," and further indicating that Plaintiffs had "wired the funds in the amount indicated above" to Dolphin Direct's account. (Pl. Ex. 1, Tab C.) Furthermore, Carlos testified that he wired $85,000 to Dolphin Direct in September 2005, and that he understood that none of this amount was returned to him around that time. (Tr., at 148:4-25, 151:6-14.)[18]

---

[17] The Court notes that the documents submitted in connection with the April 2005 Update Letter show that Plaintiffs issued checks to Dolphin Direct in April 2005 amounting to $40,000 (*see* Pl. Ex. 1, Tab B), but Carlos testified that Peter "may have returned some because he only requested 31,000, etc., but I don't remember that" (Tr., at 146:10-147:9). In any event, counsel for both parties stipulated at trial that Peter returned to Plaintiffs the difference between the requested capital contribution and the amount of Plaintiffs' checks, such that Plaintiffs' April 2005 capital contribution was, in fact, in the requested amount of $31,035. (*Id.*, at 149:1-150:24.)

[18] Although not relevant to the Court's conclusions, the Court notes that the parties stipulated, in the Joint Pretrial Order, that Plaintiffs' capital contribution in response to the September 2005 Update Letter took place in October 2005 (*see* JPO ¶ 7(xix)), while both parties' post-trial submissions instead assert, consistent with the documentary evidence presented at trial,

Finally, in September 2007, Plaintiffs received an Update Letter requesting a capital contribution of $59,879, and in response to and in reliance on that Update Letter, Plaintiffs made a $70,000 capital contribution to Dolphin Direct in October 2007.  (JPO ¶ 7(xx); Pl. Ex. 1, Tab F; *see* Tr., at 151:20-24, 152:14-16 (Carlos).)

The Update Letters submitted into evidence reflect that Dolphin Direct made only one more capital call thereafter, in a September 2009 Update Letter (*see* Pl. Ex. 1, Tab H), but Plaintiffs apparently declined to make a capital contribution in response.

### 6.   Involuntary Liquidation of Plaintiffs' Dolphin Direct Capital Account

The Court finds that Plaintiffs received three separate distributions, amounting to a total of $91,757.68, from 2004 to 2013, when Plaintiffs' capital account was involuntarily cashed out by Dolphin Direct.

Plaintiffs received their first distribution, as an investment dividend in the amount of $4,628.54, in October 2004.  (JPO ¶ 7(xvii); *see* Tr., at 195:9-196:4 (Carlos).)

In November 2013, after several years of apparent decline in the value of Plaintiffs' capital account (*see* Pl. Ex. 1, Tabs G-J), Plaintiffs received an Update Letter advising them that Dolphin Direct would be providing them with a distribution of $73,183 from their capital account, which was then valued at $87,772.  (*Id.*, Tab K; *see also* Tr., at 155:22-157:6 (Carlos).) Peter testified at trial that he had decided to make this disbursement to Plaintiffs (and, similarly, to make disbursements to other limited partners), in order to help them meet their tax obligations arising from the September 2013 sale of one of Dolphin Direct's portfolio holdings.  (Tr., at 358:5-359:13.)  In the November 2013 Update Letter, Peter also explained:

---

that Plaintiffs' investment actually took place in September 2005 (*see* Pl. Proposed Findings ¶ 24(c); Def. Proposed Findings ¶ 65).

28

> As you know, I have been bitterly disappointed with the
> performance of this fund.  The Partnership provisions no longer
> allow for investments in new companies to be made.  Unable to
> make new investments, [Dolphin Direct] will not be able to
> recover the capital invested by its partners.  I apologize for this
> abject failure.

(Pl. Ex. 1, Tab K.)  The Court finds that, after Plaintiffs received this Update Letter, and also in

or around November 2013, Peter, on behalf of Dolphin Direct, sent Plaintiffs a check for the

promised $73,183.  (JPO ¶ 7(xxi); *see* Tr., at 162:23 (Carlos), 360:1-3 (Peter).)

Plaintiffs received two additional Update Letters in December 2013 concerning a final

liquidation of their capital account.  (Pl. Ex. 1, Tabs L & M.)[19]  The first of those Update Letters,

as reflected in the letter itself and as explained by Peter at trial, advised Plaintiffs that they had

the option to withdraw the remaining balance of their capital account, then valued at $14,589, in

order to offset the tax liability that would arise from Dolphin Direct's September 2013 sale of

one of its portfolio assets.  (Pl. Ex. 1, Tab M; Tr., at 359:1-362:8.)  That letter also advised that,

in the event that all of the limited partners elected to withdraw their remaining funds from their

capital accounts, Dolphin Direct would assess a 10% penalty on the withdrawals instead of the

normal 15% penalty.  (Pl. Ex. 1, Tab M.)  The Court finds that Plaintiffs did not thereafter notify

Peter that they intended to withdraw their remaining funds from Dolphin Direct.  (*See* Tr., at

361:20-24 (Peter).)

---

[19] The Court notes that Peter testified that the December 2013 Update Letters, as
submitted in Plaintiffs' Trial Exhibit 1, were not placed in the chronological order in which they
were sent to Plaintiffs, as the letter contained in Tab M was sent prior to the letter contained in
Tab L.  (Tr., at 360:4-17; *see* Pl. Ex. 1, Tabs L & M.)

Plaintiffs then received a second Update Letter in December 2013[20] advising them that "[a] check in the amount of $13,946.14 is being sent to your address today, representing the closing balance of your interest in [Dolphin Direct]."  (Pl. Ex. 1, Tab L.)  The Court finds that Plaintiffs received this check.  (JPO ¶ 7(xxii); *see* Tr., at 362:9-14 (Peter).)[21]  At trial, Peter testified that he believed that cashing out Plaintiffs' capital account in Dolphin Direct would protect Plaintiffs from tax liability.  (Tr., at 361:25-362:8.)  Peter also testified that he had applied only a 3% penalty to the liquidation of Plaintiffs' account, "due to this unusual situation" (*id*., at 335:9-10, 362:15-21 (quoting Pl. Ex., 1, Tab M)), and that the monies retained as a result of this penalty were allocated to the remaining partners of Dolphin Direct, which at that point was 90% owned by DMSI (*id.*, at 335:24-336:5).

Peter conceded at trial, and the Court finds, that neither the Offering Memorandum nor the Partnership Agreement disclosed the possibility that a 3% (or any other) penalty would be applied in the event of an involuntary liquidation of a limited partner's capital account.  (*See id*., at 335:16-21.)  The Court also finds that, based on the evidence of the amount deducted from Plaintiffs' capital account as of the date of its final liquidation (*see* Pl. Ex 1, Tabs L & M), the deducted amount ($642.86) was approximately 4.4% of Plaintiffs' remaining balance in the account at the time of the liquidation, not 3% (*see* Pl. Proposed Findings ¶¶ 168-70).

---

[20] The parties did not present any evidence of the precise date in December 2013 in which Plaintiffs received the letter, which was merely dated "December 2013."

[21] Although not relevant to the Court's conclusions, the Court notes that, while Plaintiffs assert in their Proposed Findings that Plaintiffs never deposited this check (Pl. Proposed Findings ¶ 26), no evidence on that point was presented by Plaintiffs at trial.

### 7.    Plaintiffs' Receipt of the 2007 Financial Statements

As noted above, in 2008, Baker Tilly audited Dolphin Direct's financial statements for the period from December 2003 to December 31, 2007.  The Court finds, as also noted above, that the 2007 Financial Statements disclosed that Dolphin Direct had incurred debt on loans extended by DMI for the purpose of enabling Dolphin Direct to acquire investment assets, and that Dolphin Direct was paying interest to DMI on those loans.  (*See* Pl. Ex. 14, Tab A, at 5, 16; Tr., at 437:24-438:15 (Peter).)  As discussed below, however, the Court finds that Plaintiffs did not receive a copy of the 2007 Financial Statements until February 2014.

In February 2009, Plaintiffs received an Update Letter stating, in relevant part, that "the audit for the period from inception through December 31, 2007" was attached to the letter. (Pl. Ex. 1, Tab G.)  The version of that letter that is contained in Plaintiffs' Trial Exhibit 1, although containing Peter's signature, is marked "DRAFT" and, as presented to the Court, it does not include a copy of the 2007 Financial Statements (*id.*), while the version of that letter that is contained in Defendants' Trial Exhibit B appears to have been the final letter, and it does include the 2007 Financial Statements as an attachment (Def. Ex. B).

Peter testified at trial that, although he was unable to determine whether specific letters were sent to particular investors at a given time (*see, e.g.*, Tr., at 453:7-10), and thus he had no firsthand knowledge of the February 2009 Update Letter's having been sent to Plaintiffs (*id.*, at 452:2-7, 457:4-9), Dolphin Asset followed a standard office procedure for ensuring that Update Letters would be distributed to Dolphin Direct partners, and that procedure would have been used in the case of the February 2009 Update Letter (*id.*, at 458:14-459:14).[22]  Essentially, Peter

---

[22] In particular, according to Peter, he would draft the text of the Update Letters; Dolphin Asset's office manager, Alan Petrulis ("Petrulis"), would then input particular information pertaining to each partner (*e.g.*, names, capital account values) into separate letters; Peter and

testified to an assumption on his part that Plaintiffs would have received the 2007 Financial Statements because that would have been expected, given Dolphin Asset's ordinary practice as to how the Update Letters were sent out.  (*Id.*, at 457:4-9 (stating that he "could only presume that [the 2007 Financial Statements were sent to Plaintiffs] from [his] history with 120 such letters over the prior decades").)  Further, Peter testified that neither Plaintiffs nor any of the other Dolphin Direct partners communicated to him that the 2007 Financial Statements were not attached to the February 2009 Update Letter.  (*Id.*, at 459:19-460:7.)

Carlos, on the other hand, testified that, although he had received a February 2009 Update Letter by email, the 2007 Financial Statements were not attached to the email.  (*Id.*, at 153:10-16, 230:17-231:6.)  Carlos explained that he specifically remembered receiving the February 2009 Update Letter because he "was very happy that [Plaintiffs' capital] account had only [de]creased by .5 percent" in light of the then market-wide financial difficulties.  (*Id.*, at 230:8-24.)  Carlos further stated affirmatively that he "did not get the attachment," and noted that it was not uncommon for Dolphin Direct to fail to include attachments (such as Form K-1 tax forms) in emails to Plaintiffs transmitting Update Letters.  (*Id.*, at 230:25-231:6.)[23]  Carlos testified, rather, that Plaintiffs first received the 2007 Financial Statements, together with the 2011 Financial Statements, on January 13, 2014, attached to an email from Peter responding to a

---

Carlos P. would then review the letters; and, finally, Petrulis would send the Update Letters to the partners, typically via email.  (*Id*., at 449:22-450:7, 451:1-15, 452:2-453:10, 456:15-457:17, 458:17-18.)  Peter further testified that Petrulis would save copies of the Update Letters, including any attachments to those letters, in a computer file, after they had been sent to the partners.  (*Id*., at 452:8-453:6.)

[23] Carlos testified that he often called Peter (or "the office") to request documents that were inadvertently not attached to Update Letters, and that, although he assumed he did so with respect to the February 2009 Update Letter, he was not certain, given that he "didn't attach major importance to the fact that [the 2007 Financial Statements] [were] not there."  (*Id*., at 231:7-19.)

concern Carlos had about the calculation of Plaintiffs' total investment in Dolphin Direct.  (*Id.*, at 133:1-21; *see* Pl. Ex. 26.)  According to Carlos, beginning in at least 2012, Plaintiffs had asked Peter "again and again" for financial information relating to their investment in Dolphin Direct (*id.*, at 135:12-20; *see also id.*, at 133:19-134:10, 144:1-145:2), and finally succeeded in obtaining financial statements for the fund after Carlos emailed Peter, in late December 2013, forwarding several questions posed by Plaintiffs' accountant about their investment losses (*id.*, 135:12-20, 141:23-142:13; *see* Pl. Ex. 27 (December 26, 2013 to January 8, 2014 email exchange between Carlos and Peter concerning Plaintiffs' and Plaintiffs' accountant's concerns as to the calculation of Plaintiffs' investment losses)).  Carlos further testified that, upon receiving both sets of financial statements from Peter, Plaintiffs immediately forwarded them to their accountant (*id.*, at 142:14-20), who advised them in late February or early March 2014 that "it was a disaster," and that they "should look [for] an attorney" (*id.*, at 143:12-18).

In light of the evidence presented at trial, the Court finds that Plaintiffs made requests for financial information starting sometime in 2012 and on additional occasions thereafter, but first received the 2007 Financial Statements on January 13, 2014, as transmitted by email from Peter. It is true that Peter's testimony that Dolphin Asset employed a consistent procedure for sending Update Letters to limited partners and that no limited partners complained that the 2007 Financial Statements were not attached to February 2009 Update Letter, constitutes circumstantial evidence that the 2007 Financial Statements were sent to Plaintiffs in February 2009.  Defendants, however, have not put forward any direct evidence that the 2007 Financial Statements were in fact attached to the February 2009 Update Letter sent to Plaintiffs.[24]  On the

---

[24] Defendants point out in their Proposed Findings (*see* Def. Proposed Findings ¶ 75) that Scharfman, in his expert report, stated that Plaintiffs first learned that Dolphin Direct had incurred debt from Dolphin Management in late 2008 or early 2009, upon their receipt of the

other hand, Carlos gave credible direct testimony that Plaintiffs did not receive the 2007

Financial Statements in February 2009, but rather received them for the first time in

January 2014, after repeatedly demanding more financial information from Peter about their

investment losses.  In light of that direct evidence, the Court finds that Plaintiffs first received the

2007 Financial Statements, in addition to the 2011 Financial Statements, in January 2014.

Given the Court's finding that Plaintiffs did not receive the 2007 Financial Statements

until January 13, 2014, the Court finds, in turn, that Dolphin Direct first disclosed to Plaintiffs,

on that date, the existence of loans it had received from DMI (and/or DMSI), and the interest it

had paid to DMI, and then to DMSI, on those loans.  Finally, the Court finds, based on Peter's

testimony that it was "[n]ot likely" that he had sent the Guarantee to Plaintiffs (Tr., at

310:15-21), that the Guarantee was never disclosed to Plaintiffs prior to the commencement of

this litigation.

## II.   CONCLUSIONS OF LAW

### A.   Plaintiffs' Fraud Claims

Although Plaintiffs' fraud claims were the last of the claims that they asserted in their

Complaint (*see* Compl. ¶¶ 104-07 (Count VI)), Plaintiffs made their fraud accusations the

centerpiece of the trial, and the Court will therefore address them first herein.  It should also be

noted that, while Plaintiffs purported, in their Complaint, to assert fraud claims against "all

Defendants" – alleging that Peter made misrepresentations and omissions on his own behalf and

"on behalf of the Corporate Defendants" (*id.* ¶ 104) – the only named defendants as to which

---

2007 Financial Statements (Def. Ex. A, at 12).  At trial, however, Scharfman testified that this
statement had been made in reliance on Peter's deposition testimony, and that, based on his own
later review of the email that Plaintiffs received from Peter on January 13, 2014, he had since
come to the view that Plaintiffs first received the 2007 Financial Statements on that date.  (Tr., at
45:8-46:8; *see id.*, at 75:23-76:14; *see also* Pl. Ex. 26.)

Plaintiffs are now pressing their fraud claims are Peter, DMI, and Dolphin Advisors (*see* Pl. Proposed Conclusions § IV), although they also seek to add DMSI as a defendant on all claims that they are maintaining against DMI (*see id.* ¶ 17).[25]  Specifically, in their post-trial submissions, Plaintiffs contend:  (1) that Peter committed fraud by inducing Plaintiffs, through material omissions in the Offering Documents, to make an initial investment in Dolphin Direct (*id.* ¶¶ 96-105); (2) that, following Plaintiffs' initial investment, DMI (and DMSI, as DMI's successor) and Dolphin Advisors, aided by Peter (based on the dominion and control that he exercised over those entities), committed fraud by inducing Plaintiffs, through later solicitations that also omitted material information, to make additional investments in Dolphin Direct (*id.* ¶¶ 108-15); and (3) that DMI (and DMSI) and Dolphin Advisors, aided by Peter, also fraudulently induced Plaintiffs, by material omissions in the Update Letters, to maintain – or "hold" – their investments after they had made them (*id.*)  Prior to determining whether Plaintiffs should be permitted, at this juncture, to add DMSI as a defendant on these claims, the Court will first determine whether Plaintiffs' fraud claims against the Defendants named in their pleading can stand.  Based on the evidence presented at trial, none of these claims can survive.

---

[25] In their post-trial submissions, Plaintiffs state that, based on the fact that DMSI was DMI's "successor in interest" (*see* Pl. Proposed Conclusions ¶ 10), DMSI should be held "liable to the same extent [DMI] is found to be liable" (*id.* ¶ 17).  By persistently referring to the two entities collectively, however (*see supra*, at n.8), Plaintiffs at least implicitly argue, throughout their submissions, that DMSI should be found liable, *not just for the debts of DMI*, but also for any purportedly wrongful conduct in which DMSI engaged, on its own behalf, after it took over from DMI as a general partner in Dolphin Direct (*see generally* Pl. Proposed Findings; Pl. Proposed Conclusions).  For purposes of analyzing Plaintiffs' fraud and breach-of-fiduciary-duty claims, the Court has assumed that this is what Plaintiffs have intended to argue, although, as discussed further below (*see* Discussion, *infra*, at Section II(B)(2)(b)(ii)), the Court does not necessarily accept the premise that DMSI was a "mere continuation" of DMI, such that there would be no need to parse the conduct of the two entities based on the separate periods of their involvement in the relevant events.

### 1.   Claims That Plaintiffs Were Fraudulently <u>Induced To Invest in Dolphin Direct</u>

Plaintiffs' first fraud claim is premised on their assertions that that the Offering Documents omitted material information, most importantly that Dolphin Direct would be funded in significant part with long-term debt and that the debt would be funded through inter-Dolphin-entity loans.  (*See id.* ¶ 98.)  According to Plaintiffs, they were induced to invest in Dolphin Direct in reliance on these material omissions, and they lost a substantial portion of their investments as a result of the fraud.  Plaintiffs' second fraud claim is premised on the allegation that later solicitations, as contained in the Update Letters, omitted the same information, and that Plaintiffs relied on those letters to add to their initial investment.  All of these claims – alleging that, at various points in time, Plaintiffs were fraudulently induced to invest in Dolphin Direct – fail both because they are barred by the New York statute of limitations and because, in any event, Plaintiffs did not meet their burden of proving either justifiable reliance or a causal connection between the claimed omissions and the losses they incurred.

### a.   <u>The Claims Are Time-Barred.</u>

Given that the Court's jurisdiction rests upon diversity of citizenship, the Court applies New York's statute of limitations and choice-of-law rules to Plaintiffs' claims.  *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998).  In New York, pursuant to the state's borrowing statute, a cause of action must be timely under both the laws of New York and the jurisdiction where the cause of action accrued.  N.Y. C.P.L.R. § 202; *2138747 Ontario, Inc. v Samsung C&T Corp.*, 31 N.Y.3d 372, 376-77 (2018).  Generally, in cases involving economic injuries, plaintiffs suffer injuries in their state of residence, and thus, the cause of action accrues in that state.  *Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 374 (S.D.N.Y. 2004) (citing *Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529 (1999)).  Given that Plaintiffs are

residents of South Carolina, their claimed economic injury would have been suffered in that state, and therefore all of their claims must satisfy the statutes of limitations provided by both New York and South Carolina law.  As discussed below, to the extent Plaintiffs' fraud claims relate to the making of their investments, the claims are untimely under New York's statute of limitations, and therefore, regardless of the South Carolina statute of limitations, the claims are time-barred.

Under New York law, common-law fraud claims must be brought within the greater of six years from when the cause of action accrues, or two years from when the plaintiff could have reasonably discovered the fraud.  N.Y. C.P.L.R. § 213(8); *see In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 995 F. Supp. 2d 291, 309-10 (S.D.N.Y. 2014) ("*Bear Stearns I*").  "Under the six-year rule, the statute of limitations begins to accrue on the date(s) that plaintiffs enter an agreement to invest or lend funds as a consequence of fraudulent inducement."  *BRS Assocs., L.P. v. Dansker*, 246 B.R. 755, 773 (S.D.N.Y. 2000).  Under the two-year discovery rule, a plaintiff is deemed to have been reasonably able to discover the fraud when he was "possessed of knowledge of facts from which [the fraud] could be reasonably inferred."  *Ramiro Aviles v. S & P Glob., Inc.*, No. 17cv2987 (JPO), 2019 WL 1407473, at *27 (S.D.N.Y. Mar. 28, 2019) (quoting *Sargiss v. Magarelli*, 12 N.Y.3d 527, 532 (2009)).  Generally, investors take on a "duty of inquiry . . . when the facts would suggest fraud to a person of ordinary intelligence," *id.* (quoting *United Teamster Fund v. MagnaCare Admin. Servs., LLC*, 39 F. Supp. 3d 461, 477 (S.D.N.Y. 2014)); further, once the investor is put on "inquiry notice," knowledge of the fraud will be "imputed to the plaintiff unless [he or] she undertakes some 'investigative efforts' in response," *id.* (quoting *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 361 (2d Cir. 2013)).  Where the investor begins to investigate once the duty of inquiry arises, the

limitations period will begin to run when the investor, "'in the exercise of reasonable diligence,

should have discovered' the fraud." *In re MBIA Inc.*, No. 05cv03514 (LLS), 2007 WL 473708,

at *6 (S.D.N.Y. Feb. 14, 2007) (quoting *LC Capital Partners, LP v. Frontier Ins. Group*,

318 F.3d 148, 154 (2d Cir. 2003)).

Under this framework, Plaintiffs' induced-investment fraud claims are untimely.  Under

the applicable accrual rule, these claims accrued at the time of Plaintiffs' various investments –

*i.e.*, in May 2004, April 2005, September 2005, and October 2007.  *See Matana v. Merkin*,

957 F. Supp. 2d 473, 486 (S.D.N.Y. 2013) ("*Matana I*") (plaintiff's fraud claims based on

misrepresentations or omissions in offering documents accrued on the dates plaintiff made its

investments); *Ingrami v. Rovner*, 45 A.D.3d 806, 808 (2d Dep't. 2007) (fraud claim accrued

when plaintiff "transferred the money in reliance upon the defendants' allegedly false

representations"); *Hopkinson v. Estate of Siegal*, No. 10cv1743 (LBS), 2011 WL 1458633, at *5

(S.D.N.Y. Apr. 11, 2011) (plaintiff's fraud claim accrued on the date she invested in partnerships

that ultimately failed to generate promised revenues and tax deductions), *aff'd*, 470 F. App'x 35

(2d Cir. 2012).  Plaintiffs' Complaint setting forth these fraud claims was filed on February 26,

2016 (*see* Compl.), well beyond six years from the dates of each of Plaintiffs' investments.

Further, these fraud claims cannot be saved by New York's two-year discovery rule.  In

light of the Court's finding that Plaintiffs received the 2007 Financial Statements and the 2011

Financial Statements on January 13, 2014, Plaintiffs were, at that point, placed on inquiry notice

of the alleged fraud.  Carlos testified specifically that he understood, at that time, that Plaintiffs

"were losing everything and that the company had been 40 million in debt."  (Tr., at 143:1-4.)

"[I]n the exercise of reasonable diligence," *see In re MBIA Inc.*, 2007 WL 473708, at *6,

Plaintiffs could have discovered by that same date that Dolphin Direct had incurred debt to DMI

or to its successor – the key material fact that, Plaintiffs claim, had not previously been disclosed.  In particular, the notes to both sets of financial statements explicitly state that Dolphin Direct had received loans from DMI and was paying interest on those loans (Pl. Ex. 14, Ex. A, at 16; Ex. B, at 19), facts that Plaintiffs could have learned simply by reading those documents.

Plaintiffs, however, contend that they were only able to discover the alleged fraud through the assistance of their accountant, and further maintain that, although Carlos immediately sent the financial statements to the accountant upon receiving them from Peter (*see* Tr., at 142:14-20), the accountant did not respond until late February or early March 2014 because it was "the busy season . . . with all the taxes and all that" (*see id.*, at 143:7-18).  This is not sufficient to demonstrate that, with reasonable diligence, Plaintiffs could not have discovered the claimed fraud until "late February."  *See Bastys v. Rothschild*, No. 97cv5154 (CM) (GAY), 2000 WL 1810107, at *44 (S.D.N.Y. Nov. 21, 2000) (denying plaintiff's argument that, based on two-year discovery period, claim accrued when his accountant discovered fraud because "a fraud claim accrues when the *party asserting it* [], with reasonable diligence, could have discovered the fraud – not when one of the party's agents actually did discover it" (emphasis in original)).  Rather, the Court concludes that Plaintiffs were able, "in the exercise of reasonable diligence," to discover the alleged fraud on January 13, 2014, when they received the 2007 and 2011 Financial Statements.  Therefore, the limitations period, even affording Plaintiff the benefit of the two-year discovery rule, expired prior to Plaintiffs' filing of their Complaint on February 26, 2016.  Accordingly, to the extent Plaintiffs claim fraud relating to their decisions to invest in Dolphin Direct, their claims are untimely under the New York statute of limitations, and are consequently time-barred.

### b.     In Any Event, Plaintiffs Did Not Prove
### Their Induced-Investment Fraud Claims at Trial.

Even if Plaintiffs' claims that they were fraudulently induced to invest were not

time-barred, Defendants would still be entitled to judgment in their favor on those claims, based

on the evidence presented at trial.

As an initial matter, the Court notes that the choice of substantive law that would apply to

these claims is not necessarily the same as the law that governs the statute of limitations.  *See*

*Spanierman Gallery v. Merritt*, No. 00cv5712 (THK), 2004 WL 1781006, at *4 (S.D.N.Y.

Aug. 10, 2004).  Nor do the parties agree on the substantive law that should be applied by the

Court, should it reach the merits of Plaintiffs' fraud claims.  While Plaintiffs would rely entirely

on New York law[26] in support of these claims (*see* Pl. Proposed Conclusions ¶ 87), Defendants

suggest that either New York or South Carolina law may apply, but that the Court need not

resolve that question because the claims would fail either way (*see* Def. Proposed Findings

¶¶ 223-34).  While fraud claims are generally governed by the law of the state where the injury

occurred, *see In re Libor-based Financial Instruments Antitrust Litig.*, 299 F. Supp. 3d 430,

575-76 (S.D.N.Y. 2018), which, in this case, would be South Carolina, where Plaintiffs reside,

the Court agrees with Defendants that, regardless of the choice of law, Plaintiffs cannot succeed

on their investment-related fraud claims, *see Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*,

363 F.3d 137, 143 (2d Cir. 2004) ("In the absence of substantive difference . . ., a New York

court will dispense with choice of law analysis . . . .").

---

[26] Apart from New York's being the forum state, New York was apparently the state of incorporation of both DMI (*see supra*, at n.4) and Dolphin Advisors, LLC (*see* Pl. Ex. 3; JPO ¶ 7(x)).

To prevail on a fraud claim under South Carolina law, a plaintiff must establish:

"(1) a representation; (2) its falsity; (3) its materiality; (4) knowledge of its falsity or a reckless

disregard for its truth or falsity; (5) intent that the plaintiff act upon the representation; (6) the

hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely

thereon; and (9) the hearer's consequent and proximate injury." *Williams v. Quest Diagnostics,*

*Inc.*, 353 F. Supp. 3d 432, 446 (D.S.C. 2018) (quoting *McLaughlin v. Williams*, 379 S.C. 451,

456 (S.C. Ct. App. 2008)).  New York law essentially requires a plaintiff to establish these same

elements to prevail on a fraud claim.  *See Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103,

108 (2d Cir. 2009) (articulating the elements of a fraud claim under New York as including:

"[1] a misrepresentation or a material omission of fact which was false and known to be false by

defendant, [2] made for the purpose of inducing the other party to rely upon it, [3] justifiable

reliance of the other party on the misrepresentation or material omission, and [4] injury" (quoting

*Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 421 (1996))).  Further, under both South

Carolina and New York law, where, as here, a plaintiff claims fraud by omission, it must

demonstrate that the defendant had a duty to disclose the concealed fact, *see Thomas Daniels*

*Agency, Inc. v. Nationwide Ins. Co. of Am.*, 122 F. Supp. 3d 448, 452 (D.S.C. 2015); *Merrill*

*Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007), such as "where

there exists a preexisting definite fiduciary relation between the parties," *Thomas Daniels*

*Agency*, 122 F. Supp. 3d at 452; *see Robinson v. Crawford,* 46 A.D.3d 252, 253 (1st Dep't 2007)

("an omission does not constitute fraud unless there is a fiduciary relationship between the

parties" (citation omitted)).

With respect to the causation element of a fraud claim, both South Carolina law and New

York law dictate that a plaintiff may only recover damages "for harms proximately caused by the

misrepresentation." *Liberty Mut. Ins. Co. v. Year Round Pool, Inc.*, 104 F.3d 359 (4th Cir. 1996)

(applying South Carolina law) (citation omitted); *see Mishoe v. Gen. Motors Acceptance Corp.*,

234 S.C. 182, 198 (1958) (dismissing fraud claim on the ground that plaintiff's "loss was not

occasioned or proximately caused by any misrepresentations of [defendant]"); *Emergent Capital*

*Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (holding that, in the

investment context, the plaintiff must establish "a causal connection between [the] defendants'

non-disclosures and the subsequent decline in the value" of the investments); *see also Glidepath*

*Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 457 (S.D.N.Y. 2007) ("Loss causation is

the causal link between the alleged misconduct and the economic harm ultimately suffered by the

plaintiff." (internal quotation marks and citation omitted)).

Here, Plaintiffs did not establish, at trial, the elements of common-law fraud necessary to

prove their claims.  First, with respect to Plaintiffs' initial investment in Dolphin Direct in May

2004, Plaintiffs did not demonstrate that they reasonably relied on the Offering Documents,

given that the evidence showed, as the Court has found above, that Plaintiffs did not read those

documents.  Without having read the documents at issue, Plaintiffs could not demonstrate that

they justifiably relied on the information disclosed in those documents (or, more precisely,

information that was rendered misleading by material omissions) in making their decision to

invest in Dolphin Direct.

With respect to Plaintiffs' subsequent investments in Dolphin Direct in April 2005,

September 2005, and October 2007, the Court has found that Plaintiffs did read and rely upon the

Update Letters that solicited those investments, and concludes that their reliance on those letters,

in making their further investments, was justifiable.  In addition, Plaintiffs established at trial that

the Update Letters omitted several material facts, including the fact that Dolphin Direct had

entered into an inter-Dolphin-entity loan arrangement and the fact that it was not conducting audits on an annual basis.  Nonetheless, Plaintiffs did not prove that any omissions in the Update Letters proximately caused their alleged injury.

In order to establish "loss causation," Plaintiffs were required to show that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered."  *Glidepath Holding B.V.*, 590 F. Supp. 2d at 457 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)).  An omission will be considered to have caused the loss if "the risk that caused the loss was within the zone of risk *concealed* by the . . . omission[] alleged."  *Id.* (emphasis in original) (quoting *Lentell*, 396 F.3d at 172).

While Dolphin Direct's debt structure and auditing practices certainly presented risks to Plaintiffs as limited partners, those risks were not shown at trial to have caused, or, indeed, to have had any connection with, Plaintiffs' loss in the value of their investments.  The most significant risk created by the loan structure was that the loans could have been called, but there was no evidence to suggest that they were – rather, the evidence was to the contrary.  (*See* Tr., at 44:1-12 (Scharfman).)  For the same reason, to the extent Plaintiffs claim that proper audits would have revealed the loans, Plaintiffs have not shown how the failure to supply the audits affected the value of their holdings.  In fact, the evidence at trial suggested that the decline in Plaintiffs' investments was caused by Dolphin Direct's poor performance, due to the loss of value in its portfolio assets, during the financial crisis.  (*See supra*, at n.12.)  On the trial record, Plaintiffs simply did not meet their burden of establishing, and presumably could not have established, that their losses were proximately caused by any omissions in the Update Letters. *See, e.g.*, *Emergent Capital Inv. Mgmt.*, 343 F.3d at 197 ("if the loss was caused by an

intervening event, like a general fall in the price of Internet stocks, the chain of causation will not have been established").

Defendants are accordingly entitled to judgment in their favor on Plaintiffs' fraud-in-the-inducement claims relating to Plaintiffs' investments in Dolphin Direct.

### 2.   Holder Claims

Plaintiffs' holder claims are similarly based on allegations of non-disclosures.  With regard to these claims, Plaintiffs assert that, after they had invested in Dolphin Direct, DMI, Dolphin Advisors, and Peter fraudulently induced them to retain their investments by omitting from various Update Letters material information, including the fact that Dolphin Direct purportedly carried long-term debt, the fact that KPMG was no longer the partnership's auditor, copies of audited financial statements, and correct statements of the net asset value of Plaintiffs' capital account.  (*See* Pl. Proposed Conclusions ¶¶ 106-15.)  These fraud claims also fail because, regardless of whether the claims, or any portion of the claims, could be considered timely, they seek damages that are both unduly speculative and, once again, have not been demonstrated to have been causally connected to the claimed omissions.

### a.   The Law Is Unsettled as to  Whether Holder Claims Are Cognizable.

As a preliminary matter, Plaintiffs do not point to any precedent that suggests that South Carolina – the state where Plaintiffs purportedly suffered injury – would recognize a "holder claim" (*i.e.*, a claim for inducement to retain, rather than sell, a security), and this Court has not independently found any support for the proposition that such a claim could be sustainable under South Carolina law.  Plaintiffs, however, assert that they are entitled to relief under New York law, which, they maintain, does permit holder claims (*see id.* ¶ 106 (citing authority)), and Defendants do not specifically dispute that New York law recognizes such claims (*see* Def.

Resp. ¶¶ 40-54).  Nonetheless, based on recent case law from both New York state courts and federal courts construing New York law, and in light of the evidence presented at trial, the Court concludes that, even assuming that New York law could apply to Plaintiffs' holder claims, the claims would be precluded.

In support of their holder claims in this case, Plaintiffs particularly rely on *Cont'l Ins. Co. v. Mercadante*, 222 A.D. 181, 182 (1st Dep't 1927), in which, over 90 years ago, the First Department recognized the potential viability of such claims.  (*See* Pl. Proposed Conclusions ¶ 106.)  Indeed, there is no doubt that, historically, holder claims have been permitted in New York.  *See Beach v. Citigroup Alternative Investments LLC*, No. 12cv7717 (PKC), 2014 WL 904650, at *16 (S.D.N.Y. Mar. 7, 2014) (acknowledging that "New York courts have traditionally recognized holder claims as cognizable causes of action").  At this point, though, New York law has become more unsettled as to whether such claims should be recognized and, if so, the circumstances under which the claims may be considered viable.

In particular, the First Department itself called the viability of holder claims into question in a 2010 decision, *Starr Found. v. Am. Int'l Grp., Inc.*, 76 A.D.3d 25 (1st Dep't 2010).  In that case, the original endowment of the plaintiff, The Starr Foundation (the "Foundation"), was in the form of publicly traded common stock of the defendant American International Group, Inc. ("AIG").  *See id*. at 26.  The Foundation alleged that it had been seeking to divest itself of most of that AIG stock, and had in fact begun to do so, but – based on certain public misrepresentations made by AIG regarding the stability of its credit default swap ("CDS") portfolio – the Foundation had been induced to set a "floor price" (*i.e.*, a price below which it would not sell its AIG shares) that was higher than it would have set, had AIG disclosed the actual risks related to that portfolio.  *Id*. at 26-27.  Although the Foundation started to sell its

45

AIG stock, it suspended sales when the market price fell below the Foundation's pre-determined floor price. *Id*. Essentially, the Foundation claimed that, had the risks been accurately disclosed, it would have continued to sell the stock, at a lower price, and therefore would have divested itself of additional AIG stock (totaling 15.5 million shares) well before the stock price crashed months later, upon AIG's eventual report of billions of dollars in CDS losses. *Id*.

In finding that the Foundation's fraud claims were too "undetermineable and speculative" to be actionable, the court noted that, under New York's so-called "out-of-pocket rule," fraud damages are supposed to compensate plaintiffs for the "actual pecuniary loss sustained as the direct result of the wrong" – "not to compensate them for what they might have gained." *Id*. at 27-28 (quoting *Lama Holding*, 88 N.Y.2d at 421-22). The court recognized that a fraud claim based on "the inducement of an actual purchase or sale of a publicly traded security" can be understood to be "based on a transaction involving a particular quantity of the security at a particular time," such that, "to determine damages, the factfinder need determine only the effect of an accurate disclosure on the price of the security at the particular time the transaction actually occurred." *Id*. at 29. In contrast, the court observed that the Foundation's claim for damages was speculative on several levels, as it would have called upon the factfinder to determine "(1) whether the [Foundation] would have engaged in a transaction at all if there had been accurate disclosure of the relevant information, (2) the time frame within which the hypothetical transaction or series of transactions would have occurred, (3) the quantity of the security the [Foundation] would have sold, and (4) the effect truthful disclosure would have had on the price of the security within the relevant time frame." *Id.* at 29-30. The court concluded that these "cumulative layers of uncertainty amount[ed] to a difference in the quality, not just the quantity, of speculation, and t[ook] the claim out of the realm of cognizable damages." *Id*. at 30.

The court, in *Starr*, sought to distinguish *Mercadante*, stating that, "assuming . . . [*Mercadante*'s] continuing vitality," it "offer[ed] no support for sustaining a fraud cause of action that, like the Foundation's, [sought] recovery for the loss of the value that might have been realized in a hypothetical market exchange that never took place." *Id*. at 33.  Rather, the court noted, the plaintiffs in *Mercadante* had claimed damages based on the loss of their investment in bonds that they were fraudulently induced not to sell, and that "[n]othing in *Mercadante* state[d] or implie[d] that the measure of damages in that case would have been the amount for which the bonds could have been sold at some point before they lost their value."  *Id*. at 33.  Yet, despite this attempt to draw a distinction between the reasoning of the two decisions, there is undeniably a tension between them, *see id*. at 40 (Moskowitz, J., dissenting) ("Without admitting it, the majority in effect does away with most holder claims."), and, since *Starr*, New York courts have generally declined to allow fraud claims that seek damages for a defendant's having fraudulently induced a plaintiff to hold an interest in securities that, according to the plaintiff, would have otherwise been sold, *see, e.g.*, *Varga v. McGraw Hill Fin.*, *Inc.*, 147 A.D.3d 480, 481 (1st Dep't 2017) ("To the extent plaintiffs allege 'holder' claims, i.e., fraudulent inducement to continue to hold the securities, these claims violate the 'out-of-pocket' rule governing damages recoverable for fraud, and are not actionable."), *leave to appeal denied*, 29 N.Y.3d 908 (2017)); *Bank Hapoalim B.M. v. WestLB AG*, 121 A.D.3d 531, 535 (1st Dep't 2014) ("This case is essentially a 'holder' fraud case – that is, the alleged fraud is that the structured investment vehicles held their assets instead of liquidating them.  As a result, plaintiffs suffered no out-of-pocket loss."); *see also Ramiro Aviles*, 2019 WL 1407473, at *33 (noting that "New York courts have generally held that [holder] claims are not actionable" (internal quotation marks and citation omitted)).

Courts in this District, however, seemingly grappling with the tension between *Mercadante* and *Starr*, and in the absence of clarification from the New York Court of Appeals, *see Matana I*, 957 F. Supp. 2d at 490 (noting that "the New York Court of Appeals has not resolved with finality whether New York law recognizes such a retention-based theory of fraud"), have not uniformly rejected holder claims.  Rather, courts here have reached divergent conclusions as to whether New York law, post-*Starr*, in fact bars all such claims, in all circumstances.  While some courts in this District have held that all holder claims are now simply precluded, *see, e.g.*, *In re Bear Stearns I*, 995 F. Supp. 2d at 315 (holding that holder claims are barred under New York law); *see also In re the Bear Stearns Companies, Inc. Sec.*, No. 08 MDL 1963 (RWS), 2016 WL 4098385, at *16 (S.D.N.Y. July 25, 2016) ("*In re Bear Sterns II*") (reiterating earlier holding that "the most persuasive reading of relevant law barred holder claims"), others have found that New York law only bars holder claims seeking to recover hypothetical lost profits, while leaving as still viable claims seeking to recover non-speculative out-of-pocket losses, *see, e.g.*, *Matana v. Merkin*, 989 F. Supp. 2d 313, 324 (S.D.N.Y. 2013) ("*Matana II*") (predicting that the New York Court of Appeals would "recognize a limited set of holder claims, specifically, those in which plaintiffs seek to recover out-of-pocket losses, and perhaps, but not necessarily, further limited to those in which there is a non-conjectural evidentiary basis for asserting causation and tabulating damages").

In an effort to reconcile *Mercadante* and *Starr*, one court this District has reasoned that holder claims may still be sustainable under New York law where the plaintiff is able to demonstrate actual damages, *Beach*, 2014 WL 904650, at *17, finding that, at least at the pleading stage, it is sufficient for the plaintiff to allege:  "(1) the loss of substantially the entire investment, (2) whether the plaintiff would have sought to rescind the investment, had there been

an accurate disclosure of the relevant information, (3) the time frame within which the rescission would have occurred, (4) the portion of the investment that would have been sold, and (5) the effect truthful disclosure would have had on the value of the investment," *id*.  In *Beach*, as in this case, the plaintiffs had invested not in individual securities, but rather in a fund, and – as distinct from *Starr* – the plaintiffs directed no fraud claim against the issuer of the underlying securities. *See id.* at *1-2.  Rather, when the plaintiffs lost virtually their entire investments in the fund, they sued the fund and its former CEO, claiming that the fund's collapse was driven by its management's undisclosed decision to commit to taking on a major position in risky debt (a position that was greater than the fund's net asset value) and to exceed the fund's own internal restrictions on leverage in order to finance that commitment.  *Id.* at *4, 14.  In allowing the plaintiffs to proceed with their holder claims as pleaded, the court found that the plaintiffs had sufficiently alleged that, had they known about the debt transaction, they would have sought to redeem their entire investments in the fund, that there was a limited window in time in which those investments could have been redeemed, and that the fund documents provided "a metric for the valuation of the [f]und at the relevant times." *Id*. at *18.  Based on these allegations, the court found that the plaintiffs had adequately pleaded a "a non-speculative loss, at a specific time." *Id*.

### b.    Even If the Law Permits Some Holder Claims, Plaintiffs' Claims Fail.

Ultimately, this Court need not reach the difficult question of whether the court in *Beach* was correct that, under narrow conditions, holder claims under New York law remain possible, as, even if the Court were to adopt that reasoning and find New York law to apply to Plaintiffs' claims, the claims still could not stand.  In short, following a full trial in this case, this Court cannot conclude that, on their holder claims, Plaintiffs have proven a non-speculative basis for

recovering actual damages caused by the alleged non-disclosures.  While Plaintiffs demonstrated that they lost a substantial portion of their investments, they did not offer evidence that renders it reasonably certain that, at any given point in time, they would have withdrawn all or some defined portion of their investment account, had they been provided the information that, they claim, was wrongfully withheld from them.  Plaintiffs received a number of Update Letters at points when their investments in Dolphin Direct were still doing well (*see, e.g.*, Pl. Ex. 1, Tab E), and it is entirely possible that the disclosures, if made, would not have deterred them, at those times, from retaining their investments.  Although it is possible that, with complete disclosures, Plaintiffs might have considered a withdrawal in October 2011, when the Update Letter from that month revealed to them that the asset value of their capital account had markedly decreased (*see* Pl. Ex. 1, Tab I), Plaintiffs have not established that this was necessarily the case, and, even then, the Court could not be reasonably certain that Plaintiffs would have withdrawn their entire remaining capital investment in the fund, or merely sought to lessen their exposure to risk by drawing down a portion of their account.  As the Court would be required to speculate as to when, and to what extent, any hypothetical withdrawal by Plaintiffs would have taken place, the Court cannot find that Plaintiffs have adequately shown any non-speculative damages on their holder claims.

Moreover, *Starr* makes clear that a plaintiff asserting a holder claim may not escape the basic fraud requirement of proving damages proximately caused by the alleged misrepresentation or omission.  *See Starr*, 76 A.D.3d at 31 ("To the extent the Foundation argues that the ultimate drop in AIG's share price was greater than it otherwise would have been because general market conditions had worsened by the time the alleged misrepresentations were corrected, the loss was not related to the subject of the alleged misrepresentations and therefore was not proximately

caused by them." (citations omitted)); *see also AHW Inv. P'ship v. Citigroup Inc.*, 980 F. Supp. 2d 510, 520-21 (S.D.N.Y. 2013) (noting that, apart from holding that a fraud plaintiff may not recover lost profits or otherwise speculative damages, *Starr* rejected the plaintiffs' holder claims for the "distinct but related reason[]" that "the alleged misrepresentations did not proximately cause" the decline in value of the plaintiffs' investments at issue (citing *Starr*, 76 A.D.3d at 28-29)), *aff'd sub nom. AHW Inv. P'ship, MFS, Inc. v. Citigroup Inc.*, 661 F. App'x 2 (2d Cir. 2016).  In this case, as discussed above, the decline in Plaintiffs' capital account, and, indeed, the decline in the value of the limited partners' investments generally, appears to have been entirely divorced from the misrepresentations or omissions that Plaintiffs claim were made by DMI, Dolphin Advisors, or Peter.  In particular, Plaintiffs did not prove at trial that the value of their investments was affected in any respect by these defendants' failure to provide them with financial statements or the correct asset value of their capital account, or by Dolphin Direct's debt structure or auditing practices.  Rather, as noted above, the decline in the value of Plaintiffs' account appears to have been caused by the loss of value of the portfolio assets, in which Dolphin Direct had invested during the financial crisis.  (*See supra*, at n.12.)

In sum, based on the facts developed at trial, the Court concludes that Plaintiffs are seeking to recover speculative damages from one or more hypothetical divestments, and that Plaintiffs also failed to establish that the loss in the value of their capital account in Dolphin Direct bore a causal connection to the claimed misrepresentations or omissions.  For these reasons, the Court need not decide the question as to whether all holder claims are barred under New York law, as, even assuming (without deciding) that New York law should apply to these claims and that some holder claims may still be cognizable under New York law, Plaintiffs' holder claims in this case would, in any event, be precluded.

Accordingly, the Court will award judgment in Defendants' favor on all of Plaintiffs' fraud claims, dismissing those claims with prejudice.  Further, there is no reason for the Court to consider whether Plaintiffs should be permitted to amend their pleading to add DMSI as a defendant on their fraud claims, as any such claims against DMSI would fail for the same reasons discussed above, rendering amendment futile.

### B.     Plaintiffs' Breach-of-Fiduciary-Duty Claims

In their Complaint, Plaintiffs asserted a breach-of-fiduciary-duty claim against Peter and Dolphin Advisors.  (*See* Compl. ¶¶ 73-82 (Count I).)  That claim rested on the alleged failures of these defendants, in their claimed "fiduciary" capacities (Dolphin Advisors as the managing partner of Dolphin Direct, and Peter as the "sole control person and majority stakeholder of Dolphin Advisors" (Compl. ¶¶ 74, 75)), "to provide complete and accurate accountings to Plaintiffs with respect to Plaintiffs' investment and with respect to the financial condition of Dolphin Direct" (*id.* ¶ 78.  In addition, Plaintiffs alleged that, "[w]ithout authorization, Peter converted Plaintiffs' cash investment, as well as any distributions and additional earned capital and fee interests of Plaintiffs, to either his own account or the accounts of the Corporate Defendants, in whom [sic] Peter ha[d] exclusive or significant interests, denying Plaintiffs the return of their original cash investment and the benefit of any gains thereon."  (*Id.* ¶ 79.)

Based on the evidence presented at trial, however, Plaintiffs are now pressing different breach-of-fiduciary-duty claims, based on altered (or at least expanded) theories of wrongdoing. Plaintiffs are also essentially requesting – although they never quite spell this out with clarity – that the Court deem the Complaint amended to include DMI as a defendant on these claims, to join DMSI as an additional defendant on the claims, and, where either of these entities was the primary actor, to extend its liability to Peter on an "aiding and abetting" theory.  As the Court

52

understands their post-trial submissions, Plaintiffs are now basically seeking to pursue three types of breach-of-fiduciary-duty claims:  (1) claims (largely mirroring their fraud claims) based on alleged failures by DMI, DMSI, Dolphin Advisors, and Peter to disclose material information to Plaintiffs in connection with their investment decisions (*see* Pl. Proposed Findings ¶ 156(a-f)); (2) claims based on alleged self-dealing by DMI and DMSI, aided and abetted by Peter (*see* Pl. Proposed Conclusions ¶¶ 41(i-ii), 49-51); and (3) claims against DMSI, Dolphin Advisors, and Peter based on the involuntary liquidation of Plaintiffs' capital account in Dolphin Direct and the application of a penalty in connection with that liquidation (*see* Pl. Proposed Findings ¶ 156(g)).

As to non-disclosure, Plaintiffs contend that, based on the nature of his personal relationship with Plaintiffs, Peter stood in the position of a fiduciary with respect to them, independent of his positions in any Dolphin entities, and that he breached his fiduciary duties by failing to disclosure material information to Plaintiffs in connection with their initial investment in Dolphin Direct.  (Pl. Proposed Conclusions ¶¶ 72-77.)  Plaintiffs further assert that DMI, DMSI, and Dolphin Advisors (and Peter, based on his control over the activities of those entities) breached their fiduciary duties to Plaintiffs by failing to disclose to them, during the period when Plaintiffs were investors in Dolphin Direct, that the partnership had taken on purportedly long-term debt in the form of undocumented, "intra-Dolphin" loans, that annual audits of the partnership were not being conducted, and that KPMG was no longer the partnership's auditor. (*See* Pl. Proposed Findings ¶ 156; Pl. Proposed Conclusions ¶¶ 41-51, 75.)[27]

---

[27] While Plaintiffs suggest that the creation of backdated loan documents and the Guarantee also constituted a breach of fiduciary duty (Pl. Proposed Findings ¶ 156(c-d)), as did DMSI's purported borrowing in excess of an amount permitted by Dolphin Offshore's partnership agreement (*id.* ¶ 156(e); *see supra*, at n.11), the Court understands Plaintiffs' principal focus to be on the fact that Dolphin Direct's debt structure was not fully disclosed. Regardless, any additional breach-of-fiduciary-duty claims based on related matters that were not disclosed would be subject to the same statute-of-limitations and merits analyses set out below.

As to self-dealing, Plaintiffs now seek to claim that DMI (and then later DMSI, as DMI's successor) breached the fiduciary duty of loyalty that it owed to Plaintiffs, as investors in Dolphin Direct, by (1) lending money to Dolphin Direct and charging interest on its loans, and (2) letting that interest be collected from the accounts of the investors in Dolphin Direct, including Plaintiffs, and then routinely having those collected interest payments redirected into its *own* investment account in Dolphin Direct, thereby increasing its relative share of the investment fund and diluting the shares of other investors, including Plaintiffs. (*See* Pl. Proposed Conclusions ¶ 41.) Plaintiffs seek to hold Peter liable on these two claims, as well, on a theory that, through the control that Peter exercised over the Dolphin entities (including DMI, DMSI, and Dolphin Advisors), he assisted DMI and DMSI in committing this breach of duty. (*See id.* ¶ 51.)

Finally, as to Plaintiffs' claim regarding the liquidation of their capital account, they seem to focus on the fact that Dolphin Direct was not authorized to charge them a penalty upon involuntarily cashing out their investments in the fund, and that the charging of the penalty amounted to conversion. (*See* Discussion, *infra*, at Section II(C).) Plaintiffs apparently contend that, to the extent the decision to charge that penalty was made or permitted by DMSI, Dolphin Advisors, or Peter, each breached a fiduciary duty (or, in the case of Peter, aided and abetted a breach) in directing or allowing the penalty to be charged. (*See* Pl. Proposed Findings ¶ 156(g); Pl. Proposed Conclusions ¶¶ 121, 124.)

The Court will address the first two categories of breach-of-fiduciary-duty claims below and will turn to the third claim in connection with its analysis of Plaintiffs' separate claim for conversion.

1.      **Claimed Violations of the Fiduciary Duty of Disclosure**

In their post-trial submissions, Defendants have raised a statute-of-limitations defense to all of Plaintiffs' breach-of-fiduciary-duty claims.  The statute-of-limitations analysis is complicated with respect to Plaintiffs' non-disclosure-based claims, given the nature of the several remedies sought, the close relationship between these claims and Plaintiffs' claims of fraud, and the existence of potentially applicable tolling doctrines.  Given that the parties have devoted substantial attention to the question of whether these claims are time-barred (*see* Pl. Proposed Conclusions ¶¶ 19-26; Def. Resp. ¶¶ 2-17; *see also* Dkt. 40 (letter motion submitted by Defendants, dated Oct. 31, 2018, "seeking dismissal of each of the six causes of action pled in [P]laintiffs' Complaint" on the basis that "each of the six causes of action is time-barred")), the Court will address that question as a threshold matter, although the Court again concludes that, regardless of whether the claims are timely, they fail for lack of merit.

a.      **The Non-Disclosure Claims Should Be Considered Timely, But Only in Part, With Respect to Certain of the Claims Against Dolphin Advisors and Peter.**

As set out above, pursuant to New York's borrowing statute, Plaintiffs' claims must be timely under both the laws of New York and South Carolina.  (*See* Discussion, *supra*, at Section II(A)(1)(a).)[28]  The South Carolina statute of limitations for breach-of-fiduciary-duty

_____

[28] This is true regardless of whether the law of New York, South Carolina, or another state would govern the substance of Plaintiffs' breach-of fiduciary-duty claims.  Thus, while, as discussed below, New York's "internal affairs" doctrine dictates that, where a breach-of-fiduciary-duty claim raises issues relating to the internal affairs of an entity, the substantive law of the state under which that entity was organized governs the claim, *see Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 607 (S.D.N.Y. 2011), the applicable statute of limitations must still be determined in accordance with the law of the forum state – here, New York, including its borrowing statute, *see Willensky v. Lederman*, No. 13cv7026 (KMK), 2015 WL 327843, at *5 (S.D.N.Y. Jan. 23, 2015) ("no New York court has held that the internal affairs doctrine requires that it apply the *statutes of limitations* of a defendant corporation's home state" (emphasis in original)).

claims is three years, S.C. Code Ann. § 15-3-530; *see Mazloom v. Mazloom*, 382 S.C. 307, 323 (S.C. Ct. App. 2009), *aff'd*, 392 S.C. 403 (2011), although South Carolina applies a "discovery rule" to such claims, whereby the three years "begin[] to run when a person could or should have known, through the exercise of reasonable diligence that a cause of action might exist," *Moore v. Benson*, 390 S.C. 153, 161 (S.C. Ct. App. 2010); *see* S.C. Code Ann. § 15-3-535.  In this case, as discussed above, Plaintiffs could have reasonably discovered the alleged non-disclosures in or about January 13, 2014, when they received the 2007 and 2011 Financial Statements.  As they filed their Complaint within three years of that date, their breach-of-fiduciary-duty claims are timely under South Carolina law.

Unlike South Carolina, New York does not have a single statute of limitations for breach-of-fiduciary-duty claims.  *See IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139 (2009).  Rather, in certain circumstances, the limitations period will be three years, but, in others, it will be six years, like the statute of limitations for fraud.  *Id.*

As a general rule, the limitations period in New York for a breach-of-fiduciary-duty claim is determined by the remedy sought.  *See Yatter v. William Morris Agency*, 682 N.Y.S.2d 198, 199 (1st Dep't 1998).  If a plaintiff is seeking only money damages, then a three-year limitations period will apply to the claim, but if the relief sought by the plaintiff is "equitable in nature," then a six-year limitations period will apply.  *IDT Corp.*, 12 N.Y.3d at 139; *see Meskunas v. Auerbach*, No. 17cv9129 (VB), 2019 WL 719514, at *5 (S.D.N.Y. Feb. 20, 2019).  Where a plaintiff "demands both legal and equitable relief," *Kaufman v. Cohen*, 307 A.D.2d 113, 118 (1st Dep't. 2003), "the case law provides no clear guidance on which limitations period is applicable," *id.* at 118-19, although the three-year limitations period has been held to apply where the equitable remedy of an accounting is sought merely as a means to determine the

amount of money damages that should be awarded, *see Murphy v. Morlitz*, 751 F. App'x 28, 31 (2d Cir. 2018) (Summary Order) ("[W]here an accounting claim exists 'merely [as] a method to determine the amount of the monetary damages' sought, and 'money damages alone afford a full and complete remedy,' then the 'action sounds in law and not in equity.'" (quoting *Cadwalader Wickersham & Taft v. Spinale*, 177 A.D.2d 315, 316 (1st Dep't 1991)).

Nevertheless, even where money damages are sought, "the case law in New York clearly holds that a cause of action for breach of fiduciary duty based on allegations of *fraud* is subject to a six-year limitations period." *Kaufman*, 307 A.D.2d at 119 (emphasis added and collecting cases); *see also Childers v. New York & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 313 n.2 (S.D.N.Y. 2014) (where fraud is essential to breach-of-fiduciary-duty claim, the limitations period will be "six years from the alleged fraud or two years from the date the party discovered or, with due diligence, could have discovered it" (citing *Kaufman*)).  Where the fraud allegations are "incidental" to the claim (*i.e.*, where those allegations do not form the "essence" of the claim), the shorter limitations period will apply.  *Kaufman*, 307 A.D.2d at 119; *see also Powers Mercantile Corp. v. Feinberg*, 109 A.D.2d 117, 120 (1985) (finding that statute of limitations applicable to fraud claims will not control "[w]here the alleged fraud is merely 'the means of accomplishing the breach and add[s] nothing to the causes of action'" (quoting *Iandoli v. Asiatic Petroleum Corp.*, 57 A.D.2d 815, 816 (1977)), *aff'd sub nom. Powers Mercantile Co. v. Feinberg*, 67 N.Y.2d 981 (1986); *Corcoran v. New York Power Auth.*, 202 F.3d 530, 544-45 (2d Cir. 1999) (noting that, in determining whether the fraud statute of limitations applies, the court will "look to the essence of plaintiff's claim and not to the form in which it is pleaded" (citations omitted)).

Here, to the extent Plaintiffs' breach-of-fiduciary-duty claims are grounded in allegations of deliberate non-disclosures of material information regarding Plaintiffs' investments – allegations that, in substance, are essentially *identical* to Plaintiffs' fraud allegations (*compare* Pl. Proposed Conclusions ¶¶ 41, 46 (describing breach-of-fiduciary-duty claims) *with id.* ¶¶ 98, 109 (describing fraud claims) – the alleged fraudulent withholding of information cannot be viewed as merely the "means of accomplishing" the claimed breaches of fiduciary duty. Rather, the "essence" of Plaintiffs' breach-of-fiduciary-duty claims are that Plaintiffs were defrauded by those who owed them fiduciary duties of loyalty. (*See id.* ¶ 44 (stating that, were it not for the alleged non-disclosures, characterized by Plaintiffs as breaches of fiduciary duty, "Plaintiffs would not have invested, or continued investing, in Dolphin Direct").) In other words, to the extent Plaintiffs allege that Peter, DMI, and Dolphin Advisors breached their fiduciary duties by intentionally failing to disclose material information, causing injury to Plaintiffs, Plaintiffs' breach-of-fiduciary-duty allegations "state a valid cause of action for actual fraud," *Kaufman*, 307 A.D.2d at 120 (noting that, "[w]here a fiduciary relationship exists, the mere failure to disclose facts which one is required to disclose may constitute actual fraud, provided the fiduciary possesses the requisite intent to deceive" (internal quotation marks and citation omitted)), and thus the fraud allegations underpinning Plaintiffs' breach-of-fiduciary-duty claims cannot be characterized as "merely incidental" to the claims, *id.* (citation omitted).

This, however, cannot be the end of the Court's statute-of-limitations inquiry in this case because, where the statute-of-limitations issue is raised post-trial, the question becomes *not* whether the plaintiff's breach-of-fiduciary-duty claim, *as pleaded*, constitutes a viable fraud claim, *see Kaufman*, 307 A.D.2d at 119, but rather whether that fraud claim has been *shown* to be viable, based on the evidentiary record, *see Rich v. Dahlgren*, 42 Misc. 3d 1219(A) (Sup. Ct.,

58

Broome Cty. Jan. 30, 2014) (applying fraud statute of limitations to breach-of-fiduciary-duty

claim at motion to dismiss stage, but recognizing that the fraud statute of limitations would not

govern if, "after full discovery," the viability of plaintiff's fraud allegations is foreclosed); *see*

*Malmsteen v. Berdon, LLP*, 595 F. Supp. 2d 299, 307 n.4 (S.D.N.Y. 2009) (finding that

plaintiff's fraud claim would not provide a basis for applying the fraud statute of limitations to

plaintiff's breach-of-fiduciary-duty claim where the fraud claim was dismissed at the close of

trial), *aff'd*, 369 F. App'x 248 (2d Cir. 2010).  As discussed above, regardless of any time-bar,

Plaintiffs failed to prove all of the necessary elements of their fraud claims at trial.  Specifically,

as to the claimed fraud at the time of their initial investment, they failed to prove the requisite

reliance, and, as to all of their fraud claims, they failed to prove that their alleged damages were

proximately caused by the claimed material omissions.  Therefore, despite the fact that Plaintiffs'

fiduciary-duty claims sound in fraud to the extent they are based on non-disclosures, the

evidentiary deficiency of Plaintiffs' fraud allegations renders their parallel fiduciary-duty claims

subject to a three-year statute of limitations.

Based on the application of a three-year limitations period, only certain of Plaintiffs'

claims for the breach of the duty of disclosure would be timely, absent tolling of the statute of

limitations.  Specifically, as the Complaint was filed on February 26, 2016, Plaintiffs could only

challenge the claimed fiduciaries' failures to make disclosures from February 26, 2013 forward,

which would encompass the final Update Letters (dated November and December 2013),[29] but

would not cover most of the period at issue.[30]  As for tolling, while Plaintiffs contend that the

---

[29] There was also an Update Letter bearing a date of "February 2013" (Pl. Ex 1, Tab J),
but Plaintiffs did not establish when, in that month, they received it.

[30] Citing *IDT Corp.*, 12 N.Y.3d at 140, for the proposition that their breach-of-fiduciary-
duty claims did not accrue until those claims became enforceable (*see* Pl. Proposed Conclusions
¶ 20), Plaintiffs argue that all of those claims therefore "accrued, at the earliest, in November

New York statute of limitations should be deemed to have been tolled by virtue of New York's "fiduciary repudiation doctrine" (*see* Pl. Proposed Conclusions ¶¶ 21, 23), Plaintiffs may not avail themselves of that doctrine, which "applies only [] to claims for equitable relief, and not to claims for money damages," *Anderson v. Greene*, No. 14 Civ. 10249 (KPF), 2016 WL 4367960, at *21 (S.D.N.Y. Aug. 10, 2016); *see Kaszirer v. Kaszirer*, 286 A.D.2d 598, 599 (2001).  As Plaintiffs are only seeking money damages on their breach-of-fiduciary-duty claims (or, alternatively, an accounting for the sole purpose of determining the amount of their money damages), the doctrine is inapplicable to this case.

Plaintiffs do, however, have a colorable argument that, as to the non-disclosure of any information that was contained in the 2007 or 2011 Financial Statements (most specifically, the fact that Dolphin Direct had borrowed money from DMI and was paying interest on that debt), Peter and Dolphin Advisors (as Dolphin Direct's managing partner, controlled by Peter), should be equitably estopped from relying on the statute of limitations with respect to the period – commencing in at least 2012 – during which Plaintiffs repeatedly asked Peter to provide them with information regarding the financial condition of the fund, to no avail.  (*See* Tr., at 135:12-20 (Carlos testifying that he had asked "again and again" for financial statements), *see also id.*, at 133:19-134:10 (Carlos), 144:1-145:2 (Carlos).)  "The doctrine of equitable estoppel will preclude a defendant from asserting the statute of limitations as a defense 'where it is the defendant's affirmative wrongdoing . . . which produced the long delay between the accrual of

---

2013, when Plaintiffs sustained damages" (*id.* ¶ 22).  It appears to the Court, however, that, as with their fraud claims, Plaintiffs are basing their breach-of-the-duty-of-disclosure claims on the contention that, had they been earlier informed of the matters that were not disclosed to them, they either would not have invested in Dolphin Direct, or would have withdrawn their holdings upon the disclosures' being made.  Accordingly, the Court does not accept that these non-disclosure claims did not accrue until 2013.  For the reasons discussed below, however, the accrual date of the claims ultimately does not matter.

the cause of action and the institution of the legal proceeding.'" *N. Coast Outfitters, Ltd. v. Darling*, 134 A.D.3d 998, 999 (1st Dep't 2015 (quoting *Zumpano v. Quinn*, 6 N.Y.3d 666, 673 (2006)).  Further, where a defendant owes a fiduciary duty to the plaintiff, "the doctrine of equitable estoppel may be invoked based on the defendant's failure to disclose facts underlying the claim." *Id.*[31]

Applying the doctrine here – and accepting that Plaintiffs started requesting financial information at the beginning of 2012 – would render timely any claims that Dolphin Advisors breached its duty of disclosure, and that Peter either did the same or aided and abetted Dolphin Advisor's breach, by omitting material information from the Update Letters that were sent to Plaintiffs from 2009 through 2011.  Yet, even if this tolling were applied, this would not revive Plaintiffs' breach-of-fiduciary-duty claims that were already stale at the point when Plaintiffs started making its requests for information.  For example, to the extent Plaintiffs are seeking to claim that any defendant's breach of the duty of disclosure proximately caused Plaintiffs to make investments in Dolphin Direct, such claims would be time-barred, given that the last of Plaintiffs' investments was made in 2007, more than three years prior to when Plaintiffs began asking for information in 2012.  Similarly, any claims against DMI that Plaintiffs may be

_____

[31] The Court notes that Plaintiff would have no similar tolling argument to save more of its breach-of-fiduciary-duty claims as against DMI (or, if it were added to the Complaint, DMSI), given that equitable tolling based on a theory of concealment "tolls the statute of limitations only as to those defendants who committed the concealment, and plaintiffs may not generally use the fraudulent concealment by one defendant as a means to toll the statute of limitations against other defendants."  *Drake v. Lab. Corp. of Am. Holdings*, No. 02-CV-1924, 2009 WL 2867901, at *6 (E.D.N.Y. Sept. 3, 2009) (quoting *Griffin v. McNiff*, 744 F. Supp. 1237, 1256 (S.D.N.Y. 1990), *aff'd*, 996 F.2d 303 (2d Cir. 1993)), *aff'd*, 417 F. App'x 84 (2d Cir. 2011).  Even apart from the fact that DMI was apparently dissolved in 2008, long before Plaintiffs started requesting the financial information, Plaintiffs have not shown that their requests for disclosure were directed to either DMI or DMSI, neither of which served as Dolphin Direct's managing partner.

attempting to assert against DMI for breach of the duty of disclosure would be time-barred, given

that DMI ceased to be a partner in Dolphin Direct in 2006.

> ### b. Regardless of Whether Any Portion of Plaintiffs' Breach-of-the-Duty-of-Disclosure Claims May Be Considered Timely, the Claims Fail on the Merits.

After picking its way through the statute-of-limitations thicket, the Court concludes that,

once again, the result of the statute-of-limitations analysis makes no difference to the outcome of

Plaintiffs' claims.  As a matter of substantive law, Plaintiffs simply did not prove, at trial, that

any party (or non-party) both breached a fiduciary duty of disclosure and, by so doing,

proximately caused Plaintiffs' injury.

The parties do not agree as to the substantive law that should govern Plaintiffs' breach-

of-fiduciary-duty claims, with Plaintiffs contending that Delaware law should apply to these

claims (Pl. Proposed Conclusions ¶ 27), and Defendants asserting that New York law should

apply (Def. Proposed Findings ¶ 161).[32]  While no party suggests that South Carolina law should

apply to these claims, the Court notes that, to the extent Plaintiffs are seeking to pursue the

claims against Peter – based on the theory that, as their nephew and trusted personal advisor, he

owed them fiduciary duties that he breached by inducing them to make their initial investment in

Dolphin Direct – their claim should be governed by the law of South Carolina, where Plaintiffs

reside and where they allegedly suffered injury.  On the other hand, based on New York's

"internal affairs" doctrine, under which breach-of-fiduciary-duty claims that raise issues relating

to the internal affairs of an entity are governed by the substantive law of the state under which

---

[32] Although Defendants further assert that, if the Complaint were deemed amended to include DMI on this claim, then the claim "may need to be analyzed under Delaware law" because DMI "is a Delaware corporation" (*id*. n.3), it appears, as noted above (*see supra*, at n.4), that DMI was actually incorporated under the laws of New York.

that entity was organized, *see Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 607 (S.D.N.Y. 2011),[33] any breach-of-fiduciary-duty claims against Dolphin Advisors and DMI (both apparently New York entities (*see* Pl. Ex. 3; JOP ¶ 7(x); *see also supra*, at nn.4, 28)) should be governed by New York law.  Likewise, Delaware law would apply to any claims against DMSI (organized in Delaware (*see* Pl. Ex. 3)) for breaching fiduciary duties owed to Plaintiffs.

Under the laws of South Carolina, New York, and Delaware, in order to demonstrate a breach of fiduciary duty, a plaintiff must demonstrate (1) the existence of a fiduciary duty, (2) that a fiduciary breached that duty, and (3) damages resulting from the breach.  *RFT Mgmt. Co. v. Tinsley & Adams L.L.P.*, 399 S.C. 322, 336 (2012); *In re Platinum-Beechwood Litig.*, No. 18cv10936 (JSR), 2019 WL 1570808, at *8 (S.D.N.Y. Apr. 11, 2019); *Applied Energetics, Inc. v. Farley*, No. CV 2018-0489-TMR, 2019 WL 334426, at *6 (Del. Ch. Jan. 23, 2019).  The duties owed by fiduciaries include:  (1) the duty of loyalty, which requires that "a fiduciary must not engage in self-dealing, and he must avoid situations where his personal interest possibly conflicts with the interest of those owed a fiduciary duty"; (2) the duty of care, which requires that a fiduciary "perform his duties in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances"; and (3) as relevant to Plaintiffs' non-disclosure-based claims in this case, the duty of disclosure, which "requires a fiduciary to make full disclosure of all material facts."  *Rennaker Co. Consulting, Inc. v. TLM Grp., LLC*, No. 16cv3787 (DAB), 2017 WL 2240235, at *4 (S.D.N.Y. Mar. 29, 2017) (citations

---

[33] The Court looks to New York's internal-affairs doctrine because, where a federal court's jurisdiction is based on diversity of citizenship, the courts "look to the laws of the forum state in deciding issues regarding conflicts of law" for purposes of determining the substantive law that governs the dispute.  *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415 (2d Cir. 2006) (citing *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996)).

omitted) (recognizing owed fiduciary duties, as applied to LLC members, under New York law); *see Anthony v. Padmar, Inc*., 320 S.C. 436, 448-50 (S.C. Ct. App. 1995) (articulating the scope of fiduciary duties under South Carolina law, and noting that such duties "require[e] utter good faith or honesty, loyalty or obedience, as well as candor, due care, and fair dealing"); *DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 439 (S.D.N.Y. 2010) (articulating the scope of fiduciary duties under Delaware law). With respect to the damages element, a plaintiff must demonstrate that its "damages proximately result[ed] from the wrongful conduct of the defendant." *RFT Mgmt. Co*., 399 S.C. at 336; *see In re Parmalat Sec. Litig*., 684 F. Supp. 2d 453, 481 (S.D.N.Y. 2010), *aff'd sub nom. Food Holdings Ltd. v. Bank of Am. Corp.*, 423 F. App'x 73 (2d Cir. 2011); *In re Olsen Indus., Inc*., No. 98-140-SLR, 2000 WL 376398, at *12 (D. Del. Mar. 28, 2000).

Here, Plaintiffs have not shown that Peter, personally, stood in a fiduciary relationship with them, although the relevant corporate entities did. Further, while Plaintiffs established at trial that DMI, DMSI and Dolphin Advisors each breached their fiduciary duties of disclosure, Plaintiffs failed to prove that they sustained damages proximately resulting from those breaches.

### i. Peter Did Not Directly Owe Fiduciary Duties to Plaintiffs, Although DMI, DMSI, and Dolphin Advisors Did.

Under South Carolina law, "[a] fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence." *Moore v. Moore*, 360 S.C. 241, 250 (S.C. Ct. App. 2004) (citations omitted). The fiduciary relationship "cannot be established by the unilateral action of one party," but rather, "[t]he other party must have actually accepted or induced the confidence placed in him." *Consol. Insured Benefits, Inc. v.*

*Conseco Med. Ins. Co.*, No. 6:03 CV 03211, 2006 WL 3423891, at *14 (D.S.C. Nov. 27, 2006)

(quoting *Steele v. Victory Sav. Bank*, 368 S.E.2d 91, 94 (S.C. Ct. App. 1988)).  Furthermore,

South Carolina courts follow the "general rule" that "mere respect for another's judgment or trust

in his character is usually not sufficient to establish such a relationship," *Williams-Garrett v.

Murphy*, 106 F. Supp. 2d 834, 840 (D.S.C. 2000), and generally will not find that a familial

relationship, standing alone, creates a fiduciary relationship, *see, e.g.*, *Greenspan v. Greenspan*,

No. 2:16-CV-0001, 2016 WL 3135650, at *4 (D.S.C. May 13, 2016) ("the existence of a parental

relationship, standing alone, does not constitute or create a 'fiduciary relationship'"), *report and

recommendation adopted*, 2016 WL 3129619 (June 2, 2016)).  Indeed, South Carolina courts

have recognized the existence of fiduciary relationships only in the limited situation where one

party is in a "position to advise or act *solely* on behalf of the other party," such as, for example,

the lawyer-client relationship and the real estate broker-client relationship.  *Consol. Insured

Benefits*, 2006 WL 3423891, at *15 (emphasis added).

     Here, Plaintiffs have not shown that the trust they placed in Peter prior to their decision to

invest in Dolphin Direct was the product of anything other than their unilateral decision to take

advantage of what they perceived to be his business acumen.  *See Clearwater Tr. v. Bunting*, 367

S.C. 340, 347 (2006) (officer of corporation did not owe fiduciary duty to specific shareholders

(separate and apart from his status as a corporate officer) based on shareholders' "decision to

repose trust in him," and on their "repeated questioning of him" for financial advice, on the basis

that the trust was unilaterally imposed on the officer).  Further, while Plaintiffs demonstrated at

trial that they had maintained a close familial relationship with Peter that preceded their

investments in Dolphin Direct by several decades, and that they had relied on him for business

and financial advice in certain business ventures unrelated to Dolphin Direct, that is insufficient

to create a fiduciary relationship under South Carolina law.  As noted above, South Carolina generally does not recognize a fiduciary relationship as arising from a party's "respect for another's judgment or trust in his character," *see Williams-Garrett*, 106 F. Supp. 2d at 840, or from the familial relationship they may share, *see Greenspan*, 2016 WL 3135650, at *4.  Finally, and most fundamentally, the relationship between the parties was not one that placed Peter in a "position to advise or act *solely* on behalf of" Plaintiffs, *see Consol. Insured Benefits*, 2006 WL 3423891, at *15, and, as such, the relationship does not fit into one of the limited situations recognized under South Carolina law as constituting a "fiduciary" relationship.  For these reasons, Peter, in an individual capacity, did not owe Plaintiffs fiduciary duties.

On the other hand, under New York and Delaware law, DMI (as a general partner of Dolphin Direct), DMSI (as the same), and Dolphin Advisors (as Dolphin Direct's managing partner), each stood in a fiduciary relationship to Plaintiffs (as limited partners), and thus owed Plaintiffs fiduciary duties.  It is settled law in both New York and Delaware, and Defendants do not dispute (*see* Def. Proposed Findings ¶¶ 164-65), that the general partners and managing partners of a partnership owe fiduciary duties to the limited partners.  *Anwar*, 728 F. Supp. 2d at 439 ("It is undisputed under New York law that general partners owe a fiduciary duty to the limited partners of the partnership." (citing *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 973 (2d Cir. 1989)); *Miltland Raleigh-Durham v. Myers*, 807 F. Supp. 1025, 1058 (S.D.N.Y. 1992) (collecting cases); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012) ("there has never been any serious doubt that the general partner of a Delaware limited partnership owes fiduciary duties").

Accordingly, Plaintiffs established at trial that DMI, DMSI and Dolphin Advisors, but not Peter, owed them fiduciary duties.

ii.     **DMI, DMSI and Dolphin Advisors**
        **Breached Their Fiduciary Duties**
        **Through the Non-Disclosure of Material Facts.**

As noted above, a fiduciary is required to "make full disclosure of all material facts" to

its beneficiaries.  *Rennaker Co. Consulting, Inc.*, 2017 WL 2240235, at *4; *see DirecTV Latin*

*Am.*, 691 F. Supp. 2d at 439.  "[A]n omitted fact is material if there is a 'substantial likelihood

that the disclosure of the omitted fact would have been viewed by the reasonable investor as

having significantly altered the 'total mix' of information made available.'"  *In re Nantucket*

*Island Assocs. Ltd. P'ship Unitholders Litig.*, 810 A.2d 351, 372 (Del. Ch. 2002) (quoting

*Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001)) (applying the materiality standard of

federal securities law to the limited partnership context).  On the question of whether DMI,

DMSI, and Dolphin Advisors breached the fiduciary duty of disclosure that they each owed to

Plaintiffs, the Court concludes that these defendants indeed breached that duty by failing to

provide Plaintiffs with at least certain information.

First, each of these defendants failed to disclose to Plaintiffs that Dolphin Direct was

incurring debt from DMI (and/or from DMSI) through an inter-Dolphin-entity waterfall loan

arrangement consisting of demand loans.  Although Lehman never called its loan to Dolphin

Offshore, and thus Dolphin Direct was never "on the hook" for the debt incurred by Dolphin

entities higher up the waterfall (*see* Tr., at 44:1-13 (Scharfman)), the loan arrangement exposed

Plaintiffs, as Dolphin Direct limited partners, to significant risk that their capital account could

be reduced or liquidated in the event Lehman were to have called its loan for repayment (*id.*, at

38:19-24 (Scharfman); *see also id.*, at 301:18-302:9 (Peter)).  Plaintiffs' expert credibly opined

(*see id.*, at 34:11-18, 44:19-45:7) that the level of risk inherent in this loan arrangement made it a

material fact that DMSI and Dolphin Advisors were duty-bound to disclose to Plaintiffs, *see In*

*re Alstom SA*, 406 F. Supp. 2d 433, 452 (S.D.N.Y. 2005) (finding that "a reasonable investor

would indeed be interested in knowing" that a company "was also the guarantor of . . .

substantial loans"), *Enrico v. Russo, Garguilo & Fox*, No. 96 CV 5168, 1998 WL 178841, at *1

(E.D.N.Y. Feb. 9, 1998) (finding that defendants had a duty to disclose the existence of

mortgages and loans executed on partnership property), *vacated in part on other grounds*, 1999

WL 1288946 (Oct. 22, 1999).  Furthermore, as discussed above, the mere fact that DMI (and

then DMSI), while in the position of a fiduciary to Dolphin Direct's limited partners, was

simultaneously acting as a lender to Dolphin Direct was sufficiently material to give rise to a

duty to disclose the lending arrangement.  The failure by DMI, DMSI and Dolphin Advisors to

disclose the inter-Dolphin-entity loan arrangement constituted a breach of the duty of disclosure

that, overall (although with differing time periods for DMI and DMSI) lasted from the point of

Plaintiffs' first investment in Dolphin Direct to the point in January 2014 when the arrangement

was finally disclosed through the provision of financial statements.

Second, in 2009 or 2010, DMSI and Dolphin Advisors failed to disclose to Plaintiffs that

Dolphin Direct had entered into the Guarantee, under which Dolphin Direct guaranteed DMI's

debt to Dolphin Offshore.  (*See* Tr., at 112:19-24 (Scharfman), 306:11-13 (Peter), 314:24-315:2

(Peter); Pl. Ex. 11, Tab C.)  Given that the inter-Dolphin-entity loans were demand loans, the

Guarantee exposed Dolphin Direct's limited partners, including Plaintiffs, to significant risk.

Thus, the existence of the Guarantee was material information that Dolphin Advisors and DMSI

had a duty to disclose to Plaintiffs.  *See In re Alstom SA*, 406 F. Supp. 2d at 452.  In light of the

Court's finding that the Guarantee was never disclosed to Plaintiffs (*see* Tr., at 310:15-21

(Peter)), the Court concludes that Plaintiffs have demonstrated a breach of duty, in this regard, by

DMSI and Dolphin Advisors.

On the other hand, on the question of whether DMI, DMSI, and Dolphin Advisors breached a duty to disclose that KPMG was no longer Dolphin Direct's auditor, as had been represented in the Offering Memorandum (*see* Pl. Ex. 14; Tr., at 50:24-51:2 (Scharfman)), the Court finds that Plaintiffs have not met their burden of proof to show that this information was material.  While Scharfman opined that KPMG's no longer acting as Dolphin Direct's auditor was a "material piece of information" (Tr., at 52:14-18), and Carlos testified that the identity of KPMG as the fund's auditor was an "important fact" to him (*id.*, at 131:6-10), the Court is not persuaded that a "reasonable investor" would have viewed Dolphin Direct's decision to use Baker Tilly, instead of KPMG, as having significantly altered the "total mix" of information made available to the limited partners, *see Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, No. 14cv9443 (ER), 2016 WL 2859622, at *10 n.10 (S.D.N.Y. May 16, 2016) (suggesting that the identity of a company's auditor is not always a material fact that must be disclosed).  Thus, the Court concludes that Plaintiffs failed to prove that DMSI and Dolphin Advisors had a duty to disclose the fact that KPMG was no longer Dolphin Direct's auditor.

Further, in light of conflicting testimony presented by Plaintiffs on the issue of materiality, the Court also concludes that Plaintiffs have not met their burden to prove that DMI, DMSI, or Dolphin Advisors breached a duty by failing to disclose that Dolphin Direct was not conducting annual audits, or by failing to provide Plaintiffs with annual financial statements.  As noted above, both the Offering Memorandum and the Partnership Agreement did state that annual audits would be conducted, and that annual financial statements would be provided to Dolphin Direct's limited partners.  (*See* Pl. Ex. 14; *see also* Tr., at 50:1-23 (Scharfman).)  Yet, while Scharfman testified at trial as to the importance of annual audits – which, as he explained it, would require the fund's managers to collect and organize information on a regular basis,

permit third-party oversight of the partnership's financial activities, and allow information to flow regularly to investors (*see* Tr., at 52:19-53:19) – Carlos effectively testified that, at least through 2009, he did not consider audited financial statements to constitute material information, in the context of Plaintiffs' investments (*see id*., at 233:4-11 (stating that the audited financial statements were "of no importance" to him)).  In light of Carlos's testimony, the Court is not persuaded Plaintiffs have demonstrated that a reasonable investor would have regarded the regular performance of audits to be important to the effective functioning of an investment fund, such that the failure to disclose the fact that audits were not being conducted would have "significantly alter[ed] the 'total mix' of information made available."  *See In re Nantucket Island Assocs. Ltd. P'ship Unitholders Litig*., 810 A.2d at 372.

### iii.     Plaintiffs Failed To Demonstrate Damages Resulting From the Breach.

As to the ways in which the Court has concluded that DMI, DMSI, and Dolphin Advisors did breach the duty of disclosure that they owed to Plaintiffs, the Court further concludes that those breaches did not proximately cause the damages claimed.  As set out above, in order for a plaintiff to recover damages for a defendant's breach of fiduciary duty, the plaintiff must demonstrate that the breach proximately caused his or her injuries.  Further, "[w]here, as here, a plaintiff seeks compensatory damages for injuries allegedly sustained as a result a defendant's . . . omissions," the plaintiff "must establish a causal link between the wrongful conduct and any damages sustained."  *In re Parmalat Sec. Litig*., 684 F. Supp. 2d at 481.

For the same reason that Plaintiffs were unable, at trial, to demonstrate a causal connection between the alleged material omissions and their injuries for purposes of their fraud claims, Plaintiffs were also unable to establish, at trial, a causal link between the omissions and their injuries for purposes of their parallel breach-of-fiduciary-duty claims.  The evidence

adduced at trial suggested that Plaintiffs' investment losses were entirely unrelated to the

subjects that they should have been disclosed.  In particular, the decline in value of Plaintiffs'

capital account was not shown to have been caused by the nature of debt incurred by Dolphin

Direct, the Guarantee into which Dolphin Direct entered, or the frequency in which Dolphin

Direct performed audits or provided financial statements (which would have revealed the

partnership's debt structure).  Rather, as discussed above, the decline in Plaintiffs' investments

appears to have been caused by the poor performance of Dolphin Direct's investments during the

financial crisis.  (*See supra*, at n.12.)  Therefore, although Plaintiffs have shown breaches of

fiduciary duty by DMI, DMSI, and Dolphin Advisors – specifically, breaches of their duty to

disclose material information to Plaintiffs – Plaintiffs have not met their burden of proving that

those breaches caused Plaintiffs' investment losses.  For this reason, and even apart from any

time-bar, to the extent Plaintiffs' breach-of-fiduciary-duty claims are based on non-disclosures,

Defendants are entitled to judgment in their favor, dismissing the claims.  There is also no need

for the Court to consider whether the Complaint should be deemed amended so as to name DMI

on these claims, or to join DMSI as a new defendant on the claims, as, once again, amendment

would be futile.[34]

### 2. Claimed Violations of the Fiduciary Duty of Loyalty (by Self-Dealing)

Plaintiffs additionally seek to assert two new breach-of-fiduciary-duty claims against

DMI, DMSI, and Peter (under an aiding and abetting theory) based on allegations of self-dealing.

---

[34] There is similarly no need to consider whether Peter may be liable for aiding and abetting a breach of fiduciary duty based on non-disclosure given the Court's conclusion that Plaintiffs do not have a viable primary claim in the first instance.  *See, e.g.*, *In re Alloy, Inc.*, No. CIV.A. 5626, 2011 WL 4863716, at *14 (Del. Ch. Oct. 13, 2011) ("As a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability.").

(*See* Pl. Proposed Conclusions ¶ 41.)  The first of these claims is based simply on the fact that DMI (and then DMSI, when it apparently stepped into DMI's shoes in this regard) stood in the position of a lender to Dolphin Direct, when it was simultaneously a Dolphin Direct general partner.  (*See id.* ¶ 41(i).)  The second is based on the fact that DMI (and then DMSI) allowed interest on any loans it had extended to Dolphin Direct to be collected from the investment accounts of Dolphin Direct's limited partners (including Plaintiffs), and then had that interest routinely directed to augment its own capital account in Dolphin Direct, thereby diluting Plaintiffs' share in the fund.  (*See id.* ¶ 41(ii).)

The Court need not engage in an extensive analysis of either of these claims, as Plaintiffs lack standing to assert the first, and as, in the particular circumstances presented, it would be improper for the Court to deem the Complaint amended to add the second.

a.    **Plaintiffs Lack Standing To Assert a Claim<br>Against DMI or DMSI for Having Stood<br><u>in the Position of a Lender to Dophin Direct.</u>**

Although the issue of standing has not been raised by the parties, "a challenge to subject matter jurisdiction cannot be waived and may be raised [either by motion or] *sua sponte* at any time."  *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 107 (2d Cir. 1997) (internal quotation marks and citations omitted).  The issue of standing is implicated here because the loans that underlie the claim were extended to Dolphin Direct, not to Plaintiffs, and thus the claim presents the question of whether a claim challenging the extension of those loans and the loan terms can only be raised by the partnership itself.

Standing is an essential component of the case-or-controversy requirement of Article III of the Constitution.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  To satisfy Article III's standing requirements, a plaintiff must show an injury in fact (1) that is (a) concrete

72

and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) that is fairly traceable to the challenged action of the defendant; and (3) that is likely to be redressed by a favorable decision.  *Id.*  "[T]he injury must affect the plaintiff in a personal and individual way." *Id.*, at 561 n.1.  Thus, "[a] limited partner's standing to sue requires an alleged injury that is independent of any injury to the partnership itself," *DNV Inv. P'ship v. SGM Holdings LLC*, No. 15cv1255 (PAC), 2016 WL 1071032, at *2 (S.D.N.Y. Mar. 17, 2016), *aff'd in part, vacated in part on other grounds*, 670 F. App'x 732 (2d Cir. 2016), such that evidence demonstrating that the limited partner has "suffered 'only through diminution in the value of [his or her] share'" in the partnership will not be sufficient to confer standing, *Lewin v. Lipper Convertibles*, 756 F. Supp. 2d 432, 442 (S.D.N.Y. 2010) (quoting *Dall. Cowboys Football Club, Ltd. v. Nat'l Football League Trust*, No. 95cv9426, 1996 WL 601705, at *2 (S.D.N.Y. Oct. 18, 1996)), *aff'd in part, vacated in part sub nom. CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114 (2d Cir. 2013); *see Attick v. Valeria Assocs., L.P.*, 835 F. Supp. 103, 110 (S.D.N.Y. 1992) (recognizing that "a limited partner does not have standing to assert RICO claims if the only injury he suffered is the diminution of the value of his investment in the limited partnership"). Further, the party invoking federal jurisdiction bears the burden of establishing the elements of standing "for each claim and form of relief sought."  *Carver v. City of New York*, 621 F.3d 221, 225 (2d Cir. 2010) (quoting *Baur v. Veneman*, 352 F.3d 625, 642 n.15 (2d Cir. 2003)); *see Lujan*, 504 U.S. at 561.

The Court concludes that Plaintiffs do not have standing to bring a claim against DMI or DMSI based on the fact that these entities stood in the position of a lender to Dolphin Direct. Any DMI or DMSI loans were extended to *Dolphin Direct*, not to Plaintiffs, and the evidence at trial established that the interest paid by Dolphin Direct on the loans was an expense of the

partnership (*see* Tr., at 328:9-15 (Peter)), even if that expense was shared, *pro rata*, by the investors.  Thus, while the payment of interest to DMI and then to DMSI necessarily reduced the value of each partner's investment in Dolphin Direct, that injury was not distinct from any injury suffered by the partnership as a whole.  *See Lewin*, 756 F. Supp. 2d at 442.  As Plaintiffs have not established that the fact of the loans, or the requirement that Dolphin Direct pay interest on the loans, caused them any injury "independent of any injury to the partnership itself," *DNV Inv. P'ship*, 2016 WL 1071032, at *2, they lack standing to assert a claim based on the extension of any loans by DMI or DMSI to Dolphin Direct, or for the interest charged on any such loans. Rather, any such claim would had to have been brought derivatively on behalf of Dolphin Direct. *See id.*

> **b.    Deeming the Complaint Amended
> To Add Plaintiffs' Newly Articulated Dilution
> <u>Claim Would Be Futile and/or Unduly Prejudicial.</u>**

No similar standing issue is presented by Plaintiffs' proposed claim challenging the arrangement by which the interest payments made by Dolphin Direct on the loans extended by DMI and/or DMSI were recognized as contributions to DMI's or DMSI's own capital account in the partnership.  As set out above, the effect of this arrangement was to increase the percentage of DMI's, and then DMSI's, stake in the fund relative to the stakes of the limited partners, whose shares in the fund were correspondingly diluted.  (*See* Tr., at 319:25-320:19 (Peter), 329:14-24 (Peter).)  The dilution of Plaintiffs' stake in Dolphin Direct constituted a particularized injury to them, reflecting, rather than a diminution in the *value* of their investment, a diminution in their *share* of the partnership.  Plaintiffs' injury, in this regard, was not merely reflective of an injury to the partnership as a whole, as the partnership actually benefited from the redirection of monies into the fund.  Nor was Plaintiffs' injury common to all of Dolphin Direct's partners, given that

74

DMI and DMSI, as general partners, plainly benefitted from the arrangement – at the expense of Plaintiffs and the other limited partners.  The Court therefore concludes that Plaintiffs would have standing to assert a breach-of-fiduciary-duty claim against DMI and DMSI for diluting Plaintiffs' interest in the fund through self-dealing, and to assert an aiding-and-abetting claim against Peter for effecting the dilutive arrangement.

Yet the very fact that this claim is based on the dilution of Plaintiffs' interests highlights the marked difference between this claim and the others that Plaintiffs raised in their Complaint and informed the Court – and Defendants – that they were planning to present at trial.  There are no allegations in the Complaint (which, as already noted, does not name DMSI as a defendant) that DMI breached its fiduciary duty of loyalty by diluting Plaintiffs' share in Dolphin Direct, through taking monies from Plaintiffs' capital account, in the form of interest payments, and redirecting those monies into its own capital account.  In fact, there is no breach-of-fiduciary-duty claim *at all* pleaded against DMI in the Complaint.  (*See* ¶¶ 73-82 (Count I) (asserting breach-of-fiduciary claims only against Peter and Dolphin Advisors).)  Moreover, both in the Joint Pretrial Order and at the commencement of trial, Plaintiffs indicated that, at trial, they planned to establish the elements of two other new claims – "promoter liability" and "inducement not to sell" – that had purportedly "c[o]me up during discovery."  (Tr., at 6; *see also* JPO ¶ 4(a).)  Plaintiffs said nothing about any intention to pursue a breach-of-fiduciary-duty claim at trial based on DMI's or DMSI's dilution of Plaintiffs' share in the fund through the redirection of interest payments on Dolphin Direct loans.

It is, of course, true that, under Rule 15(b) of the Federal Rules of Civil Procedure, "[a] party may move 'at any time' during or following trial to amend its pleadings 'to conform them to the evidence and to raise an unpleaded issue.'"  *Dimare Homestead, Inc. v. Alphas Co. of New*

*York*, No. 09cv6644 (PKC), 2011 WL 13272402, at *1 (S.D.N.Y. Dec. 28, 2011) (quoting

Fed. R. Civ. P. 15(b)(2)).  Indeed, where the "issue not raised by the pleadings is tried by the

parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."

Fed. R. Civ. P. 15(b)(2).  Where, however, the party against whom the amendment is sought

does *not* consent to the trial of the issue, then the Court should only permit an amendment "when

doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the

evidence would prejudice that party's action or defense on the merits."  Fed. R. Civ. P. 15(b)(1);

*see Dimare Homestead*, 2011 WL 13272402, at *1 ("a motion to amend under Rule 15(b) should

be granted 'only if the party against whom the amendment is offered will not be prejudiced by

the amendment.'" (quoting *Fisher v. Vassar Coll.*, 70 F.3d 1420, 1449 (2d Cir. 1995))); *see also*

*Hillburn by Hillburn v. Maher*, 795 F.2d 252, 264 (2d Cir. 1986).  While the consent of a party

against whom the amendment is sought may be implied from that party's "failure to object to the

admission of evidence relevant to the unpleaded issue," *Silverstein v. Penguin Putnam, Inc*.,

522 F. Supp. 2d 579, 604 (S.D.N.Y. 2007), "consent will not be implied from the failure to

object to evidence that is relevant to both pleaded and unpleaded issues, unless it was somehow

obvious that the party offering the evidence was attempting to raise the unpleaded issue, *id.*

    "In determining whether the objecting party would be prejudiced by allowing the

amendment, courts must consider whether the failure to plead the claim raised at trial

disadvantaged the opponent in presenting its case."  *Id.* at 604 (citing *Cruz v. Coach Stores, Inc*.,

202 F.3d 560, 569 (2d Cir. 2000)).  Where the Court determines that a party would be prejudiced

by the amendment, it is within the court's "sound discretion" to deny leave to amend.  *See*

*Dimare Homestead*, 2011 WL 13272402, at *1 (citation omitted); *see also Silverstein*, 522

F. Supp. 2d at 606 (denying motion to amend complaint after trial, to add an unpleaded claim,

where defendant "neither consented to nor defended against it").  Leave to amend should also be

denied – whether before or after trial – where the proposed amendment would be futile.  *See,*

*e.g.*, *Dluhos v. Floating & Abandoned Vessel, Known as New York*, 162 F.3d 63, 69 (2d Cir.

1998).

i.      <strong>The Claim Against DMI, as Well as Any<br>Claim Against Peter for Aiding and Abetting<br><u>DMI's Alleged Breach, Would Be Time-Barred.</u></strong>

One basis for a court to reject an amendment as futile is that the proposed new claim

would be barred by the applicable statute of limitations.  *See, e.g.*, *Grace v. Rosenstock*, 228 F.3d

40, 53 (2d Cir. 2000).  Here, the statute of limitations on Plaintiffs' self-dealing claim would be

three years under both South Carolina and New York law,[35] and, as DMI apparently ceased

being a general partner in Dolphin Direct in 2006 (*see* Pl. Ex. 3), Plaintiffs' self-dealing claim

against DMI – which was not asserted until 10 years later – would be time-barred.[36]  For the

same reasons, to the extent Plaintiffs would seek to hold Peter liable for aiding and abetting any

breach of duty by DMI, that claim would also be untimely.

---

[35] Given that the claim is based on a breach of the duty of loyalty, and does not sound in fraud, the three-year limitations period would apply not only in South Carolina, *see Mazloom*, 382 S.C. at 323, but also in New York, *see Powers Mercantile Corp.*, 109 A.D.2d at 120; *Kaufman*, 307 A.D.2d at 118-19.

[36] Again, the Court does not accept Plaintiffs' argument that none of its breach-of-fiduciary-duty claims accrued until November 2013, when Plaintiffs purportedly sustained damages (*see supra*, at n.30), given that, as to any claim of dilution of its interest in Dolphin Direct, Plaintiffs presumably sustained damages at the time of each act of dilution.  Nor can any tolling doctrine save Plaintiffs' self-dealing claim against DMI, as, for the reasons discussed above (*see* Discussion, *supra*, at Section II(B)(1)(a)), neither the "fiduciary repudiation doctrine" nor the doctrine of equitable tolling would be applicable in this instance.

Accordingly, it would be futile to deem the Complaint amended to include such claims against DMI, or against Peter for his role in DMI's activities, and Plaintiffs' request to do so is denied.

### ii. DMSI Did Not Consent to the Resolution of This Claim Against It at This Trial, and Did Not Have the Opportunity To Defend Against the Claim.

As for DMSI, even if the evidence that was presented at trial suggested that it engaged in activity that diluted Plaintiffs' interest in Dolphin Direct relative to its own interest, and even if this constituted a breach of its fiduciary duty, it would be improper for the Court to hold DMSI accountable to Plaintiffs for self-dealing. Not only did Plaintiffs fail to lay out with clarity, in advance of trial, that it would be seeking to try such a claim (as against either DMI or DMSI), but DMSI has never been named as a party defendant, was never served with process, and never appeared in the action to defend itself in its own right. Further, even *after* trial, Plaintiffs have failed to make a reasoned presentation as to why they should be permitted to add DMSI as a direct defendant on this claim, at this stage.[37]

As a preliminary matter, Plaintiffs' principal explanation as to why DMSI should now be named as a defendant on this claim is that it supposedly has "successor liability" to DMI. (*See,*

---

[37] On this point, it is worth noting that Plaintiffs' post-trial request that their pleadings be deemed amended is so meager that the Court has struggled to discern the claims to which their request applies. In their opening post-trial submission, Plaintiffs stated only that they sought to "amend [the caption] to add [DMSI]" (Pl. Proposed Conclusions ¶ 12), and that, upon Plaintiffs' having "adduced evidence of additional claims," the "pleadings are deemed to be conformed to the proof" (*id.* ¶ 18). In addition, while Plaintiffs provided some explanation for the basis of their request in responding to Defendants' arguments regarding Plaintiffs' proposed new claims (*see* Pl. Resp. ¶¶ 140, 156), even then Plaintiffs referred to DMI and DMSI jointly as "Dolphin Management" and failed to provide specific support for adding DMSI not merely as an entity with "successor liability" for any wrongdoing of DMI, but as a defendant that breached its *own* duties to Plaintiffs, during the period when it, itself, was serving as a general partner in, and a lender to, Dolphin Direct.

*e.g.*, Pl. Proposed Conclusions ¶ 13 (setting out when New York law "recognizes that a successor entity *will be liable for the debts of its predecessor*" (emphasis added)).)   The Court, however, has already found that Plaintiffs' proposed self-dealing claim against DMI would be time-barred, and, for this reason, the Court has concluded that it would be futile to deem the Complaint amended to include the claim against DMI.   Successor liability only has meaning if the original actor is found liable, and, here, that is not the case.

Further, to the extent that, even in the sections of their submissions that cite authority regarding successor liability, Plaintiffs are suggesting that DMI's business continued, unchanged, with the transfer of its interests to DMSI, such that the two entities should be viewed as a single entity that existed, without interruption, for the duration of the entire relevant period, Plaintiffs fail to support their position with sufficient evidence.   In their Proposed Conclusions of Law, Plaintiffs assert that DMSI is a "mere continuation" of DMI (*see* Pl. Proposed Conclusions ¶¶ 13-16) and that "it is also, de facto, the same entity" (*id*. ¶ 16).   Plaintiffs further assert that "[Peter's] admission that [DMSI] is [DMI's] successor-in-interest is dispositive of this issue." (*Id*.)   The fact that one business entity is admitted to be a "successor in interest" to another for relevant purposes does not, however, mean that the successor is necessarily either a "mere continuation" of its predecessor or, "de facto, the same entity."   Nor does the fact that Peter owned and managed both entities, or that both were general partners of Dolphin Direct (*see id*.), establish that they should be considered one and the same, with a difference in name only.   As noted above, DMI was apparently a New York corporation, whereas DMSI was incorporated in Delaware.   (*See* Pl. Ex. 3.)   Moreover, no evidence was offered at trial as to the terms of the transfer of DMI's interests to DMSI.   Plaintiffs did not offer evidence to clarify if this was merely an asset sale, or if the liabilities of DMI were also transferred.   Plaintiffs also failed to

establish whether all of the assets of DMI were transferred, or only some, or if the two entities –

even if both general partners of Dolphin Direct – engaged in any other, potentially distinct,

business activities.  Plaintiffs did not even establish that DMI was dissolved at the time of the

transfer of its relevant interests to DMSI, and public records suggest that it was not – but rather

that it was dissolved in April 2008, a year and a half after the claimed transfer.  (*Compare* Pl.

Ex. 3 *with* NYS Business Entity Database.)

Thus, Plaintiffs have not proven that DSMI was, in reality, one and the same entity as

DMI, and the Court cannot simply assume the effective "identity" of the two corporations.

Accordingly, the Court considers DMSI to be a true non-party that was never afforded process,

in this case.  The Supreme Court has made clear that the opportunity to respond to an amended

complaint, particularly as afforded to an adverse party that has been added as a defendant

pursuant to Rule 15, is "fundamental to due process," and is "the echo of the opportunity to

respond to original pleadings secured by Rule 12."  *Nelson v. Adams USA, Inc.*, 529 U.S. 460,

466 (2000).  It is therefore improper for a court to deem a complaint amended after trial, so as to

add new defendants that were not given proper notice of the claims against them, and "were not

present or represented as parties at trial."  *Campbell v. City of New York*, No. 99cv5129 (LTS)

(THK), 2003 WL 660847, at *5 (S.D.N.Y. Feb. 27, 2003) (denying plaintiff's post-trial motion

to amend his complaint to add new defendants given that "the new defendants did not have a fair

opportunity to defend against these claims"), *aff'd*, 93 F. App'x 315 (2d Cir. 2004).  Here, the

record contains no representation by Defendants' counsel that counsel was appearing on behalf

of DMSI at trial, and merely because Peter was a principal of DMSI does not mean that the

Court should find DMSI to have been "present."

The Court also notes that it would not be fair to assume that DMSI would have had no defense to this claim, had it been named as a party and had it appeared to defend.  Under Delaware law, which the parties agree would govern any substantive claim against DMSI (*see* Pl. Proposed Conclusions ¶ 27; Def. Proposed Findings, at n.3), a fiduciary's "appearing on both sides of a transaction" implicates its duty of loyalty.  *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993), *decision modified on reargument*, 636 A.2d 956 (Del. 1994).  Once a plaintiff has shown that its fiduciary engaged in a self-interested transaction, the burden shifts to the fiduciary to prove the fairness of the transaction.  *Carlson v. Hallinan*, 925 A.2d 506, 529-530 (Del. Ch. 2006), *opinion clarified*, No. CIV.A. 19466, 2006 WL 1510759 (May 22, 2006).  This requires a demonstration of both fair pricing, which concerns the "economic and financial considerations of the proposed [transaction]," *id.* at 531, and fair dealing, which concerns "how the transaction was structured, the timing, disclosures, and approvals," *Related Companies, L.P. v. Ruthling*, No. 17cv4175, 2018 WL 3315728, at *14 (S.D.N.Y. July 5, 2018) (applying Delaware law).  It is possible that, if DMSI had been given fair notice of the need to defend itself at trial on Plaintiffs' self-dealing claim, then it would have mounted a defense, either with respect to the fairness of the transactions in question or as to any damages allegedly sustained by Plaintiffs.

On these issues, the Court notes that, while any loan – particularly any demand loan – that was extended to Dolphin Direct exposed the fund to risk, Dolphin Direct (and Plaintiffs as limited partners in the fund) also presumably enjoyed a benefit from the added liquidity that any such loan provided, as an infusion of capital into the fund would have allowed it to make portfolio investments.  Further, it is possible that DMI or DMSI, as lender, arranged for interest to be paid at a commercially reasonable rate, or even at a below-market rate; the record, as it

stands, simply contains no evidence on this point.  It is also worth noting that the fund actually

reaped a benefit from having any interest it paid to DMSI reinvested in the fund, so that the

fund's overall capital would not be depleted, and the fund, accordingly, would be able to retain

stability.  Thus, even though Plaintiffs' share of the fund was apparently diluted by DMSI's

conduct, Plaintiffs also arguably stood to benefit from the very arrangement that now forms the

basis of their claim that DMSI acted in a way that disadvantaged them.  Had Plaintiffs given

DMSI proper notice of this claim, and properly afforded it an opportunity to defend against the

claim, DMSI may have been able to demonstrate that, overall, the arrangement was not unfair to

Plaintiffs, or that Plaintiffs' benefits from the transactions in question outweighed, or at least

mitigated, their losses.

　　　　For all of these reasons, Plaintiffs' request to deem the Complaint amended to join DMSI

on a self-dealing claim is denied.

   **iii.  The Court Declines To Deem the Complaint
     Amended To Add a Claim That Peter
     <u>Aided and Abetted DMSI's Alleged Self-Dealing.</u>**

   Finally, the Court concludes that Plaintiffs' Complaint should not be deemed amended to

include a claim that Peter, by virtue of his control over non-party DMSI, aided and abetted that

non-party in a breach of its fiduciary duty of loyalty.

   On the question of whether Peter consented to the trial of this claim against him, the

Court finds that Peter did not so consent  As already noted, Plaintiffs' counsel did not even

expressly state, prior to or at the time of trial, that Plaintiffs were seeking to try this claim.

Rather, at the commencement of the trial, Plaintiffs' counsel's merely stated – as counsel had

indicated in the Joint Pretrial Order – that Plaintiffs would seek to have the Complaint amended

to conform to the proof, with respect to claims "concerning promoter's liability and inducement

not to sell" (Tr., at 6), neither of which relates to the claim at issue here.  Further, although Peter was questioned several times at trial about Dolphin Direct's payment of interest on loans from DMI or DMSI, and although this line of questioning covered the topic of the redirection of the interest payments into DMI's or DMSI's capital account with Dolphin Direct and the resulting dilution of Plaintiffs' share of the fund, this questioning was generally relevant to Plaintiffs' fraud claims and parallel breach-of-fiduciary-duty claims, both of which centered on the non-disclosure of the inter-Dolphin-entity loan structure.  As it was not "obvious" that, through this questioning, Plaintiffs were attempting solely to prove an unpleaded claim, the Court will not infer consent from Peter's failure to object, through counsel, to evidence that was "relevant to both pleaded and unpleaded issues." *Silverstein*, 522 F. Supp. 2d at 604.

Additionally, the Court finds that it would be unfair to deem the Complaint amended to add this particular aiding-and-abetting claim against him, at this time.  The only way in which Peter may be held liable on this claim is if DMSI is found to have engaged in the self-dealing in question, given that, "[a]s a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability."  *In re Alloy*, 2011 WL 4863716, at *14.  Essentially, then, Plaintiffs are asking the Court to add, by amendment, a claim against Peter that was not identified by Plaintiffs in advance of trial, as to which Peter's liability can only be secondary to that of a non-party actor, and as to which – as noted above – a defense might have been presented by the primary actor, had it been properly named, served with process, and given notice of the claim.  In these unusual circumstances, the Court concludes that Peter would be unduly prejudiced by the allowance of the proposed amendment to add the aiding-and-abetting claim against him, and the Court, in its discretion, declines to allow that amendment, as well.

C.     **Plaintiffs' Claim for Conversion, and**
       **Related Claim for Breach-of-Fiduciary-Duty**

In their Complaint, Plaintiffs allege that, "[w]ithout authorization, Peter converted

Plaintiffs' cash investment, as well as any distributions and additional earned capital and fee

interests of Plaintiffs, to either his own account or the accounts of the Corporate Defendants, in

whom [sic] Peter ha[d] exclusive or significant interests, denying Plaintiffs the return of his

original cash investment and the benefit of any gains thereon."  (Compl. (Count II) ¶ 86.)  In

their post-trial submissions, however, Plaintiffs now merely contend that "Dolphin Management

and [Dolphin Direct] improperly converted Plaintiffs' money when Plaintiffs['] [Dolphin Direct]

account was unilaterally terminated."  (Pl. Proposed Findings § IX (formatting modified).)  More

specifically, Plaintiffs focus on the fact that, when Plaintiffs' account was involuntarily

liquidated, Dolphin Direct charged Plaintiffs a penalty of approximately 4.4% that the

Partnership Agreement did not authorize it to charge.  (*See id.* ¶¶ 168-70.)

Plaintiffs also contend, though, as set out above, that Peter, Dolphin Advisors, and DMSI

breached their fiduciary duties by directing the unauthorized penalty to be charged.  (*See* Pl.

Proposed Findings ¶ 156(g); Pl. Proposed Conclusions ¶¶ 121, 124; *see also* Compl. ¶ 79

(Count I) (generally alleging, as part of pleaded breach-of-fiduciary-duty claim, that "[w]ithout

authorization, Peter converted Plaintiffs' cash investment . . . to either his own account or the

accounts of the Corporate Defendants").)

As discussed below, Dolphin Direct's unauthorized imposition of a penalty on the forced

liquidation of Plaintiffs' capital account constituted conversion, under the law, with respect to

the amount of that penalty.  As damages for the demonstrated conversion of those particular

funds, Plaintiffs are entitled to reimbursement, from Dolphin Direct, of the amount of the penalty

unlawfully imposed.  Moreover, the Court finds that Dolphin Advisors breached its fiduciary

duties to Plaintiffs by allowing the penalty to be imposed and that Peter aided and abetted that breach, such that they should be held jointly and severally liable for the amount converted.  Once again, however, any request by Plaintiffs to join DMSI as a defendant, with respect to any conversion or related claim, is denied.

**1.    The Conversion Claim and Any Related
Breach-of-Fiduciary-Duty Claims Are Timely.**

Both New York and South Carolina have a three-year statute of limitations for conversion.  N.Y. C.P.L.R. 214(c); S.C. Code Ann. § 15-3-530; *see also Malanga v. Chamberlain*, 71 A.D.3d 644, 645 (2010); *Walsh v. Woods*, 358 S.C. 259, 264 (S.C. Ct. App. 2004).  As noted above, Plaintiffs' final distribution from Dolphin Direct, to which the penalty was applied, was sent to Plaintiffs in December 2013.  (*See* Pl. Ex. 1, Tab L; JPO ¶ 7(xxii); *see* Tr., at 362:9-14 (Peter).)  Given that Plaintiffs filed their Complaint in February 26, 2016, the Court finds that their conversion claim (which, as currently maintained, falls within the scope of the broader conversion claim pleaded in the Complaint) was asserted within the three-year limitations period.

Similarly, based on the three-year statute of limitations that would apply to a related breach-of-fiduciary-duty claim under both New York and South Carolina law, *see IDT Corp.*, 12 N.Y.3d at 139; *Mazloom*, 382 S.C. at 323, Plaintiffs' claim that Dolphin Advisors and Peter breached their fiduciary duties to Plaintiffs by directing or allowing the conversion of their money (a claim that falls within the scope of the breach-of-fiduciary-duty claim pleaded in the Complaint) is also timely.

### 2.   Plaintiffs Proved These Claims at Trial.

#### a.   Dolphin Direct Is Liable for Conversion.

The parties dispute which state's substantive law applies to Plaintiffs' conversion claim, with Plaintiffs suggesting that the laws of Delaware, New York, and Florida[38] are potentially applicable (*see* Pl. Proposed Conclusions ¶ 125), and Defendants suggesting, instead, that the Court should apply the laws of Delaware, New York, or South Carolina (*see* Def. Proposed Findings ¶¶ 184-86).  As some, but not all, of these states allow money to be the subject of a conversion claim, *compare, e.g.*, *Polanco v. NCO Portfolio Mgmt., Inc.*, 23 F. Supp. 3d 363, 370 (S.D.N.Y. 2014) (noting that such a claim is permissible under New York law, where the money in question is "specifically identifiable and [] subject to an obligation to be returned or to be otherwise treated in a particular manner" (internal quotation marks and citation omitted)), *with DeFranco v. Pordham*, No. CV 15C-01-158, 2015 WL 4751217, at *2 (Del. Super. Ct. Aug. 11, 2015) ("Delaware law does not recognize a cause of action for the conversion of money."), the Court will perform a choice-of-law analysis.

New York courts apply an "interest analysis" to tort claims, according to which "the law of the jurisdiction having the greatest interest in the litigation is applied."  *Langsam v. Vallarta Gardens*, No. 08cv2222 (WCC), 2009 WL 8631353, at *9 (S.D.N.Y. June 15, 2009) (quoting *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998)).  Where "conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."  *Backus v. U3*

---

[38] The Court understands Plaintiffs' suggestion that Florida law may apply to the conversion claim is based on the fact that Dolphin Asset, at some point, opened an office in Florida, and that Peter occasionally worked there.  (*See* Tr., at 287:4-8 (Peter); 458:20-22 (Peter).)

*Advisors, Inc.*, No. 16cv8990 (GHW), 2017 WL 3600430, at *13 (S.D.N.Y. Aug. 18, 2017) (quoting *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993)).  Generally, the site of the tort will be the place in which the victims of the tort resided, "as that is the locus of their economic loss."  *Grund v. Delaware Charter Guarantee & Tr. Co.*, 788 F. Supp. 2d 226, 244 (S.D.N.Y. 2011).

As conversion claims are conduct-regulating causes of action, *Backus*, 2017 WL 3600430, at *13, Plaintiffs' conversion claims are subject to the law of the state in which the tort occurred.  Given that Plaintiffs resided in South Carolina at the time the penalty was imposed by Dolphin Direct on their final distribution, the locus of their economic loss was South Carolina, which is where the tort can thus be deemed to have occurred.  *See id*. (applying the law of the state where plaintiff resided to conversion claims).  Therefore, the Court will apply South Carolina law to Plaintiffs' conversion claim.

Under South Carolina law, "[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of the condition or the exclusion of the owner's rights."  *Coll. of Charleston Found. v. Ham*, 585 F. Supp. 2d 737, 746 (D.S.C. 2008) (quoting *Crane v. Citicorp Nat'l Servs., Inc.*, 313 S.C. 70, 73 (1993)).  South Carolina courts have held that "[m]oney may be the subject of conversion when it is capable of being identified[,] and there may be conversion of determinate sums even though the specific coins and bills are not identified."  *Moore v. Weinberg*, 383 S.C. 583, 589 (2009). While a plaintiff will not prevail on a conversion claim where the defendant's use of the at-issue funds did not constitute an "unauthorized taking," *see Brannon v. Palmetto Bank*, 371 S.C. 357, 364 (S.C. Ct. App. 2006), a plaintiff will prevail where the defendant's use of the funds was unauthorized, based on the terms of an agreement between the parties, *see Mullis v. Trident*

87

*Emergency Physicians*, 351 S.C. 503, 505 (S.C. Ct. App. 2002) (upholding judgment for plaintiff on his conversion claim where defendant withheld a greater amount from plaintiff's salary than was authorized under the parties' agreement).

Dolphin Direct's imposition of a penalty in connection with the liquidation of Plaintiffs' capital account – be it a 3% penalty, as testified to by Peter (Tr., at 335:9-10), or a 4.4% penalty, as reflected by the documentation of the amount withheld from Plaintiffs' remaining balance (*see* Pl. Ex. 1, Tabs L & M; *see also* Pl. Proposed Findings ¶¶ 169-70) – was not authorized by the Dolphin Direct Partnership Agreement, and thus constitutes a conversion of the withheld funds. As set out above, the Partnership Agreement provided that, in the event a limited partner were to request the withdrawal of its investment, Dolphin Direct would distribute that partner's capital account while imposing (and retaining) a 15% penalty on that distribution. (Pl. Ex. 4, Tab A, at 10, § 3.3(a).) The Partnership Agreement explicitly provided that this arrangement would be triggered by the limited partner's "request in writing" (*id.*), but it did not provide that *any* penalty would be imposed in the event the partner's capital account were cashed out involuntarily, based on the unilateral determination of the fund's management. The $642.86 that was retained by Dolphin Direct when it liquidated Plaintiffs' capital account was therefore an unauthorized penalty. Given that this amount may be fairly understood to be a "determinative sum," *see Mullis*, 351 S.C. at 503 ("The fact that the partnership commingled the money does not change its nature as a determinative sum."), the Court concludes that Dolphin Direct's retention of that amount constituted conversion. Dolphin Direct is therefore liable to Plaintiffs for conversion, in the amount of $642.86.

**b.      Dolphin Advisors Breached Its**
**<u>Fiduciary Duty by Effecting the Conversion.</u>**

Under New York's Partnership Law, a general partner is responsible for the debts of the

partnership.  *See* N.Y. P'ship Law §§ 26, 98; *see also Qualis Care, L.P. v. Hall*, No. 95cv4955

(BSJ), 1999 WL 683564, at *7 n.5 (S.D.N.Y. Sept. 1, 1999) (holding general partner liable for

"all damages relating to [limited partnership's] breach of fiduciary duty" in accordance with

New York's Partnership Law).  As Dolphin Advisors was a general partner of Dolphin Direct

(*see* Pl. Ex. 4, Tab A, at 2, § 2.1 (identifying Dolphin Advisors as a general partner)), Dolphin

Advisors is jointly and severally liable, by operation of law, for any judgment against Dolphin

Direct on Plaintiffs' conversion claim, *see Qualis Care*, 1999 WL 683564, at *7 n.5.[39]

In any event, Dolphin Advisors is liable for breaching its fiduciary duties with respect to

the conversion of Plaintiffs' money.[40]  In accordance with Dolphin Direct's organizational

documents, Dolphin Advisors, as the managing partner of Dolphin Direct, would have

effectuated the imposition of the penalty on the liquidation of Plaintiffs' capital account.  (*See*

Pl. Ex. 4, Tab A, at 2, § 2.1 (providing that Dolphin Advisors "shall have exclusive control of the

business of [Dolphin Direct]").)  Further, Dolphin Advisors stood to gain directly from the

conversion, as, according to Peter, the unauthorized penalty charge, once deducted from

Plaintiffs' account, was allocated to the remaining partners in the fund.  (*See* Tr., at 335:22-

---

[39] In their post-trial submissions, Plaintiffs request that the Court also hold "Dolphin Management, as general partner" of Dolphin Direct, jointly and severally liable for the amount recoverable from Dolphin Direct on the conversion claim.  (Pl. Proposed Conclusions ¶ 135.) Plaintiffs are presumably referring here to DMSI, given that, at the time of the conversion, DMI was no longer in existence.  For the reasons stated above, however, the Court declines to enter any judgment at this time against DMSI, which remains a non-party to this action.

[40] Although South Carolina law applies to Plaintiffs' conversion claim against Dolphin Direct, the Court continues to apply New York law, pursuant to the state's internal affairs doctrine, to claims against Dolphin Advisors for breaching its fiduciary duties, and against Peter for aiding and abetting those breaches.

336:1.)  The act of conversion thus constituted a breach of Dolphin Advisors' fiduciary duty of loyalty to Plaintiffs.  *See, e.g.*, *Miltland Raleigh-Durham v. Myers*, 807 F. Supp. 1025, 1059 (S.D.N.Y. 1992) (finding that general partner's taking of funds from limited partnerships as purported fees, without the consent of the limited partners, constituted a breach of its fiduciary duties).

For these reasons, and because Plaintiffs have established that the amount of their loss (*i.e.*, the unauthorized charge) was proximately caused by Dolphin Advisors' breach of fiduciary duty, the Court concludes that Dolphin Advisors is jointly and severally liable, with Dolphin Direct, for the amount of the converted penalty charge.

### c.        Peter Aided and Abetted Dolphin Advisors' Breach.

Plaintiffs also seek to hold Peter liable for the conversion, contending he aided and abetted Dolphin Advisors' breach of its duty of loyalty.   Under New York law, to prevail on a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must demonstrate "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach."  *In re Stillwater Capital Partners Inc. Litig.*, 851 F. Supp. 2d 556, 570 (S.D.N.Y. 2012) (quoting *Kaufman*, 307 A.D.2d at 125).  With respect to the second element, while the plaintiff is not required to demonstrate that the defendant "had an intent to harm," the plaintiff must show that the "defendant had *actual knowledge* of the breach of duty."  *Krys v. Butt*, 486 F. App'x 153, 157 (2d Cir. 2012) (Summary Order) (emphasis in original) (quoting *Kaufman*, 307 A.D.2d at 125). In the limited partnership context, courts have recognized that limited partners may bring aiding-and-abetting claims against officers of the general partner that is responsible for the partnership's management.  *See, e.g.*, *Zaccaro v. Shah*, 746 F. Supp. 2d 508, 524-26 (S.D.N.Y. 2010)

(permitting limited partner's breach-of-fiduciary claim against president of general partner, for aiding and abetting general partner's breach of fiduciary duty to limited partner, to survive summary judgment); *JFK Family Ltd. P'ship v. Millbrae Nat. Gas Dev. Fund 2005, L.P.*, 21 Misc. 3d 1102(A) (Sup. Ct., Westchester Cty. Sept. 16, 2008) (limited partner adequately pleaded claim against officers of general partner for aiding and abetting general partner's breaches of fiduciary duty).

Given the Court's conclusion that Dolphin Advisors breached its duty of loyalty to Plaintiffs, and that Plaintiffs were injured thereby, the only element at issue with respect to an aiding-and-abetting claim against Peter, is whether Peter "knowingly induced or participated in the breach."  *See In re Stillwater Capital Partners Inc. Litig.*, 851 F. Supp. 2d at 570.  Based on his own testimony at trial, Peter was the one who made the decision to charge the penalty in question (*see* Tr., at 334:25-335:10, 367:6-8), and, further, he particularly stood to benefit from Plaintiffs' loss, as DMSI, at the time, owed an approximately 90% interest in the partnership (*id.*, at 336:2-5), and Peter was the sole owner of DMSI (*see* Pl. Ex. 3).  In light of Peter's acknowledged role in personally directing the conversion of Plaintiffs' money, the Court concludes that Peter "knowingly induced or participated" in Dolphin Advisors' breach of the duty of loyalty and therefore aided and abetted that breach.  *See In re Stillwater Capital Partners Inc. Litig.*, 851 F. Supp. 2d at 570.

The Court therefore concludes that Peter should also be held jointly and severally liable – with Dolphin Direct and Dolphin Advisors – for the amount of the unlawfully charged penalty.

### D.    Plaintiffs' Promoter's Liability Claim

Plaintiffs also seek to add to their Complaint a new claim against Peter, DMI, and Dolphin Advisors for "promoter's liability," which Plaintiffs describe as "akin to a breach of

fiduciary [duty] cause of action," based on the breach of duties owed by a "promoter" of a new venture to the prospective investors in that venture.  (Pl. Proposed Conclusions ¶ 136.)  The proposed claim is specifically premised on Plaintiffs' allegation that "[DMI] manipulated a deal by which Dolphin Offshore supplied Dolphin Advisors with securities that [were] to be used as Dolphin Advisors['s] equitable contribution in Dolphin Direct" (*id.* ¶ 142), and that those securities were sold to Dolphin Direct at "a profit rather than invested at cost basis," such that "Dolphin Entities made a gain of at least $1,310,440" (*id.* ¶¶ 142-43).[41]  The Court concludes that Plaintiffs do not have standing to bring this claim.

As discussed above, in order for Plaintiffs to establish that they have standing to bring a claim, they must demonstrate that they suffered an injury in a "personal and individual way," *Lujan*, 504 U.S. at 561 n.1, that is "independent of any injury to the partnership itself," *DNV Inv. P'ship*, 2016 WL 1071032, at *2.  Plaintiffs' promoter's liability claim is premised on allegations that Dolphin Advisors and Dolphin Management engaged in a transaction concerning "securities that they provided to *Dolphin Direct*" (Pl. Proposed Conclusions ¶ 141), and that "secret profits [were made] from *Dolphin Direct*" (*id.* ¶ 148).  Plaintiffs did not establish at trial that securities were sold to them individually, or that any profit was made from funds taken disproportionately from their own capital account in Dolphin Direct, as apart from Dolphin Direct's general funds.  The only entity that would have standing to bring this type of claim is

---

[41] At trial, Peter was briefly questioned by Plaintiffs' counsel regarding a theory that, shortly after Dolphin Direct's formation, Peter had arranged for Dolphin Offshore to sell certain securities to Dolphin Direct indirectly, through Dolphin Advisors, and that Dolphin Offshore had earned profits on those sales.  (*See* Tr., at 278:20-282:16.)  Peter's testimony, and the document that Plaintiffs assert is relevant to that theory (*see* Pl. Ex. 29, at 87048), are too unclear to support any factual finding in Plaintiffs' favor on this issue.  In any event, given the Court's conclusion that Plaintiffs do not have standing to bring a claim premised on these allegations, it is not necessary that the Court make any such findings.

Dolphin Direct, and indeed, the only relevant case cited by Plaintiffs in support of this claim involved a claim asserted on behalf of a corporation (*i.e.*, brought as a derivative action) against its promoter, and not directly by its individual stockholders.  (Pl. Proposed Findings ¶ 139 (citing *Gladstone v. Bennett*, 153 A.2d 577, 579 (1959)).  Accordingly, based on the allegations on which they would rest this claim, Plaintiffs have not established that they suffered any particularized injury independent from the partnership, and the Court concludes that they do not have standing to bring their promoter's liability claim.

>        E.        <u>Plaintiffs' Claims for Equitable Relief</u>

In addition to their claims for damages, Plaintiffs have asserted three claims for equitable relief, including claims for piercing the corporate veil (Compl. (Count III), an accounting (Compl. (Count IV)), and equitable subordination (*id.* (Count V)).  In their post-trial submissions, Plaintiffs also assert, for the first time, a claim for the recharacterization of debt. (*See* Pl. Proposed Conclusions ¶¶ 181-93.)  Plaintiffs are entitled to none of the equitable relief sought.

First, as to piercing the corporate veil, Plaintiffs contend that, to the extent any of the corporate defendants are found liable on any claim for money damages, the corporate veil should be pierced so as to find Peter liable as well.  (*See* Pl. Proposed Conclusions ¶¶ 164-75.)  In light of the Court's conclusions, above, that Plaintiffs have not proven any of their fraud or breach-of-fiduciary-duty claims against any Dolphin entity (except for the single conversion-related breach-of-duty claim against Dolphin Advisors, on which Peter has, in any event, been found jointly and severally liable for aiding and abetting the wrongful conduct), there is no reason for the Court to examine whether the criteria for piercing the corporate veil would be satisfied.

Second, Plaintiffs are not entitled to an accounting, for essentially the same reasons. New York recognizes a right to an accounting that is "premised upon the existence of a

confidential or fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest." *Dee v. Rakower*, 112 A.D.3d 204, 214 (2013) (quoting *Lawrence v Kennedy*, 95 A.D.3d 955, 958 (2012)).  Here, Plaintiffs seek an accounting for several discrete purposes, including, *inter alia*, to determine the amount by which DMI and DMSI profited from charging Dolphin Direct interest on loans; the amount that DMI, DMSI, and Dolphin Advisors may have earned in management fees; the extent to which any Dolphin entities profited by selling securities to Dolphin Direct; and the amount of Plaintiffs' financial stake in Dolphin Direct prior to their capital account being involuntarily liquidated.  (Pl. Proposed Conclusions ¶¶ 157-61.)  The overall purpose of the requested accounting, though, would be to determine the amounts that Plaintiffs claim to be owed in compensatory damages on their fraud and breach-of-fiduciary-duty claims.  As Plaintiffs have not proven those underlying claims (except for the single conversion-related claim, as to which damages are readily calculable), no accounting is necessary.

Finally, as for their claims for recharacterization of debt or equitable subordination, Plaintiffs contend that because DMI and/or DMSI purportedly violated fiduciary duties in extending loans to Dolphin Direct, the debt incurred by Dolphin Direct should either be recharacterized as equity advanced by DMI or DMSI (*i.e.*, the recharacterization claim) (*see* Pl. Proposed Conclusions ¶¶ 181-93), or be "subordinated to the legitimate claims of the limited partners who suffered injury . . ." (*i.e.*, the equitable subordination claim) (*id.* ¶¶ 194-96).

Recharacterization and equitable subordination are both remedies "grounded in bankruptcy courts' equitable authority to ensure 'that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.'"  *In re SubMicron Sys. Corp.*, 432 F.3d 448, 454 (3d Cir. 2006) (quoting *Pepper v. Litton*, 308 U.S. 295, 305

(1939)).  Recharacterization is used when equity requires that a sum otherwise accounted for as debt be treated instead as equity capital, *id*., at 454-55, and equitable subordination is used when "equity demands that the payment priority of claims of an otherwise legitimate creditor be changed to fall behind those of other claimants," *id.*

The parties dispute whether these claims may be properly brought before a district court (*see* Def. Proposed Findings ¶¶ 208-10; Pl. Resp. ¶ 210), and Defendants rely on several decisions from the Second Circuit that strongly suggest that such claims are limited to the province of federal bankruptcy courts, *see All. Shippers Inc. v. Garcia*, 669 F. App'x 11, 12 (2d Cir. 2016) (Summary Order) (upholding dismissal of "plaintiff's recharacterization and equitable subordination claims as bankruptcy claims that are not properly before a district court"); *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995) ("Equitable subordination is distinctly a power of federal bankruptcy courts, as courts of equity, to subordinate the claims of one creditor to those of others.").

This Court, however, need not reach the question of whether such claims are properly before it, given that, for the same reason that Plaintiffs lack standing to bring a breach-of-fiduciary-duty claim based on the fact that DMI (or DMSI) made any loan to Dolphin Direct or charged it interest on that loan (*see* Discussion, *supra*, at Section II(B)(2)(a)), Plaintiffs also lack standing to bring a claim seeking to recharacterize or subordinate that debt.  As discussed above, the evidence at trial established that the relevant debt was incurred by Dolphin Direct, and that Dolphin Direct serviced that debt as an expense of the partnership.  Thus, Plaintiffs, as apart from the partnership as a whole, did not suffer any particularized injury in connection with the debt incurred by Dolphin Direct, and, accordingly, Plaintiffs lack standing to seek the recharacterization or subordination of that debt.

Defendants are therefore entitled to judgment in their favor on all of Plaintiffs' claims for equitable relief.

### III.    AMOUNTS TO BE AWARDED TO PLAINTIFFS

#### A.    Damages

For the reasons stated above, the Court concludes that Dolphin Direct, Dolphin Advisors, and Peter are jointly and severally liable for compensatory damages of $642.86, representing the amount of the unlawful penalty that was charged to Plaintiffs by Dolphin Direct upon the involuntary liquidation of Plaintiffs' capital account.  This amount was the subject of conversion by Dolphin Direct, and it also represents a loss proximately caused by Dolphin Advisors' and Peter's breach of fiduciary duty in allowing or directing this charge to be imposed.

The Court further concludes that, despite their request (*see* Pl. Proposed Conclusions ¶ 84), Plaintiffs are not entitled to punitive damages in this case.  In New York, in order to demonstrate entitlement to punitive damages, the plaintiff must demonstrate, by clear and convincing evidence, that the defendant exhibited "conduct having a high degree of moral culpability which manifests a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard."  *FMS Bonds, Inc. v. Bank of New York Mellon*, No. 15cv9375 (ER), 2016 WL 4059155, at *16 (S.D.N.Y. July 28, 2016) (citation omitted).  While the Court has found that Dolphin Advisors and Peter caused Dolphin Direct to withhold some of Plaintiffs' money, in violation of the Partnership Agreement, the amount withheld was fairly modest, and the Court has further found that Plaintiffs failed to prove any of their other, more substantial claims.  Under the circumstances, Plaintiffs have not certainly demonstrated that any of the Defendants acted with the high level of moral culpability necessary to render an award of punitive damages appropriate.

B.    <u>Prejudgment Interest</u>

Plaintiffs are entitled to prejudgment interest on the damages to be awarded on both their

conversion and related breach-of-fiduciary-duty claims.  With respect to the conversion claim,

South Carolina law (which, as noted above, is applicable to that claim) entitles a prevailing

plaintiff to prejudgment interest at a statutory rate of 8.75% per annum.  *Antonelli v. Mahoney*,

No. 9:08-2949, 2009 WL 10677612, at *2 (D.S.C. Jan. 21, 2009) (awarding prejudgment interest

for plaintiffs' conversion claims, calculated from the date of the conversion of funds); *see*

S.C. Code Ann. § 34-31-20 (providing that the statutory interest rate is 8.75%).  With respect to

the breach-of-fiduciary-duty claims, New York law (which, as noted above, is applicable to those

claims), also entitles a prevailing plaintiff to prejudgment interest, although at a statutory rate of

9% per annum.  *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*,

No. 08cv4810 (THK), 2011 WL 13263368, at *4 (S.D.N.Y. Dec. 7, 2011) ("Courts customarily

award prejudgment interest for breaches of fiduciary duty."); *see* N.Y. C.P.L.R. 5004 (providing

that the statutory interest rate is nine percent).

Therefore, on the amount that was converted from Plaintiffs' capital account, Plaintiffs

are entitled, as against Dolphin Direct, to prejudgment interest at the rate set by South Carolina

law (8.75%), calculated from December 31, 2013[42] – the point in which Plaintiffs funds were

converted – to the date of entry of Judgment.  As against Dolphin Advisors and Peter, Plaintiffs

are entitled to prejudgment interest at the rate set by New York law (9%), also calculated from

December 31, 2013.

---

[42] As noted above, the parties did not present any evidence of the specific date in December 2013 in which Plaintiffs received the Update Letter enclosing the check constituting the liquidation of their capital account.  (*See supra*, at n.20).  Therefore, in the absence of any evidence as to the precise date that month in which Plaintiffs' funds were converted, the Court deems those funds to have been converted on the last day of December 2013.

### C.     <u>Plaintiffs Are Not Entitled to an Award of Attorneys' Fees.</u>

Plaintiffs also seek an award of attorneys' fees in this case. (*See* Pl. Proposed Conclusions ¶¶ 63-66.)

"Under the general rule in New York, attorneys' fees are the ordinary incidents of litigation and may not be awarded to the prevailing party unless authorized by agreement between the parties, statute, or court rule." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003). Thus, in the absence of any agreement between the parties permitting Plaintiffs' recovery of attorneys' fees from Dolphin Direct, Dolphin Advisors, or Peter, and given that Plaintiffs' point to no statute or court rule authorizing it, Plaintiffs are not entitled to recover attorneys' fees from these defendants. *See Congel v. Malfitano*, 31 N.Y.3d 272, 290 (2018) (holding that, where partnership agreement did not authorize recovery of attorneys' fees, an award of such fees to partner who had prevailed on breach-of-contract and breach-of-fiduciary-duty claims against other partners "would be to contradict New York's well-established adoption of the American Rule that the prevailing litigant ordinarily cannot collect . . . attorneys' fees from its unsuccessful opponents" (internal quotation marks and citation omitted)); *cf. Regan v. Conway*, 768 F. Supp. 2d 412, 415 (E.D.N.Y. 2011) (acknowledging "general rule [] that each party bears his or own attorneys['] fees," but awarding recovery of attorneys' fees to party prevailing on breach-of-fiduciary-duty claim, in light of agreement between parties permitting recovery of fees).

## <u>CONCLUSION</u>

Based on the trial record, and for the reasons stated herein, the Court concludes that:

1.     Plaintiffs are entitled to judgment in their favor in the amount of $642.86, jointly and severally, as against:

a.   defendant Dolphin Direct Equity Partners, LP, for conversion,

b.   defendant Dolphin Advisors, LLC, for breach of fiduciary duty for allowing or directing the conversion, and

c.   defendant Peter Salas, for aiding and abetting that breach of fiduciary duty;

2.   Plaintiffs are further entitled to recover prejudgment interest on the amount set out above, which interest shall also be jointly and severally recoverable from the specified defendants, but only up to the amounts calculated by the application of the following interest rates:

a.   the rate of 8.75% per annum, as to the judgment imposed against defendant Dolphin Direct Equity Partners, LP, and

b.   the rate of 9% per annum, as to the judgment imposed against defendants Dolphin Advisors, LLC, and Peter Salas,

with such interest to be calculated by the Clerk of Court from December 31, 2013 to the date of entry of judgment;

3.   In all other respects, Defendants are entitled to judgment in their favor, and, except as set forth above, Plaintiffs' claims, as pleaded in this action, are dismissed; and

4.   Plaintiffs' request that the Complaint be deemed amended to add claims not originally pleaded and to join Dolphin Mgmt. Services, Inc. as an additional defendant is denied.

Settle Judgment.

Dated: New York, New York
       August 27, 2019

SO ORDERED

_Debra Freeman_

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

All Counsel (via ECF)